IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTAURO LIQUID OPPORTUNITIES MASTER FUND, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>ALESSANDRO BAZZONI, CINQUE TERRE FINANCIAL GROUP, LTD., CT ENERGIA LTD., CT ENERGIA HOLDING, LTD., CT ENERGY HOLDING SRL, and CTVEN INVESTMENTS SRL,<br><br>Defendants. | **15 CV 9003**<br>Case No.<br><br>**COMPLAINT** |

Plaintiff Centauro Liquid Opportunities Master Fund, L.P. ("Centauro"), by and through its undersigned attorneys, alleges as follows for its Complaint against Defendants Alessandro Bazzoni, Cinque Terre Financial Group, Ltd. ("CTFG"), CT Energia, Ltd. ("CT Energia"), CT Energia Holding, Ltd. ("CT Energia Holding"), CT Energy Holding SRL ("CT Energy"), and CTVEN Investments SRL ("CTVEN") (collectively "Defendants"):

## NATURE OF THE ACTION

1.     This is an action to recover more than $20 million dollars owed to Centauro by Defendants, pursuant to the unambiguous terms of a valid contract. Defendant Alessandro Bazzoni has used a web of companies that he controls to orchestrate a complex fraud against Centauro and to avoid repayment of funds owed to Centauro based on the clear contract terms. In May 2015, after misappropriating millions of dollars belonging to Centauro, Defendants CTFG and CT Energia – two of the companies controlled by Bazzoni – issued to Centauro a Promissory Note in the amount of $21,092,213.00. This Promissory Note was signed by Bazzoni. The

1

Promissory Note required Defendants to pay the $21,092,213.00 owed in a series of installments. Defendants defaulted on the Promissory Note almost immediately. After the default, Centauro demanded immediate payment. To date, Defendants have failed to pay Centauro any portion of the funds owed under the Promissory Note. During the very month Defendants defaulted on the Promissory Note, one of Bazzoni's other companies invested over $32 million in an unrelated business venture.

2.      Prior to Defendants' default, Centauro and CTFG were engaged in a joint venture in which Centauro raised funds for oil transactions that CTFG executed. Bazzoni lied to Centauro's principals, Yvonne Morabito and Ron Dagar, about his background, his experience, and CTFG's finances. CTFG also misrepresented details about its banking in order to divert Centauro's funds. Centauro therefore brings claims against Defendants for breach of contract, fraud, and unjust enrichment.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is an action between citizens of the United States and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000.

4.      CTFG and CT Energia have consented to personal jurisdiction in the Southern District of New York.

5.      Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §§ 1391(a) and 1391(c), because a substantial part of the events and omissions giving rise to the claim occurred in this district.

2

## THE PARTIES

### Centauro Liquid Opportunities Master Fund, L.P.

6.      Plaintiff Centauro Liquid Opportunities Master Fund, L.P. ("Centauro") is a limited partnership formed under the laws of the Cayman Islands. Centauro's principal place of business is 641 Lexington Avenue, New York, New York 10022. Yvonne Morabito, a citizen of New York State, is the sole general partner of Centauro. Centauro's limited partners include: (i) Centauro Liquid Opportunities Fund (U.S.) L.P., a Delaware partnership; (ii) Centauro Liquid Opportunities Fund Offshore, L.P., which is regulated under the laws of the Cayman Islands; and (iii) Centauro Liquid Opportunities G.P. LLC, a Delaware limited liability company, (collectively the "Feeder Funds"). The investors in the Feeder Funds are limited partners of those funds. None of the investors and none of the partners of Centauro are citizens of Italy, Malta, or the British Virgin Islands, and none of them are domiciled in these locations.

### Cinque Terre Financial Group, Ltd.

7.      Defendant Cinque Terre Financial Group, Ltd. ("CTFG") is a limited liability company formed and existing under the laws of the British Virgin Islands. CTFG's principal place of business is Baarerstrasse 135, 1st Floor, 6301 Zug, Switzerland, and its primary offices are located at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands. CTFG is wholly owned by Defendant Alessandro Bazzoni. CTFG is a trading company that purports to provide the expertise and contacts necessary to execute oil transactions in energy markets.

### CT Energia, Ltd.

8.      Defendant CT Energia, Ltd. ("CT Energia") is a British Virgin Islands corporation with its primary offices at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands. CT Energia purports to operate in 23 countries and hold full licenses for import, export,

wholesale, and retail services in the oil market trading crude oil and refined petroleum products in energy markets throughout the world. Bazzoni serves as President and CEO of CT Energia.

CT Energy Holding SRL

9.      Defendant CT Energy Holding SRL ("CT Energy") is a Venezuelan-Italian consortium organized as a Barbados Society. CT Energy is owned and controlled by Bazzoni and his business partners. Bazzoni owns 35% of CT Energy together with another business partner through a holding company, CTVEN Investments SRL.

10.     CT Energy is sued in its capacity as an alter ego of and as controlled by Defendants Bazzoni, CTFG, and CT Energia and as such, is liable to the same extent as the other Defendants.

CT Energia Holding, Ltd.

11.     Defendant CT Energia Holding, Ltd. ("CT Energia Holding") is a company organized under the laws of Malta that is controlled by affiliates of CT Energy. Alessandro Bazzoni is the Chief Executive Officer of CT Energia Holding.

12.     CT Energia Holding is sued in its capacity as an alter ego of and as controlled by Defendants Bazzoni, CTFG, CT Energia, and CT Energy, and as such, is liable to the same extent as the other Defendants.

CTVEN Investments SRL

13.     Defendant CTVEN Investments SRL ("CTVEN") is a Barbados Society with restricted liability. The principal purpose of CTVEN is to be a member of CT Energy. Bazzoni and his business partner are the controlling persons of CTVEN.

14.     CTVEN is sued in its capacity as an alter ego of and as controlled by Defendants Bazzoni, CTFG, CT Energia and CT Energy, and CT Energia Holding, and as such, is liable to the same extent as the other Defendants.

4

Alessandro Bazzoni

15.     Defendant Alessandro Bazzoni is a citizen of Italy. As explained above, Bazzoni is the founder, partner, member and/or CEO of Defendants CTFG, CT Energia, and CT Energia Holding, and is an investor, owner, and/or partner in Defendant CT Energy and CTVEN. As an investor, owner, or partner in the Defendant-entities, Bazzoni dominated or controlled these entities and abused that privilege in order to execute his fraudulent schemes. Centauro is entitled to recover from any assets in which Bazzoni has an interest, and he is therefore sued in his personal capacity.

## BACKGROUND

### The Formation of Centauro and the Joint Venture

16.     In or about December 2008, Ronald Dagar and Yvonne Morabito met Alessandro Bazzoni. Prior to that point, Morabito and Dagar had been working together on a series of investment projects.

17.     Bazzoni told Morabito and Dagar that he was the founder and sole owner of CTFG. He further claimed that CTFG provided trading and logistics for international oil transactions. Bazzoni claimed that he personally financed all of CTFG's prior deals and secured bank financing for the balance of the necessary capital. He described CTFG as a highly profitable operation.

18.     Soon after the initial meeting, Bazzoni proposed the creation of a joint business venture in which his company, CTFG, would purchase oil at wholesale price and sell it to end users at retail price. Morabito and Dagar in turn would form an investment fund to provide the capital necessary to purchase the oil at wholesale price. CTFG agreed to provide the contacts, technical expertise, and labor required to purchase, sell, and transport the oil from the wholesale seller to the retail buyer. CTFG and the planned investment fund would each take 50% of the

5

profits from all transactions that Centauro approved and funded. At the conclusion of each transaction, at the investment fund's discretion, CTFG would either return the investment fund's capital, or redeploy it in a future transaction.

19.     In 2009, Morabito and Dagar formed Centauro, an investment fund to raise capital for use in oil transactions executed by CTFG. From its inception, Dagar and Morabito were both general partners of Centauro. Dagar passed away in July 2015, rendering Morabito the sole general partner.

20.     On September 14, 2009, Centauro and CTFG executed a Joint Venture Agreement ("JVA"), attached hereto as **Exhibit A**. Pursuant to the JVA, CTFG would identify a potential oil transaction for the joint venture and propose it to Centauro for approval. The proposal would take the form of a deal summary which included the general terms and conditions of the proposed transaction, the legal names of the counterparties to the proposed transaction, and a good faith estimate of the full amount of deal costs and capital required. Ex. A, § 3.3.1(e).

21.     Pursuant to the terms of the JVA, CTFG was not permitted to pursue any oil transaction using Centauro's capital unless Centauro approved the deal summary. If Centauro approved and funded a certain transaction proposed by CTFG, CTFG had to use its "commercial best efforts" to execute the oil transaction in a manner consistent with the deal summary. Ex. A, § 3.4.2.

22.     At the conclusion of each transaction, CTFG was required to either return Centauro's initial investment or redeploy it in a future transaction, based on Centauro's instruction. Ex. A, § 2.3. CTFG was also required to return fifty percent of any profits from each transaction to Centauro. Ex. A, § 2.3.

23.     Centauro initiated its first transaction in October 2010 and conducted approximately one transaction per month, or 26 transactions total, through January 2012. By 2014, Centauro had invested millions of dollars with CTFG in various transactions that CTFG promised to execute in good faith.

## CTFG's Misappropriation of Centauro's Investment

24.     By April 2014, Centauro had not received returns on transactions which, based on CTFG's deal summaries, should have been completed by that point. CTFG had specifically represented that by this time period the transactions would be complete and that Centauro's funds would be returned. Nevertheless, by the spring of 2014, CTFG had failed to return Centauro's investment.

25.     When Centauro requested an explanation for the missing funds, CTFG provided a number of incoherent and unverifiable justifications for its failure to return Centauro's funds. CTFG also claimed that these transactions were still viable. CTFG claimed that it was being hampered by delays, and that Centauro would receive its expected profits as soon as the pending transactions were completed.

26.     In December 2014, Centauro requested that CTFG provide an accounting of all outstanding funds Centauro had invested and a timeframe for return of Centauro's capital. Centauro also informed CTFG that Centauro had elected to redeem $2.3 million of its investment. Centauro requested that this money be returned by January 1, 2015.

27.     In December 2014, CTFG advised Centauro that it could not return Centauro's money due to a variety of alleged intervening factors. Among other factors, CTFG cited delayed cargos, unexpected legal problems, and employment disputes.

7

28.     Bazzoni also claimed that all of Centauro's invested funds were tied up in pending transactions and thus Centauro's withdrawal request could not be honored until these transactions were completed.

29.     In January 2015, Centauro requested an update on the timeline for the return of its deal capital, including the $2.3 million withdrawal request. Bazzoni again claimed that due to delays in oil transactions and a potential fraud perpetrated on CTFG by a former CTFG employee, CTFG did not know when it would be able to return Centauro's capital.

## The Promissory Note

30.     By March 2015, CTFG owed Centauro over $21 million. CTFG again claimed that it was unable to return these funds to Centauro. CTFG represented that it could not make any payments to Centauro despite the fact that in November 2014, four months prior, CTFG represented to Centauro that CTFG had assets in the amount of $20,511,622 and equity in the amount of $15,969,239.

31.     CTFG therefore agreed to issue Centauro a Promissory Note, contractually agreeing to pay all of the funds it owed Centauro in monthly installments of $500,000. The Promissory Note, attached hereto as **Exhibit B**, and dated May 21, 2015, was for a sum due of $21,092,213.00, plus interest. It further specified that, in the event of default, "the full principal amount of this Note, together with all accrued but unpaid interest thereon, shall become, at [Centauro's] election, immediately due and payable in cash." Ex. B, § 4(c). On May 21, 2015, Bazzoni signed the Promissory Note on behalf of both CTFG and CT Energia.

32.     Pursuant to § 15 of the Promissory Note, the parties agreed that the Promissory Note would be governed by New York law and that all legal proceedings concerning its interpretation, enforcement and defense must be commenced in a state or federal court sitting in "the City of New York, Borough of Manhattan." Ex. B, § 15. The Promissory Note also provided

8

that CTFG and CT Energia would pay all attorneys' fees and costs associated with "any legal proceedings or other actions to collect under or to enforce this Note." Ex. B, § 8.

33. CTFG and CT Energia also consented to the jurisdiction of the federal courts sitting in New York City for the adjudication of any dispute related to the Promissory Note. Ex. B, § 15.

## Defendants' Breach of the Promissory Note

34. Almost immediately after executing the Promissory Note, defendants defaulted, missing their very first payment due under the terms of the contract.

35. After Defendants failed to make the first required installment payment, Morabito advised Defendants of their default, accelerated the Promissory Note, and demanded that Defendants pay the principal amount plus interest. To date, Defendants have failed to make any of the required installment payments due under the Promissory Note.

## Bazzoni's $32 Million Investment in the Same Month of the CTFG Default

36. By June 2015, Bazzoni had diverted, misused, or lost over $21 million of Centauro's invested funds.

37. Nevertheless, on June 19, 2015, Defendant CT Energy, a company controlled by Bazzoni, invested over $32 million in Harvest Natural Resources Inc. ("HNR"), a petroleum exploration and production company. HNR is incorporated in Delaware and its principal place of business is in Houston, Texas. HNR's primary operations are in Venezuela and Gabon.

38. On June 19, 2015, HNR executed a purchase agreement with CT Energy by which CT Energy purchased, among other things: (a) a non-convertible senior secured note for $25.225 million and (b) an immediately convertible senior secured note for $6.975 million. On

September 15, 2015, CT Energy elected to convert the principal amount of the convertible note, plus accrued and unpaid interest, into 8,667,597 shares of HNR's common stock.

39.    Through Defendant CTVEN, Bazzoni personally owns or controls at least 35% of CT Energy's equity interests – including 35% of the $25.225 million non-convertible senior secured note and of the 8,667,597 shares of common stock.

40.    On June 19, 2015, upon execution of the purchase and management agreements, HNR paid off a $1.3 million unsecured note to CT Energia Holding. Bazzoni is the CEO of CT Energia Holding. Thus, Bazzoni's actions, among other things, show that he lied about his access to the funds necessary to repay Centauro. On information and belief, Bazzoni did this in order to divert assets and block the return of the funds owed to Centauro.

### CTFG's Diversion of Centauro's Funds without Proper Authority

41.    Pursuant to the JVA, Centauro deposited deal capital for approved deals into a bank account in the name of the joint venture. The JVA required CTFG to establish and maintain such bank accounts "in good faith" on behalf of the joint venture. Ex. A, § 3.1.1.

42.    Once Centauro deposited these funds, CTFG transferred it to one of its bank accounts to use to purchase the oil from a wholesale vendor. Centauro and CTFG agreed upon a series of controls to ensure that Centauro's funds were deployed only in connection with a Centauro-approved deal. Specifically, Centauro and CTFG agreed that Centauro's principals would have full transparency into CTFG's bank accounts. Through Dagar and Morabito, Centauro was also supposed to have joint signatory authority over the transfer of any of Centauro's funds from the CTFG account. This control was designed to ensure that neither Bazzoni nor CTFG could independently authorize the deployment of funds provided by

Centauro. Centauro and CTFG also agreed that Centauro would receive notification if this signatory authority ever changed.

43.    Despite Bazzoni's and CTFG's representations, these controls were not implemented. In March 2014, Dagar and Morabito learned that neither of them had been designated as authorized users for one of the bank accounts used to house the capital for the joint venture. Thus Bazzoni and CTFG could authorize the transfer of funds from the joint venture's bank account to CTFG's bank account without approval from or knowledge of either Dagar or Morabito. Dagar and Morabito also learned that they could not view the joint venture's bank accounts online in order to monitor the account balance.

44.    Upon learning this information, Morabito and Dagar immediately demanded that CTFG implement the controls previously agreed upon. They continued to make these demands to CTFG through December 2014.

## CTFG's False Claims That It Had Been Defrauded

45.    Before agreeing to enter into the Promissory Note, CTFG and Bazzoni misrepresented to Centauro the reason that CTFG could not return Centauro's capital.

46.    After repeated demands in early 2015 for the return of Centauro's funds, Bazzoni informed Centauro that he could not return Centauro's capital because CTFG had allegedly been the victim of a major fraud. Bazzoni claimed that the fraud had been perpetrated by a former employee of CTFG. In sum, Bazzoni claimed that the former employee had used his connections with the Panamanian government to orchestrate the seizure of oil that had been purchased by CTFG. He further claimed that this situation had triggered the seizure of funds in CTFG's bank accounts. When Centauro pressed Bazzoni to provide documentation to support these claims, he

11

refused. On information and belief, Bazzoni fabricated this incident in order to conceal his misappropriation of Centauro's investments.

### KPMG's Failed Attempt to Confirm CTFG's Claims of Fraud

47.     In December 2014, the joint venture's auditor, KPMG, requested additional information from CTFG regarding certain deal transactions in order to complete the joint venture's 2013 audit. KPMG specifically requested confirmation letters from certain companies with which CTFG represented that it had done business. CTFG refused to provide confirmation letters for a number of these companies on the basis that these companies were supposedly associated with the former employee who purportedly defrauded CTFG. CTFG claimed that providing KPMG information about these companies would enable the former employee to continue the supposed fraud scheme, on the theory that these companies would provide false information to KPMG about CTFG.

48.     In response, KPMG requested that CTFG prove the validity of the transactions by other means. Specifically, KPMG requested bank statements for each transaction.

49.     CTFG refused to provide sufficient confirmation of the 2013 transactions. CTFG attempted to justify this refusal by reiterating its claims that providing this information to the auditors would further enable the alleged fraud perpetrated by the former CTFG employee.

50.     In January 2015, KPMG reported to CTFG that it could not identify any evidence corroborating CTFG's claim that it had been a victim of a major fraud perpetrated by its former employee.

### KPMG's Evaluation of Separate Fraud Allegations Against CTFG

51.     During its investigation, KPMG received an email informing KPMG that Panama Canal Oil and Bunker Terminal, S.A. ("PCOB") had been the victim of a fraud scheme

12

perpetrated by CTFG and that PCOB was contemplating criminal charges against CTFG.

52.     KPMG advised CTFG of these allegations. CTFG attributed them to a "miscommunication" and refused to provide KPMG with any additional information regarding the allegations advanced by the PCOB employee. As a result, KPMG was unable to confirm the purported fraud that CTFG claimed had occurred and was unable to provide a 2013 audit for the joint venture. KPMG was ultimately forced to withdraw as auditor.

### Bazzoni's Numerous Misrepresentations and Omissions

53.     Centauro has learned that, throughout its business dealings involving CTFG, Bazzoni and other CTFG personnel lied about numerous aspects of their backgrounds and CTFG's operations.

54.     Early in his interactions with Dagar and Morabito, Bazzoni claimed that he had extensive contacts and experience in the international oil industry. He claimed that he had used his family's vast personal wealth to enter the industry. He claimed he had used this wealth, in tandem with his friendships from boarding school, to orchestrate successful oil transactions throughout the world, including in Russia, Central America, and South America. Centauro later learned that these claims were false. Bazzoni's family did not possess great wealth. Moreover, Bazzoni lacked the type of deep experience in the international oil trading community that he claimed he possessed.

55.     Bazzoni also provided Morabito and Dagar with "deal documents" and contracts from oil transactions purportedly executed by Bazzoni and CTFG. The deal documents purported to show oil deals requiring between $3 and $5 million in capital investment for approximately $30 million in cargo. On information and belief, these documents were fabricated by Bazzoni and described transactions which were never successfully executed.

13

56.     Bazzoni also provided Morabito and Dagar with CTFG's 2009 financial statements showing that CTFG allegedly transacted approximately $1.6 billion in sales for 2009. Moreover, CTFG purported to have over $1 billion in total assets. These statements also showed that CTFG's purported gross profits were approximately $50 million. On information and belief, these figures were fabricated by Bazzoni and bore no relationship to the reality of CTFG's finances.

57.     The 2009 financial statements also represented that CTFG had offices in Russia and Malaysia and that CTFG had seven operating subsidiaries. At no point, however, in CTFG's business dealings with Centauro has CTFG provided any support for its claims of a truly international operation. Centauro is aware of no real staff in Russia or Malaysia and no real subsidiary operations of the type initially described by Bazzoni. On information and belief, CTFG's claims were false.

58.     The 2009 financial statements reported that CTFG "hedges substantially all of its inventory purchases through futures contracts and swap agreements. Hedges are executed when inventory is purchased and are identified with that specific inventory." After CTFG's default, however, CTFG was unable to identify any securities that could be liquidated in order to fulfill CTFG's obligations under the Promissory Note. On information and belief, CTFG did not deploy the type of hedging strategy it claimed it was utilizing.

59.     Before entering into the joint venture, Morabito and Dagar evaluated Bazzoni's proposal and conducted extensive due diligence on Bazzoni and CTFG, including meetings with critical CTFG employees. These employees purported to have extensive experience in the oil industry, including engineering and other work for some of the world's leading oil companies. On information and belief, CTFG misrepresented the experience of its employees.

14

## Alessandro Bazzoni and CTFG – Alter Egos

60.     On information and belief, Centauro alleges that there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendant Bazzoni and Defendants CTFG, CT Energia, CT Energia Holding, CT Energy, and CTVEN such that any individuality and separateness between these Defendants has ceased. Bazzoni has included in the name of each of his front companies either the words "Cinque Terre" or "CT," which is an abbreviation for "Cinque Terre." Bazzoni has claimed that the "Cinque Terre" name refers to his family's roots and ownership interests in property in the Cinque Terre region of Italy – a cluster of five villages on the Italian Riviera. All causes of action are alleged against Defendants CT Energia Holding, CT Energy, and CTVEN as they are liable as the alter egos of the remaining Defendants.

61.     On information and belief, Bazzoni engaged in a series of transactions intended to transfer assets from CTFG and CT Energia to other entities he controls, including CT Energia Holding and CT Energy. Bazzoni has, at all times, exercised control and dominion over CTFG, CT Energia, CT Energia Holding, CT Energy, and CTVEN, with a disregard for the separate legal status of these entities in an attempt to defraud Centauro and frustrate Centauro's ability to recover sums owed pursuant to contract.

62.     Publicly available documents, including HNR's Form 13-D filed June 19, 2015 illustrate the comingling of these entities. The Form 13-D reports that each: "of CTVEN and [an individual], as members of CT Energy Holding [SRL], may be deemed to be the beneficial owners of the securities beneficially owned by CT Energy Holding [SRL]. [Another individual] and Bazzoni, as controlling persons of CT Energy Holding [SRL] (together with [a third individual]) and of CTVEN, may be deemed to be the beneficial owner of the securities that are

15

deemed to be beneficially owned by CTVEN. Each of CTVEN and of [the other individuals] and Bazzoni disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein."

63.    As part of the HNR Purchase Agreement, HNR agreed to appoint CT Energia Holding to oversee the day to day operations of its Venezuelan operations. Under the accompanying Management Agreement, Bazzoni was appointed "Director and General Manager – Venezuelan Operations."

64.    The HNR Press Release announcing the agreement with CT Energia Holding was published on CT Energia's website. The HNR press release did not distinguish between CT Energia Holding and CT Energia nor did it explain or suggest that one entity invested the funds while a separate entity, CT Energia Holding, was responsible for the Management Agreement.

65.    Further comingling is evidenced in the HNR September 1, 2015 Form 10-Q, which states that "[o]n May 11, 2015, [HNR] borrowed $1.3 million from CT Energy to fund certain corporate expenses." However, upon execution of the Purchase Agreement on June 19, 2015, HNR paid the note off in favor of CT Energia Holding, not CT Energy. CT Energia Holding is "controlled by affiliates of CT Energy." Thus, money was borrowed from CT Energy repaid to CT Energia Holding.

66.    Adherence to the fiction of the existence of Defendants CTFG, CT Energia, CT Energia Holding, CT Energy, and CTVEN as separate entities from Bazzoni would enable him to abuse corporate privilege. Doing so would sanction fraud and promote injustice.

67.    On information and belief, Centauro alleges that CTFG, CT Energia, CT Energia Holding, CT Energy, and CTVEN have such a unity of interest and operations, including through Bazzoni's control, that these companies have no separate identities. Centauro further alleges that

16

if the acts of each company are treated as those of each entity alone, an inequitable result will follow.

68.     On information and belief, Centauro alleges that CTFG, CT Energia, CT Energia Holding, CT Energy, and CTVEN have transferred assets and revenues among and between themselves so as to defraud Centauro. CTFG, CT Energia, CT Energia Holding, CT Energy, and CTVEN are all largely owned or controlled by Bazzoni.

69.     These companies do not operate as separate entities, but rather as one, with separate corporate forms used to shield assets and other revenues in a manner to best suit their owner, Bazzoni. Moreover, CTFG, CT Energia, CT Energia Holding, CT Energy, and CTVEN are all alter egos of each other, in that they all share the same ownership, management, and primary business purpose in the same industry.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Breach of Contract for Default on Promissory Note
### Against All Defendants

70.     Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

71.     As described herein, the Promissory Note is a valid and binding contract between Centauro, and Defendants Bazzoni, CTFG and CT Energia.

72.     Centauro has fulfilled its obligations in full to Defendants under the Promissory Note.

73.     Defendants have breached the Promissory Note by failing to make the required monthly installment payments when such payments became due and owing, and by failing to pay

17

the entire principal balance of the Promissory Note, plus interest, whereupon it became due immediately when Centauro notified Defendants of their election to accelerate the contract, pursuant to § 4(c) of the Promissory Note.

74.     Centauro has suffered damages in the amount of $21,092,213.00, plus interest calculated pursuant to the terms of the Promissory Note, as a direct result of Defendants' breach of their obligations pursuant to the Promissory Note.

75.     As the result of this breach, Defendants are jointly and severally obligated to pay Centauro the principal sum due and owing under the Promissory Note, as well as all unpaid interest, late charges, attorneys' fees, and all other costs incurred by Centauro in the enforcement of its rights under the Promissory Note.

## SECOND CAUSE OF ACTION
### Breach of Contract for Failure to Distribute Revenue
### Against All Defendants

76.     Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

77.     Centauro has fulfilled its obligations in full to Defendants under the Promissory Note.

78.     Section 2(c) of the Promissory Note requires that all revenues generated from CTFG, CT Energia, or any of their affiliated entities, such as Defendants CT Energy, CT Energia Holding, and CTVEN are to be distributed back to CTFG and CT Energia.

79.     Defendants have breached § 2(c) of the Promissory Note in that Defendants Bazzoni, CTFG and CT Energia have generated revenues that, rather than distributing back to CTFG and CT Energia, the "Makers" under the Note, they have invested in a separate company,

18

Harvest Natural Resources, Inc. Bazzoni, CTFG and CT Energia have used Defendants CT Energia Holding, CT Energy, and CTVEN to circumvent § 2(c) of the Promissory Note.

80. Defendants have breached § 2(c) in that Defendants CT Energia Holding, CT Energy, and CTVEN are controlled by the "Makers" and have generated revenues that were not distributed back to the Makers.

81. CT Energia Holding received a $1.3 million payment from HNR which it did not provide to Centauro pursuant to the terms of the Promissory Note. Additionally, by failing to distribute proceeds from CT Energy's $7 million conversion of debt into HNR stock, CTFG and CT Energia breached the requirement in the contract that any affiliate's profits be used to service the Promissory Note.

82. All of these revenues should have been distributed back to CTFG and CT Energia and used to pay their obligations to Centauro pursuant to the terms of the Promissory Note.

83. Having accelerated the Promissory Note, Centauro is entitled to damages in the amount of $21,092,213.00, plus interest calculated pursuant to the terms of the Promissory Note, as a direct result of Defendants' breach of their obligations.

84. As the result of this breach, Defendants are jointly and severally obligated to pay Centauro $21,092,213.00, as well as all unpaid interest, late charges, attorneys' fees, and all other costs incurred by Centauro in the enforcement of its rights under the Promissory Note.

## THIRD CAUSE OF ACTION
### Common Law Fraud
### Against All Defendants

85. Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

86. In or about September 2009, Defendant Bazzoni falsely and fraudulently

19

represented to Centauro his background, credentials and connections in the oil industry.

87.    On numerous subsequent occasions, Defendant Bazzoni and CTFG falsely and fraudulently represented to Centauro: (a) that Centauro's principals had signatory control over the various bank accounts used by the joint venture; (b) that Bazzoni was not using Centauro's capital for unknown and unauthorized purposes; (c) the nature of Bazzoni's personal and professional background; and (d) the status of CTFG's liquidity.

88.    In early 2015, Defendant Bazzoni falsely and fraudulently represented to Centauro that he had "lost" over $20 million in joint venture capital and that he was unable to repay the lost capital immediately.

89.    Each of these representations was false. These representations were also material. Bazzoni knew them to be false. He made them with the intent to defraud and deceive Centauro and with the intent to induce Centauro to act in the manner herein alleged.

90.    Centauro, at the time each of these representations were made by Defendant Bazzoni and at the time Centauro took the actions herein described, was ignorant of the falsity of Bazzoni's representations and believed them to be true.

91.    In reliance on these representations, Centauro was induced to and did (a) form a joint venture with Defendants; (b) continue and maintain that joint venture; (c) provide Defendants with over $21 million in capital; and (d) execute a Promissory Note providing Defendants the opportunity to repay the "lost" funds over time, rather than demanding immediate payment. Had Centauro known the actual facts and the true intentions of Bazzoni, Centauro would not have taken these actions.

92.    Centauro's reliance on Defendants' representations was reasonable and justified, given, among other reasons, that Bazzoni provided, on information and belief, false

corroboration of his statements and given that Centauro's initial investigations in these matters did not uncover the fraud.

93.     As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Centauro has been injured and is entitled to damages in a sum to be proven at trial.

94.     In doing the acts herein alleged, Defendants' acts constituted oppression, fraud, and malice, and Centauro is entitled to punitive damages in a sum to be proven at trial.

## FOURTH CAUSE OF ACTION
### Fraudulent Inducement
### Against All Defendants

95.     Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

96.     On or about September 2009, Defendant Bazzoni falsely and fraudulently represented to Centauro his background, credentials and connections in the oil industry.

97.     On numerous occasions between 2010 and 2014, Defendant Bazzoni falsely and fraudulently represented to Centauro: (a) that Centauro's principals had signatory control over the various bank accounts used by the joint venture; (b) that Bazzoni was not using Centauro's capital for unknown and unauthorized purposes; (c) the nature of Bazzoni's personal and professional background; and (d) the status of CTFG's liquidity.

98.     On or about January 2015 Defendant Bazzoni falsely and fraudulently represented to Centauro that he had "lost" over $21 million in joint venture capital and that he was unable to repay the lost capital immediately.

99.     Each of these misrepresentations or omissions of material fact was made to induce Centauro to: (a) form the joint venture with Defendants; (b) continue and maintain that joint venture; (c) provide Defendant with over $21 million in invested capital; and (d) execute a

21

Promissory Note providing Defendants the opportunity to repay the misappropriated funds over time. Had Centauro known the actual facts and the true intentions of Bazzoni, Centauro would not have taken these actions.

100.   Defendant Bazzoni knew these representations to be false, or intentionally omitted material facts with the intent to defraud and deceive Centauro and to induce Centauro to act in the manner herein alleged.

101.   Centauro, at the time each of these representations were made by Defendant Bazzoni and at the time Centauro took the actions herein alleged, was ignorant of the falsity of Defendant's misrepresentations and believed them to be true.

102.   Centauro's reliance on Defendants' representations was reasonable and justified, given that the results of Centauro's own investigations in these matters did not initially uncover the fraud.

103.   As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Centauro has suffered injuries and is entitled to damages in a sum to be proven at trial.

104.   In doing the acts herein alleged, Defendants' acts constituted oppression, fraud, and malice, and Centauro is entitled to punitive damages in a sum to be proven at trial.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment
### Against All Defendants

105.   Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

106.   As alleged herein, Defendant Bazzoni misappropriated assets belonging to the joint venture and used them for Defendants CT Energia Holding, CT Energy, and CTVEN's benefit, in order to invest in HNR.

107. Accordingly, there is a direct relationship between Centauro and Defendants Bazzoni, CT Energia Holding, CT Energy, and CTVEN.

108. To permit Defendants CT Energia Holding, CT Energy, and CTVEN to retain the benefits of the Bazzoni-Centauro joint venture would undermine equity and good conscience.

109. As a direct result of Bazzoni's misappropriation, Defendants CT Energia Holding, CT Energy, and CTVEN have been unjustly enriched at Centauro's expense.

## SIXTH CAUSE OF ACTION
### Common Law Conversion
### Against All Defendants

110. Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

111. Centauro provided Defendants Bazzoni and CTFG with certain funds for use only in the parties' joint oil investment venture.

112. Defendants used Centauro's property—its capital provided in the joint venture— for purposes not authorized by Centauro, including: (1) Bazzoni's purchase of personal goods and real estate, including a multi-million dollar estate in Palm Beach, Florida, which Bazzoni has continued to improve to this date; (2) the financing of Defendant's unrelated and separate business ventures, including Bazzoni, CT Energia Holding, and CT Energy's purchase of an interest in HNR.

113. By these actions, Defendants have exercised an unauthorized dominion over Centauro's property and have altered the condition of Centauro's property, to the exclusion of Centauro's rights.

114. Defendants have refused to return Centauro's property on demand.

23

115.   Defendants CT Energia Holding, CT Energy, and CTVEN are liable for conversion as the alter egos of the remaining Defendants.

116.   Defendants' interference with Centauro's possession and use of their property has caused damage to Centauro.

## PRAYER FOR RELIEF

WHEREFORE, Centauro prays for relief as follows:

A.    Adjudge that Defendants are liable for each cause of action stated here;

B.    Adjudge that Defendants must pay to Centauro $21,092,213.00 owing under the Promissory Note as well as all interest that has accrued pursuant to the terms of the Promissory Note at the time judgment is entered;

C.    For compensatory damages in an amount according to proof;

D.    For punitive and exemplary damages in an amount according to proof;

E.    Enter an order of attachment filed herewith;

F.    Enter judgment against Defendants for the amount of damages that Centauro proves at trial;

G.    Enter a judgment awarding Centauro expenses, costs, and attorneys' fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure; and

H.    For such other and further relief as the Court deems just and proper.

Dated this 16th day of November 2015.

Respectfully submitted,

BOIES SCHILLER & FLEXNER LLP

By: _Donald L. Flexner_
Donald L. Flexner
Randall W. Jackson
BOIES SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
T. 212-446-2300