IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CENTAURO LIQUID OPPORTUNITIES
MASTER FUND, L.P.,

                          Plaintiff,

        vs.

ALESSANDRO BAZZONI, CINQUE TERRE
FINANCIAL GROUP, LTD., CT ENERGIA
LTD., and CT ENERGIA LTD. d/b/a
ELEMENTO LTD.,

                          Defendants.

Case No. 15-cv-9003 (LTS) (SN)

**AMENDED COMPLAINT**

Plaintiff Centauro Liquid Opportunities Master Fund, L.P. ("Centauro"), by and through

its undersigned attorneys, alleges as follows for its Amended Complaint against Defendants

Alessandro Bazzoni, Cinque Terre Financial Group, Ltd. ("CTFG"), CT Energia Ltd. ("CTEL"),

and CT Energia Ltd. d/b/a Elemento Ltd. ("CTEL Malta") (collectively "Defendants"):

**NATURE OF THE ACTION**

1.      This is an action to recover more than $20 million dollars owed to Centauro by

Defendants pursuant to the unambiguous terms of a valid contract. Defendant Alessandro

Bazzoni has used a web of companies that he controls to orchestrate a complex fraud against

Centauro and to avoid repayment of funds owed to Centauro based on clear contract terms.

Centauro and CTFG were engaged in a joint venture in which Centauro raised funds for oil

transactions that CTFG executed. In May 2015, after admittedly losing millions of dollars

belonging to Centauro, Defendants CTFG and CTEL (an affiliate oil trading company also

wholly owned and controlled by Bazzoni) issued to Centauro a Promissory Note in the amount

of $21,092,213.00. This Promissory Note was signed by Bazzoni as CEO of each of its makers, CTEL and CTFG. The Promissory Note required CTEL and CTFG to repay the $21,092,213.00 owed in a series of installments. CTEL and CTFG defaulted on the Promissory Note almost immediately. After the default, Centauro demanded immediate payment. Centauro later learned that the diligence information used to induce the promissory note was fictitious. To date, CTEL and CTFG have not made a single payment due to Centauro under the Promissory Note.

2.      Subsequent to the default with Centauro, CTFG went into bankruptcy in the British Virgin Islands. With CTFG under water, Bazzoni continued to engage in oil trading through CTEL. However, to avoid repaying Centauro, Bazzoni formed a second company with the exact same name as CTEL – CT Energia Ltd. – in another jurisdiction, Malta. Bazzoni created this new "CTEL" along with other "Cinque Terre" entities, CT Energia Holding Ltd. and CT Energia Oil and Gas Ltd, all in Malta. Collectively these businesses held themselves out as "CT Energia" for the purpose of using their new Maltese corporate forms to avoid paying CTEL's debt to Centauro. To further frustrate Centauro's effort to collect on its debt, after word of this lawsuit spread throughout the market, CTEL (acting through Bazzoni) stripped the Maltese CTEL of its apparent "CT Energia" connection, and renamed it "Elemento."

3.      Centauro therefore brings this action for breach of contract and fraudulent inducement of the Promissory Note against CTFG, CTEL, and CTEL's alter ego in Malta, including CTEL's sole owner, director, and CEO, Alessandro Bazzoni.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is an action between citizens of the United States and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000.

5.     CTFG and CTEL have consented to personal jurisdiction in the Southern District of New York.

6.     The remaining Defendants Bazzoni and CTEL Malta are subject to this Court's jurisdiction by virtue of their status as alter egos of Defendant CTEL.

7.     Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §§ 1391(a) and 1391(c), because a substantial part of the events and omissions giving rise to the claim occurred in this district.

## THE PARTIES

Centauro Liquid Opportunities Master Fund, L.P.

8.      Plaintiff Centauro Liquid Opportunities Master Fund, L.P. ("Centauro") is a limited partnership formed under the laws of the Cayman Islands. Centauro's principal place of business is 641 Lexington Avenue, New York, New York 10022. Yvonne Morabito, a citizen of New York State, is the sole general partner of Centauro. Centauro's limited partners include: (i) Centauro Liquid Opportunities Fund (U.S.) L.P., a Delaware partnership; (ii) Centauro Liquid Opportunities Fund Offshore, L.P., which is regulated under the laws of the Cayman Islands; and (iii) Centauro Liquid Opportunities G.P. LLC, a Delaware limited liability company, (collectively the "Feeder Funds"). The investors in the Feeder Funds are limited partners of those funds. None of the investors and none of the partners of Centauro are citizens of Italy, Malta, or the British Virgin Islands, and none of them are domiciled in these locations.

Cinque Terre Financial Group, Ltd.

9.      Defendant Cinque Terre Financial Group, Ltd. ("CTFG") is a limited liability company formed and existing under the laws of the British Virgin Islands. CTFG's primary offices are located at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands. CTFG is wholly owned by Defendant Alessandro Bazzoni. CTFG is a trading company that purports to provide the expertise and contacts necessary to execute oil transactions in energy markets. In or about April 2016, CTFG was forced into bankruptcy by a creditor in the British Virgin Islands.

CT Energia Ltd.

10.     Defendant CT Energia Ltd. ("CTEL") is a British Virgin Islands corporation with its primary offices at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands. CTEL purports to be an oil trading company that operates in 23 countries and holds full licenses for

import, export wholesale, and retail services in the oil market trading crude oil and refined petroleum products in energy markets throughout the world. Defendant Bazzoni is the sole owner, President, and CEO of CTEL. CTEL purports to conduct its worldwide trading operations through the use of local subsidiaries in numerous jurisdictions.

CT Energia Ltd. d/b/a Elemento Ltd.

11.     Defendant CT Energia Ltd. d/b/a Elemento Ltd. ("CTEL Malta") is a limited liability company organized under the laws of Malta. CTEL Malta was formed in October 2015 by Alessandro Bazzoni, who is its controlling director. CTEL Malta has a registered office at 85 St. John Street, Valletta VLT 1165, Malta. CTEL Malta is wholly owned by another Bazzoni entity, CT Energia Holding, Ltd. ("CT Energia Holding"), which in turn is owned and controlled by Defendant Bazzoni. In or about July 25, 2016, CTEL Malta filed name change documentation purporting to adopt the name "Elemento Ltd."

12.     CTEL Malta is sued in its capacity as an alter ego of, and as controlled by Defendant CTEL and CTEL's sole owner and director Bazzoni, and as such, is liable to the same extent as the other Defendants.

Alessandro Bazzoni

13.     Defendant Alessandro Bazzoni is a citizen of Italy. As explained above, Bazzoni is the founder and sole owner of Defendants CTFG and CTEL. Mr. Bazzoni is also the controlling owner of CT Energia Holding, which wholly owns the Maltese trading company Defendant CTEL Malta.  CT Energia Holding is a company organized under the laws of Malta and Bazzoni is its Chief Executive Officer.  CT Energia Holding has a registered office at 85 St. John Street, Valletta VLT 1165, Malta.

14.     Related to Defendant CTEL Malta, and its affiliate CT Energia Holding, Mr. Bazzoni also owns and controls another affiliate in Malta, CT Energia Oil and Gas Ltd. ("CTOG"), a limited liability company organized under the laws of Malta. CTOG was formed in December 2015 by Alessandro Bazzoni, who was its sole officer and director. CTOG has a registered office at 85 St. John Street, Valletta VLT 1165, Malta.  In or about August 3, 2016, CTOG filed name change documentation purporting to adopt the name "Elemento Oil & Gas Ltd."

15.     As an owner and/or controlling director of Defendant CTEL Malta and its affiliates, Bazzoni abused their corporate forms in order to orchestrate a fraud designed to shield CTEL from its liability to Centauro.  Bazzoni is sued in his professional and individual capacities, as Centauro seeks to pierce CTEL's corporate veil in order to hold Bazzoni personally liable for the debts and obligations of his companies.

## BACKGROUND

### The Joint Venture

16.     Ronald Dagar and Yvonne Morabito met Alessandro Bazzoni in 2008. Bazzoni told Morabito and Dagar that he was the founder and sole owner of CTFG. He further claimed that CTFG provided trading and logistics for international oil transactions. Bazzoni claimed that he personally financed all of CTFG's prior deals and secured bank financing for the balance of the necessary capital. He described CTFG as a highly profitable operation. However, due to the ongoing credit crisis in the market at that time, Bazzoni needed additional investment capital.

17.     Soon after the initial meeting, Bazzoni, Morabito and Dagar explored the creation of a joint business venture in which Bazzoni's company, CTFG, would purchase oil at wholesale price and sell it to end users at retail price. Morabito and Dagar in turn would form an investment fund to provide the capital necessary to purchase the oil at a wholesale price. CTFG agreed to provide the contacts, technical expertise, and labor required to purchase, sell, and transport the oil from the wholesale seller to the retail buyer. CTFG and the planned investment fund would each take 50% of the profits from all approved transactions.

18.     In 2009, Morabito and Dagar formed Centauro, an investment fund to raise capital for use in oil transactions to be executed by CTFG. From its inception, Dagar and Morabito were both general partners of Centauro. Dagar passed away in July 2015, rendering Morabito the sole general partner.

19.     On September 14, 2009, Centauro and CTFG executed a Joint Venture Agreement ("JVA"), attached hereto as **Exhibit A**. Pursuant to the JVA, CTFG would identify a potential oil transaction for the joint venture and propose it to Centauro for approval. The proposal would take the form of a deal summary which included the terms and conditions of the

proposed transaction, the legal names of the counterparties to the proposed transaction, and a good faith estimate of the full amount of deal costs and capital required. Ex. A, § 3.3.1(e).

20.     Pursuant to the terms of the JVA, CTFG was not permitted to pursue any oil transaction using Centauro's capital unless Centauro approved the deal summary. If Centauro approved and funded a certain transaction proposed by CTFG, CTFG had to use its "commercial best efforts" to execute the transaction in a manner consistent with the deal summary. Ex. A, § 3.4.2.

21.     At the conclusion of each transaction, CTFG was required to either return Centauro's initial investment or redeploy it in a future transaction, based on Centauro's instruction. Ex. A, § 2.3. CTFG was also required to return fifty percent of any profits from each transaction to Centauro or redeploy them in a future transaction, based on Centauro's instruction. Ex. A, § 2.3.

22.     The parties set up and maintained certain joint banking relationships and investment vehicles to facilitate Centauro's investment of capital into the transactions CTFG had proposed (and Centauro had approved), and CTFG's return of profits and investment capital to Centauro from the executed transactions.

23.     The parties began initiating transactions in 2010, and several years later, by 2014, Centauro had invested millions of dollars with CTFG, housed in joint banking and credit facilities and in various oil transactions in progress that CTFG promised to execute in good faith.

**CTFG's Misappropriation of Centauro's Investment**

24.     By late 2014, Centauro became increasingly suspicious of CTFG, having not received promised returns of supposed profits and capital invested in several outstanding transactions throughout the year. In December 2014, Centauro requested that CTFG provide an

8

accounting of all outstanding funds Centauro had invested and a timeframe for the return or profits and capital Centauro had been promised. Centauro also submitted a redemption request to CTFG seeking the return of $2.3 million of its investment. Centauro requested that this money be returned by January 1, 2015.

25.    Initially, CTFG assured Centauro that it had assets of over $20 million and that the joint venture's banking facilities also had over $20 million in liquidity. However, after CTFG repeatedly refused to honor Centauro's redemption request, CTFG finally acknowledged that it had lost Centauro's funds.

26.    CTFG claimed to have been a victim of a theft and fraud involving oil cargoes in Panama. However, Centauro had never approved any deals for its funds to be invested in these purportedly stolen cargoes. Moreover, CTFG's insurance company found no evidence to support CTFG's claim that it had fallen victim to thieves in Panama. Even assuming the insurance company was wrong, and CTFG really was a victim, Centauro never authorized the deployment of its capital in the supposedly stolen cargoes.

27.    In addition to this false excuse, Centauro also learned that CTFG had been manipulating the parties' joint banking relationships to saddle the relevant account with debt that Centauro had never approved. By falsely representing that Centauro had joint control over certain joint accounts, CTFG was able to misuse the accounts to collateralize transactions and investments wholly unrelated to its joint venture with Centauro. When CTFG was unable to meet these obligations to other creditors in non-Centauro transactions, Centauro's funds (which Centauro never authorized CTFG to use for the purpose of collateralizing its obligations) were among the assets confiscated by CTFG's creditors.

**The Promissory Note**

28.     Faced with its deliberate misuse of Centauro's investment, CTFG agreed to execute a promissory note in Centauro's favor in order to repay the money and avoid costly and expensive litigation. The proposed note was also intended to give CTFG time to work out its finances, while providing a guaranty secured by another "Cinque Terre" entity, CTEL, in the interim. CTEL was also wholly owned and controlled by Bazzoni, and purportedly engaged in the same type of oil transactions that CTFG had previously been engaged in with Centauro.

29.     CTFG and CTEL retained New York counsel at Baker & McKenzie, and the parties met and negotiated the terms of the note in person and over the telephone on numerous occasions in April and May of 2015. CTFG and CTEL's CEO Richard Rothenberg and Bazzoni participated in each of these meetings by phone, or in person in New York City and in Florida. In recognition of the validity of the debt CTFG owed to Centauro, Bazzoni authorized CTEL to pay Centauro $850,000, drawn from the New York bank account of an affiliated "Cinque Terre" entity.

30.     During an extensive diligence process, Bazzoni represented to Centauro that although CTFG was under water with many of its creditors, he had a different oil trading company, CTEL, whose oil trading revenues could be used to service a potential promissory note. Bazzoni and Rothenberg represented that CTEL had its own financing from major international banks and financial institutions. Bazzoni and Rothenberg also provided information purporting to detail existing and future business lines that would enable CTEL to pay Centauro.

31.     After many weeks of negotiations, both through counsel and between Bazzoni, Morabito and Dagar themselves (including meetings and phone conferences in New York), CTFG and CTEL agreed to issue Centauro a Promissory Note, contractually agreeing to pay all of the funds CTFG owed Centauro in monthly installments of $500,000. CTFG and CTEL

10

executed The Promissory Note, attached hereto as **Exhibit B**, which recites that is it "FOR VALUE RECEIVED" and entitles Centauro to payment of $21,092,213.00, plus interest, "in consideration of" a "commercial agreement reached between" CTFG, CTEL and Centauro with respect to the repayment of the principal owed to Centauro after losing its money. The Note further specified that, in the event of default, "the full principal amount of this Note, together with all accrued but unpaid interest thereon, shall become, at [Centauro's] election, immediately due and payable in cash." Ex. B, § 4(c). On May 21, 2015, Bazzoni signed the Promissory Note on behalf of both of his wholly owned companies, CTFG and CTEL.

32.     The parties also agreed that the Promissory Note would be governed by New York law and that all legal proceedings concerning its interpretation, enforcement and defense must be commenced in a state or federal court sitting in "the City of New York, Borough of Manhattan." Ex. B, § 15. The Promissory Note also provided that CTFG and CTEL would pay all attorneys' fees and costs associated with "any legal proceedings or other actions to collect under or to enforce this Note." Ex. B, § 8.

33.     CTFG and CTEL consented to the jurisdiction of the federal courts sitting in New York City for the adjudication of any dispute related to the Promissory Note. Ex. B, § 15.

### Defendants' Breach of the Promissory Note

34.     Almost immediately after executing the Promissory Note, CTEL and CTFG defaulted, missing their very first payment due under the terms of the payment schedule.

35.     After CTEL and CTFG failed to make the first required installment payment, Morabito advised them of their default, accelerated the Promissory Note, and demanded that they pay the principal amount plus interest. To date, CTEL and CTFG have failed to make any of the required installment payments due under the Promissory Note.

36.     In addition, Section 2(c) of the Promissory Note requires that all revenues generated from CTFG, CTEL, or any of their affiliated entities, are to be distributed back to CTFG and CTEL in order to service the Note.

37.     CTEL has breached this term of the contract by creating a second "CTEL" in Malta, Defendant CTEL Malta, which, along with affiliates CTOG and CT Energia Holding, continues to engage in oil trading whose profits and revenues should be, but have not been used to service the Note.

38.     On information and belief, CTEL and Bazzoni are the ultimate beneficiaries of the revenues and profits flowing to the three Malta "Cinque Terre" entities, including Defendant CTEL Malta, and its affiliates CTOG, and CT Energia Holding, – all of which are owned or majority controlled by CTEL, both directly and through Bazzoni.

**CTEL and CTFG Conspire to Fraudulently Induce the Note**

39.     During the diligence process and negotiations leading up to the execution of the Promissory Note, CTEL repeatedly represented that it had ongoing deals and business lines that could be used to service CTFG's obligation to pay Centauro. On the basis of those representations, Centauro agreed to execute the Promissory Note.

40.     The diligence information showing purported business lines CTEL described, however, was fictitious. For example, Bazzoni represented that CTEL was entering into a $32 million investment scheme with a company called Harvest Natural Resources, Inc. ("HNR"), a petroleum exploration and production company with significant assets in Venezuela. CTEL provided Centauro with information purporting to show that it would reap profits from a joint venture with HNR, through CT Energia Holding, and other "Cinque Terre" branded entities in Barbados and Venezuela.

41.     As Centauro has learned, these representations proved to be false. Contrary to Bazzoni and Rothenberg's representations during the Note due diligence process and on CTEL's website, CTEL had no actual investment in HNR and was not entitled to any proceeds from that broader $32 million investment scheme. In fact, Bazzoni's business partner in the supposed HNR investment scheme, Oswaldo Cisneros, and the entity jointly controlled by Bazzoni and Cisneros called CT Energy Holding SRL (through which the $32 million investment was to flow to HNR) have admitted that sworn statements made to the Securities & Exchange Commission ("SEC") regarding Bazzoni's involvement in this transaction were false. Once the falsity of those statements came to light, CT Energy Holding SRL and Mr. Cisneros amended them and filed new documents with the SEC clarifying CTEL and Bazzoni's lack of involvement and lack of any stake in the profits of the investment. In effect, these amended sworn SEC statements verify that the diligence CTEL provided to Centauro was fictitious and intentionally misleading.

42.     Beyond the HNR investment, CTEL purported, during the Note diligence process, to have business lines in numerous locations that would generate revenues to enable CTEL to meet its financial obligations to Centauro, including in Argentina, Bolivia, Peru, Miami, and ports in West Africa, which have all turned out to be false.  And it was on the basis of these intentionally false representations that CTEL induced Centauro to enter into the contract at the heart of this case, the $21 million Promissory Note.

**Alter Egos Allegations**

43.     Centauro alleges that there exists, and at all relevant times mentioned herein has existed, a unity of interest and ownership between Defendant CTEL and Defendant CTEL Malta. Both entities are owned and controlled by Alessandro Bazzoni, and according to a witness and

other corroborative information, are principally engaged in the same oil trading ventures, using the same personnel, including Richard Rothenberg, Mark Walker, and Albert Alpha.

44.    Centauro alleges that Defendant CTEL Malta was created by CTEL through Bazzoni in October and December of 2015, **after** CTEL had already incurred an obligation to Centauro upon executing the Promissory Note in May of 2015. Moreover, Defendants CTEL Malta and its affiliate CTOG purported to publicly change their names to "Elemento" in July and August of 2016, **after** Centauro had filed this lawsuit in November 2015, which explicitly took aim at Bazzoni's "Cinque Terre" branded companies and exposed the fraudulent nature of their interactions with Centauro. CTEL, acting through Bazzoni (who owns and controls both Defendant CTEL Malta and its affiliate CTOG), orchestrated the creation and purported renaming of CTEL Malta in order to shield CTEL from liability to Centauro.

45.    Moreover, Bazzoni orchestrated the transfer of 100% ownership of Defendant CTEL Malta to CT Energia Holding in or about December 2015 (also after this lawsuit was filed).  On information and belief, CTEL acting through Bazzoni executed this transfer in order to further shield CTEL's assets from Centauro. On information and belief, CT Energia Holding is nothing more than a holding company for Defendant CTEL Malta and CTOG's assets and profits, which ultimately flow back to CTEL, through Bazzoni.

46.    Centauro alleges that CTEL, and CTEL Malta lack any separateness whatsoever such that any individuality and separateness of their corporate forms have ceased. On information and belief, CTEL Malta was created by CTEL through Bazzoni expressly for the purpose of avoiding CTEL's debt to Centauro. On information and belief, these companies share offices, email accounts, personnel, financial accounts, and revenue streams from oil transactions, among other things, such that there is no separateness between them.

47.     Centauro also alleges that CTEL and Bazzoni are one and the same. Bazzoni has branded all of his companies with the "Cinque Terre" or "CT" moniker, which is an abbreviation for "Cinque Terre."  Bazzoni has claimed that the "Cinque Terre" name refers to his family's roots and ownership interests in property in the Cinque Terre region of Italy – a cluster of five villages on the Italian Riviera.

48.     Centauro alleges that Bazzoni has abused CTEL's corporate form such that he should be personally liable for its debts. In effect, CTEL and Bazzoni are one and the same. On information and belief, Centauro alleges that Bazzoni uses CTEL's accounts to purchase personal property, including a vacation home in Palm Beach, Florida and renovations to a friend's home in Bridgehampton, New York; to pay for personal expenses, including among other things, medical expenses, automobiles, luxury travel for himself and his friends, and expenses associated with horses and fees for participating in polo tournaments all over the world. Bazzoni has also abused CTEL's corporate form by directing CTEL to create a series of Maltese alter egos in order to avoid paying its debt to Centauro.

49.     Bazzoni has, at all times, exercised control and dominion over CTEL with a disregard for its separate legal status in order to defraud Centauro and frustrate Centauro's ability to recover sums owed pursuant to a valid contract. Accordingly, the legal fiction of the separate existence between Bazzoni and CTEL, and CTEL and CTEL Malta is intended to sanction fraud and promote injustice.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
**Breach of Contract for Default on Promissory Note**
**Against All Defendants**

50.    Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

51.    As described herein, the Promissory Note is a valid and binding contract between Centauro, and Defendants CTFG and CTEL.

52.    Centauro has fulfilled its obligations in full to Defendants under the Promissory Note.

53.    Defendants have breached the Promissory Note by failing to make the required monthly installment payments when such payments became due and owing, and by failing to pay the entire principal balance of the Promissory Note, plus interest, whereupon it became due immediately when Centauro notified Defendants of its election to accelerate the contract, pursuant to § 4(c) of the Promissory Note.

54.    Centauro has suffered damages in the amount of $21,092,213.00, plus interest calculated pursuant to the terms of the Promissory Note, as a direct result of Defendants' breach of their obligations pursuant to the Promissory Note.

55.    As the result of this breach, Defendants are jointly and severally obligated to pay Centauro the principal sum due and owing under the Promissory Note, as well as all unpaid interest, late charges, attorneys' fees, and all other costs incurred by Centauro in the enforcement of its rights under the Promissory Note.

## SECOND CAUSE OF ACTION
### Breach of Contract for Failure to Distribute Revenue
### Against All Defendants

56.    Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

57.    Centauro has fulfilled its obligations in full to Defendants under the Promissory Note.

58.    Section 2(c) of the Promissory Note requires that all revenues generated from CTFG, CTEL, or any of their affiliated entities, such as Defendants CTEL Malta, or its affiliates CTOG, and CT Energia Holding, be distributed back to the makers in order to service the Note.

59.    CTEL has breached § 2(c) of the Promissory Note in that Defendants CTEL Malta, and its affiliates CTOG, and CT Energia Holding have generated, and continue to generate revenues and profits that they have not been distributed back to CTEL for purposes of servicing CTEL's obligation to pay Centauro under the Note.

60.    All of the Maltese revenues and profits should have been distributed back to CTEL and used to pay their obligations to Centauro pursuant to the terms of the Promissory Note because these entities are majority owned by CTEL through Bazzoni, and they are commonly controlled by CTEL.

61.    Having accelerated the Promissory Note, Centauro is entitled to damages in the amount of $21,092,213.00, plus interest calculated pursuant to the terms of the Promissory Note, as a direct result of Defendants' breach of their obligations.

62.    As the result of this breach, Defendants are jointly and severally obligated to pay Centauro $21,092,213.00, as well as all unpaid interest, late charges, attorneys' fees, and all other costs incurred by Centauro in the enforcement of its rights under the Promissory Note.

17

## THIRD CAUSE OF ACTION
### Fraudulent Inducement
### Against All Defendants

63.     Centauro re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

64.     In or about April and May of 2015, Defendant CTEL falsely and fraudulently represented to Centauro that it had business lines and sources of revenue that could be used to service a promissory note.

65.     On numerous occasions during negotiations of that promissory note in April and May of 2015 for Defendant CTFG to repay money it misappropriated from Centauro, CTEL made false representations, including about a purported investment in Harvest Natural Resources. The representations were later excluded in amended SEC filings describing the Harvest Natural Resources transaction because they were false, and were false at the time they were originally made by CTEL to Centauro.

66.     CTEL also provided Centauro with additional information during the diligence process purporting to show business lines in locations around the world, the revenues from which CTEL intended to use to service the Note.  Those representations were also intentionally false.

67.     Each of CTFG and CTEL's misrepresentations or omissions of material fact were made to induce Centauro to execute a Promissory Note providing the financially distressed entity CTFG an opportunity to avoid litigation and work out its finances and for CTEL to repay the debt over time. Had Centauro known the actual facts and the true intentions of CTEL, Centauro would not have agreed to execute the Note.

68.     CTFG and CTEL knew CTEL's representations to be false, or intentionally

omitted material facts with the intent to defraud and deceive Centauro and to induce Centauro to act in the manner herein alleged.

69.     Centauro, at the time each of these representations were made by CTEL and at the time Centauro took the actions herein alleged, was ignorant of the falsity of Defendant's misrepresentations and believed them to be true.

70.     Centauro's reliance on CTFG and CTEL's representations was reasonable and justified, given that the results of Centauro's own investigations in these matters did not initially uncover the fraud.

71.     As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Centauro has suffered injuries and is entitled to damages in a sum to be proven at trial.

72.     In doing the acts herein alleged, Defendants' acts constituted oppression, fraud, and malice, and Centauro is entitled to punitive damages in a sum to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Centauro prays for relief as follows:

A.      Adjudge that Defendants are liable for each cause of action stated here;

B.      Adjudge that Defendants must pay to Centauro $21,092,213.00 owing under the Promissory Note as well as all interest that has accrued pursuant to the terms of the Promissory Note at the time judgment is entered;

C.      For compensatory damages in an amount according to proof;

D.      For punitive and exemplary damages in an amount according to proof;

E.      Enter judgment against Defendants for the amount of damages that Centauro proves at trial;

F.      Enter a judgment awarding Centauro expenses, costs, and attorneys' fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure; and

G.      For such other and further relief as the Court deems just and proper.

Dated this 8th day of September 2017.

                                        Respectfully submitted,

                                        BOIES SCHILLER & FLEXNER LLP

                                        By: __/s/_Randall W. Jackson_____
                                              Donald L. Flexner
                                              Randall W. Jackson
                                              Byron D.M. Pacheco
                                              BOIES SCHILLER & FLEXNER LLP
                                              575 Lexington Avenue
                                              New York, NY 10022
                                              T. 212-446-2300

# EXHIBIT A

## JOINT VENTURE AGREEMENT

This **JOINT VENTURE AGREEMENT** ("**Agreement**"), is made and entered into as of *September 4th*, 2009, by and between Cinque Terre Financial Group, LTD, a company incorporated under the laws of the British Virgin Islands ("**CTFG**"), and Centauro Liquid Opportunities Master Fund, LP, a company formed under the laws of the Cayman Islands ("**Centauro**"). Each of CTFG and Centauro is individually referred to herein as a "**JV Party**" and together as the "**JV Parties**".

### RECITALS

*Whereas*, CTFG and Centauro share common objectives, among which is to formalize a joint venture (the "**Joint Venture**") through which the JV Parties shall form an entity to trade Products (as defined below) through the commercial expertise of CTFG and the financial support of Centauro; and

*Whereas*, CTFG and Centauro desire to enter into this Agreement to set forth the terms and conditions of the Joint Venture.

*NOW, THEREFORE*, in consideration of the mutual promises herein contained and for other good and valid consideration, the sufficiency and receipt of which is hereby acknowledged, the JV Parties hereby agree as follows:

### ARTICLE 1.
### DEFINITIONS

In this Agreement, the following words and phrases shall have the following respective meanings unless the context otherwise provides:

1.1    "**AAA**" has the meaning provided in Section 8.2.1.

1.2    "**Affiliate**" means, with respect to a Person, any other Person who or which, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person, whether by ownership of voting securities, by contract or otherwise; provided, however, that no JV Party shall be deemed to be an Affiliate of the other JV Party by virtue of the transactions contemplated by this Agreement.

1.3    "**Agreement**" has the meaning provided in the Preamble and shall include any schedules attached hereto.

1.4    "**Applicable Law**" means, with respect to any Person, any material domestic or foreign, federal, state or local statute, law, rule, regulation, order, writ, injunction, judgment, decree or other requirement, of any Governmental Authority applicable to such Person or any of its properties or assets.

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

1

12/08/2009  05:32  12122230048                                                    PAGE  02/19

1.5     "**Approved Deal**" means a transaction by the Joint Venture in Products approved pursuant to the terms of this Agreement.

1.6     "**Approved Deal Costs**" has the meaning provided in Section 3.3.1(c).

1.7     "**Bankruptcy**" means the occurrence, with respect to any specified Person, of (i) an assignment for the benefit of creditors; (ii) the filing of a voluntary petition in bankruptcy; (iii) the adjudication of such Person as a bankrupt or insolvent (whether "insolvency" is defined to mean the inability to pay one's debts as they come due or the excess of liabilities over assets), or the entering against it of an order of relief in any bankruptcy or insolvency proceeding, by a court of competent jurisdiction; (iv) the filing of a petition or answer seeking on behalf of such Person any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) the filing of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding described in the preceding clause (iv); (vi) the seeking of a consent to or acquiescence in the appointment of a trustee, receiver or liquidator with respect to all or substantially all of such Person's assets; (vii) the institution of a proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, where such proceeding has not been dismissed within one hundred twenty (120) days after its commencement; or (viii) the appointment of a trustee, receiver or liquidator of such Person, without its consent, of all or substantially all of such Person's assets, where such appointment is not vacated or stayed within ninety (90) days of such appointment or, within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

1.8     "**Business Day**" means any day except for a Saturday, Sunday or other day on which banks or other financial institutions located in Geneva, Switzerland or New York, New York are required or authorized by law to close.

1.9     "**Buyer**" means any third-party purchaser of Products from the Joint Venture and shall not be an Affiliate of a JV Party.

1.10     "**CTFG**" has the meaning provided in the Preamble.  The address of the registered office of CTFG is Craigmuir Chambers, P.O. Box 71, Road Town, Tortola, British Virgin Islands.  The operational office of CTFG is Via alla Campagna, Via 2/A 6900 Lugano, Switzerland.

1.11     "**Centauro**" has the meaning provided in the Preamble.  The registered office of Centauro is c/o Walkers SPV Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands.  The operational office of Centauro is 145 East 57th Street, 11th Floor, New York, New York, 10022.

1.12     "**Confidential Information**" has the meaning provided in Section 10.1.1.

1.13     "**Control**", "**Controlling**" and/or "**Controlled**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

2

12/08/2009  05:32   12122230048                                                          PAGE  03/19

**1.14** "**Deal Capital**" means cash or cash equivalents made available by Centauro to the Joint Venture in respect of an Approved Deal (including to cover Approved Deal Costs), whether in the form of cash or the extension of any form of credit to the Joint Venture, as shall be agreed to by the JV Parties from time to time.

**1.15** "**Deal Costs**" means the actual fees, expenses, commissions or other costs incurred by the Joint Venture in respect of an Approved Deal that are not passed through in their entirety to a counterparty in such Approved Deal, which Deal Costs must be approved by the JV Parties in accordance with this Agreement.

**1.16** "**Deal Summary**" has the meaning provided in Section 3.3.1.

**1.17** "**Defending Party**" has the meaning provided in Section 8.2.1.

**1.18** "**Disclosing Party**" has the meaning provided in Section 10.1.1.

**1.19** "**Excess Deal Costs**" means Deal Costs of an Approved Deal which are in excess of the Approved Deal Costs for such Approved Deal but which (x) are reasonably required for such Approved Deal and (y) have been pre-approved by Centauro.

**1.20** "**Fail-Sale**" has the meaning provided in Section 3.5.1.

**1.21** "**GAAP**" means generally accepted accounting principles of the United States, applied on a consistent basis.

**1.22** "**Governmental Authority**" means any foreign, domestic, federal, territorial, state or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission or tribunal or any regulatory, administrative or other agency, or any political or other subdivision, department or branch of any of the foregoing which has competent jurisdiction over the relevant Persons or its business, property, assets or operations.

**1.23** "**Joint Venture**" shall have the meaning set forth in the Recitals and shall include each entity which may formed by the JV Parties pursuant to the terms of this Agreement. The Joint Venture shall be named "**CINQUE TERRE ENERGY PARTNERS II**", or such other name as may be determined by the JV Parties from time to time.

**1.24** "**Operating Costs**" means any and all expenses needed to promote, advance, and accomplish the goals and objectives of the Joint Venture, which includes, but is not limited to, all expenses related to communications, legal advice, audit expenses, human resources, travel, hotel, office rental and/or leasing, telephone service, long-distance telephone service, internet service, fax telephone service, office supplies, and services of the JV Parties in advancing the interests of the Joint Venture.

**1.25** "**Person**" means any individual, partnership (of a general, limited or limited liability nature), corporation, association, joint stock company, limited liability company, trust, joint venture, unincorporated organization and governmental, quasi-governmental, judicial

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

3

or regulatory entity or any department, agency or political subdivision thereof or any other entity of whatever form whatsoever.

1.26    "**Petitioning Party**" has the meaning provided in Section 8.2.1.

1.27    "**Products**" means any of the following petrochemical products: oil, gas, crude and diesel, and shall include any derivatives of the foregoing.

1.28    "**Profits**" and "**Losses**" as used herein mean, in respect of an Approved Deal, the difference of the amount of gross revenue earned by the Joint Venture in respect of such Approved Deal less (x) the amount of Deal Capital for such Approved Deal and (y) the amount of Excess Deal Costs for such Approved Deal, expressed as a positive number (if Profits) or a negative number (if Losses). Unless otherwise agreed to in writing by the JV Parties, no other costs or expenses shall be deducted from the gross revenue earned by the Joint Venture in respect of a particular Approved Deal when determining the Profits or Losses of such Approved Deal.

1.29    "**Receiving Party**" has the meaning provided in Section 10.1.1.

1.30    "**Representative**" means the Person(s) authorized by a JV Party to execute a Deal Summary on behalf of such JV Party and whose signature on a Deal Summary shall be binding on such JV Party. The Representative of Centauro may be a manager or employee of Centauro Capital Management, LLC, a Delaware limited liability company that acts as Centauro's investment manager, or any successor or assignee thereof.

1.31    "**Section**" and "**Subsection**" refer to a section or subsection of this Agreement.

1.32    "**Supplier**" means a third-party provider of Products to the Joint Venture and shall not be an Affiliate of a JV Party.

1.33    "**Uncommitted Capital**" means the amount of cash or cash equivalents made available by Centauro at any time in the possession of the Joint Venture in excess of the amount of cash or cash equivalents then currently committed as Deal Capital pursuant to one or more Approved Deals.

1.34    Unless the context clearly indicates a contrary intention, an expression which denotes:

1.34.1  Any gender includes the other genders;

1.34.2  The plural includes the singular and vice versa.

1.35    Where any number of days is to be calculated from a particular day, such number shall be calculated as excluding such particular day and commencing on the next day. If the last day of such number so calculated falls on a day that is not a business day, the last day shall be deemed to be the next succeeding day that is a business day.

Initials Cinque Terre

EAST\42469644.2
6033091v6

Initials Centauro

4

**1.36**   The use of the word "including" followed by a specific example/s shall not be construed as limiting the meaning of the general wording preceding it and the *eiusdem generis* rule shall not be applied in the interpretation of such general wording or such specific examples.

## ARTICLE 2.
## OWNERSHIP AND PARTICIPATION

**2.1**   Ownership of the Joint Venture.

**2.1.1**   Each of the JV Parties shall own a fifty percent (50%) equity interest in the Joint Venture entity to be formed in accordance herewith.   In the event that the JV Parties decide to form additional entities which are to be governed by this Agreement, the terms of this Agreement shall be incorporated into the constituent documents of such entities and each JV Party shall own a fifty percent (50%) equity interest in such entity.

**2.1.2**   Nothing in this Agreement shall be interpreted to confer any ownership or interest in one JV Party in and to the other JV Party.   Neither JV Party may represent that it has any authority to assume or create any obligation, express or implied, on behalf of the other JV Party without the other JV Party's prior written agreement.

**2.2**   Profits and Losses.

**2.2.1**   Subject to the terms and conditions of this Agreement, any Profits in respect of an Approved Deal shall be shared equally by the JV Parties.

**2.2.2**   Subject to the terms and conditions of this Agreement, any Losses of the Joint Venture in respect of an Approved Deal shall be borne solely by Centauro; provided, however, that Centauro shall bear Losses in respect of an Approved Deal only by a reduction, on a dollar-for-dollar basis, in the amount of Deal Capital that is returned to Centauro related to such Approved Deal.

**2.3**   Distributions.   Within five (5) Business Days following the actual receipt of consideration by the Joint Venture in respect of an Approved Deal, or at such other times as may be agreed upon by the JV Parties, CTFG shall cause the Joint Venture to make the following distributions to the JV Parties from the gross revenue actually received by the Joint Venture in respect of such Approved Deal:

**2.3.1**   First, to Centauro, an amount equal to the Deal Capital made available by it in respect of such Approved Deal;

**2.3.2**   Second, to each JV Party, to the extent that such JV Party has incurred out-of-pocket Excess Deal Costs which have not been repaid to it, an amount equal to such Excess Deal Costs; and

**2.3.3**   Third, to each JV Party, an amount equal to fifty percent (50%) of the Profit from such Approved Deal, if any.

Initials Cinque Terre

EAST\42469644.2
6033091v6

Initials Centauro

5

12/08/2009  05:32   12122230048                                                     PAGE  06/19

Notwithstanding the foregoing or the definition herein of "Profits" and "Losses," it is the intent of the JV Parties that the application and classification of income of the Joint Venture entity be set forth in further detail in the governing documents of the Joint Venture entity, particularly with respect to such concepts as capital accounts and allocation of profits and losses from a tax perspective.

### 2.4    Operating Costs.

2.4.1    Each JV Party shall be responsible for its own Operating Costs unless such cost is specifically included in a Deal Summary.  It is specifically agreed and understood that, except as provided in Section 2.4.2 or Section 2.4.3 or as may be required for Centauro to perform its functions and obligations under this Agreement, all Operating Costs of the Joint Venture shall be incurred by CTFG and CTFG shall only be entitled to reimbursement thereof to the extent that such Operating Costs constitute Approved Deal Costs or Excess Deal Costs.

2.4.2    Notwithstanding Section 2.4.1 or any other provision of this Agreement, the JV Parties agree that the costs of establishing the Joint Venture entity, including reasonable attorney and other professional fees (including in respect of tax advice), up to an amount equal to $[___], shall be deemed Deal Costs of the first Approved Deal.

2.4.3    Notwithstanding Section 2.4.1 or any other provision of this Agreement, the JV Parties agree that Operating Costs relating to the annual independent audit of the Joint Venture shall be borne fifty percent (50%) by each JV Party and shall be paid out of Profits from an agreed-upon Approved Deal, or, if no such Profits are available, the JV Parties shall each contribute to the Joint Venture their respective share of such Operating Costs.

### 2.5    Representations and Warranties of the JV Parties.  On and as of the date hereof, each of the JV Parties represents and warrants to the other JV Party as follows:

2.5.1    *Organization and Standing.*  Such JV Party is a corporation, partnership or other legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, with all requisite corporate, partnership or other power, as applicable, to enter into and perform its obligations under this Agreement.

2.5.2    *Authority.*  Such JV Party has the full right, power and authority to execute and deliver this Agreement and to perform its obligations hereunder and this Agreement constitutes a valid and legally binding agreement of such JV Party enforceable against it in accordance with its terms.

2.5.3    *Absence of Conflicts.*  The execution, delivery and performance of this Agreement by such JV Party and the consummation of the transactions contemplated hereby do not and will not violate conflict with or constitute a breach or default (with or without notice or lapse of time or both) under any statute, regulation, judgment, order, writ, decree or injunction applicable to such JV Party, any of its Affiliates or any of their respective properties or assets, the organizational documents of such JV Party, or any mortgage, indenture, contract, license agreement, financing statement, loan agreement or other agreement binding on such JV Party or any of its Affiliates.

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

6

12/08/2009   05:32     12122230048                                                    PAGE   07/19

2.5.4   *No Required Consents or Contractual Restrictions.*  No consent or approval of such JV Party (including such JV Party's board of directors or members) or any third party is currently required to be obtained by such JV Party in connection with the execution or delivery of this Agreement or the performance of the transactions contemplated hereby, other than any consents that have been obtained.

2.5.5   *No Disqualification.*  Such JV Party is not prohibited or restricted by law, governmental orders, judicial decrees or regulations from owning an equity interest in the Joint Venture.

2.5.6   *No Litigation.*  There are no claims, actions, suits, investigations or proceedings pending, or to the best of such JV Party's knowledge, threatened against such JV Party, at law or in equity, or before or by any Governmental Authority, department, commission, board, bureau, agency or instrumentality, domestic or foreign, which if determined adversely could have a material adverse effect on the ability of such JV Party to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

2.5.7   *Solvency.*  Such JV Party is not insolvent as determined under any Applicable Law nor is such JV Party unable to pay its debts as they become due, and has not on its own behalf invoked or sought protection under (nor is such JV Party contemplating invoking or seeking protection under) any applicable laws relating to receivership, bankruptcy or insolvency, and no third party has invoked any such laws against such JV Party. Such JV Party is not in the process of or taking any steps in furtherance of dissolution or liquidation, nor does such JV Party anticipate taking such action.

2.5.8   *Adequate Financial Resources.*  Such JV Party has or reasonably expects to obtain readily available funds necessary to fully perform and fulfill its obligations under this Agreement.

## ARTICLE 3.
## DUTIES AND OBLIGATIONS OF THE JV PARTIES

3.1     Conduct of Business by the Joint Venture.

3.1.1   Subject to Section 3.2, the day-to-day operations of the Joint Venture shall be managed in good faith by CTFG. The duties of CTFG shall include:

(a)     negotiating transactions on behalf of the Joint Venture in which the Joint Venture acquires Products from a Supplier and sells Products to a Buyer;

(b)     ensuring that all purchases and sales of Products by the Joint Venture comply with Applicable Law;

(c)     forming wholly owned subsidiaries of the Joint Venture for use in certain jurisdictions, as is necessary for liability or tax purposes or to permit the Joint Venture to obtain any operating licenses it may require;

Initials Cinque Terre

EAST\42469644.2
6033091v6

Initials Centauro

7

12/08/2009  05:32  12122230048                                              PAGE  08/19

(d)     obtaining any certifications or licenses for the Joint Venture as required by Applicable Law;

(e)     establishing bank accounts in the name of the Joint Venture;

(f)     formulating sales and marketing strategies and material for the Joint Venture; and

(g)     establishing such contacts as are required to operate the logistics, imports, and customs-related issues of the Joint Venture.

3.1.2   Upon agreement of the JV Parties, employees or consultants may be retained from time to time by the Joint Venture and the JV Parties shall specify the manner in which such Joint Venture consultants or employees shall be compensated.

**3.2**     _Actions Requiring Centauro Approval_.    Actions with respect to the following matters shall not be taken by the Joint Venture or any of its subsidiaries unless approved by Centauro, and CTFG shall not permit the Joint Venture or any of its subsidiaries to take any such actions with respect to such matters unless each such matter has been so approved (provided that any such matter covered in a Deal Summary and subsequently approved as a part of an Approved Deal by Centauro shall be deemed to have been properly approved in accordance herewith):

3.2.1   incurrence by the Joint Venture or any of its subsidiaries of indebtedness (including the issuance of any guaranties, bonds, commitments or other credit support), or the creation or imposition of any liens, mortgages or encumbrances upon any assets or properties of the Joint Venture or any of its subsidiaries securing such indebtedness, or providing guarantees for or pledging the Joint Venture's or any of its subsidiaries' assets as collateral for indebtedness of any party other than the Joint Venture or any of its subsidiaries;

3.2.2   any formation or acquisition of a direct or indirect subsidiary of the Joint Venture;

3.2.3   the payment in any year, individually or in the aggregate, of more than a _de minimis_ amount pursuant to any contract, agreement or commitment, other than contracts representing Approved Deals;

3.2.4   contracts between the Joint Venture or its subsidiaries, on the one hand, and CTFG or one of its Affiliates on the other hand;

3.2.5   any change in material accounting principles other than changes required by applicable law;

3.2.6   any purchase, issuance or redemption of securities of the Joint Venture;

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

8

12/08/2009  05:32  12122230048  PAGE  09/19

3.2.7  any acquisition (including by merger, amalgamation, consolidation or business combination) of other Persons or assets not in the ordinary course of business and not representing Approved Deals;

3.2.8  the participation in or entering into, amendment or termination of any material joint venture or profit sharing arrangement, or the entry into any new business venture;

3.2.9  any adoption or amendment of the constituent documents of the Joint Venture or any of its subsidiaries;

3.2.10  any appointment of or change in the Joint Venture's independent public accountants and auditors;

3.2.11  any merger, amalgamation, consolidation or business combination in which the Joint Venture or a subsidiary is a party, any transformation of the Joint Venture or any of its subsidiaries, or any sale or spin-off of all or substantially all of the Joint Venture's or a subsidiary's assets or properties; or

3.2.12  the commencement of any Bankruptcy proceeding, liquidation or voluntary reorganization, or the taking of any corporate action in furtherance thereof, in each case in respect of the Joint Venture or any of its subsidiaries.

3.3  Delivery of Deal Summaries.

3.3.1  Upon the identification by CTFG of a potential transaction for the Joint Venture, a Representative of CTFG shall deliver (by e-mail or otherwise) a **"Deal Summary"** to a Representative of Centauro (and any other secondary destination designated by Centauro in writing), which Deal Summary shall include the following information:

(a)  the general terms and conditions of the proposed transaction, including the type of Product to be purchased and sold in the proposed transaction and timing of the proposed transaction;

(b)  the complete legal names of the counterparties to the proposed transaction and the names of their respective representatives;

(c)  a good faith estimate of the full amount of the Deal Costs that are to be borne by the Joint Venture in respect of such proposed transaction (such good faith estimate, if approved by Centauro, to constitute the **"Approved Deal Costs"** of the proposed transaction);

(d)  each difference in the terms of the type set forth in Section 3.3.2 of the sale and purchase components of the proposed transaction; and

(e)  the amount and nature of Deal Capital required by the Joint Venture to be made available by Centauro to consummate such proposed transaction.

3.3.2   Except as specifically approved by Centauro, CTFG shall ensure that the purchase and sale components of a proposed transaction set forth in a Deal Summary (other than purchase price, sale price, buyer payment due date, and seller payment due date) shall mirror each other to provide for a "back-to-back" transaction.

3.3.3   In respect of each Approved Deal, CTFG shall use its commercially reasonable efforts to arrange the sale of Products to a secondary buyer in the event of a Fail-Sale.

3.3.4   The Deal Summary shall specify the hour and date by which Centauro's Representative shall have the right to accept the Deal Summary or to propose changes to the Deal Summary.  The time allotted to Centauro shall be not less than forty-eight (48) hours, unless there are exigent circumstances as determined by the JV Parties at such time.

3.3.5   If Centauro's Representative fails to accept the Deal Summary or to propose changes to the Deal Summary within the time allotted, then the proposed transaction shall not be an Approved Deal.

3.3.6   If Centauro's Representative makes any changes to the Deal Summary, the proposed transaction shall not be an Approved Deal until and unless CTFG's Representative executes and delivers the Deal Summary as changed to Centauro within forty-eight (48) hours of the counter-proposal, or a shorter amount of time if there are exigent circumstances, as determined by the JV Parties at such time.

3.3.7   If a proposed transaction contemplated by a Deal Summary does not become an Approved Deal for any reason, then neither JV Party (or any of their Affiliates) may pursue such transaction on terms that are more favorable to such JV Party (or its Affiliates) without first re-proposing such transaction to the Joint Venture.

**3.4**   Approval of Deal Summaries.

3.4.1   Upon the execution of a Deal Summary by Centauro's Representative, or the execution of a revised Deal Summary by CTFG's Representative, the proposed transaction described in such Deal Summary shall become an Approved Deal and shall be binding on the JV Parties.

3.4.2   In respect of each Approved Deal, Centauro shall provide the Deal Capital specified in the Deal Summary within two (2) Business Days, and CTFG shall use its commercial best efforts on behalf of and at the expense of the Joint Venture to bring the Approved Deal to completion, provided, however, that in so doing, CTFG shall not be required to expend a material amount of its own funds without a commitment for reimbursement from Centauro. Centauro may supply Deal Capital in mutually agreed upon forms, including letters of credit.  For the avoidance of doubt, except as provided in this section and in Section 2.4.3, Centauro shall have no obligation to provide Deal Capital or any other form of funding to the Joint Venture.

**3.5**   Failure of an Approved Deal.

Initials Cinque Terre

Initials Centauro

12/08/2009  05:32   12122230048                                                         PAGE  11/19

3.5.1   If an Approved Deal shall terminate for any reason prior to the delivery of Products to the Buyer in circumstances in which the Joint Venture remains obligated to purchase Products from the Seller (a "**Fail-Sale**"), CTFG shall notify Centauro of such Fail-Sale and the JV Parties shall immediately schedule a conference in person or by electronic means to discuss the situation and decide on a course of action; provided, however, that in advance of such conference, CTFG shall be authorized to transfer the Products to a new Buyer without advance authorization from Centauro's Representative, but upon prior notice to Centauro's Representative, if, and only if, all of the terms (including price) to be accepted by such Buyer are identical to or substantially the same as the terms of the Approved Deal or are more favorable to the Joint Venture.

3.5.2   Centauro shall have the right, exercisable at its sole discretion and at any time, to withdraw any Uncommitted Capital, including interest thereon, if any.

**3.6**   <u>Compliance with Applicable Law</u>.   CTFG and Centauro shall at all times refrain from engaging in any illegal, unfair or deceptive trade practices or unethical business practices whatsoever in respect of the activities contemplated hereunder.   CTFG shall ensure that the Joint Venture at all times complies with Applicable Law.

**3.7**   <u>Records and Accounting</u>.

3.7.1   The books and records of the Joint Venture shall be kept, and the financial position and the results of its operations recorded, by CTFG in accordance with GAAP. The books and records of the Joint Venture shall reflect all Joint Venture transactions and shall be appropriate and adequate for the Joint Venture's business.

3.7.2   Centauro shall have access to the books and records of the Joint Venture and the right to inspect and copy them. Centauro shall have the right to obtain from CTFG a copy of any and all tax filings made by the Joint Venture. CTFG shall provide to Centauro, and to any third-party administrator which may be retained by Centauro, such financial information regarding the Joint Venture as may be required by Centauro for the proper maintenance of its own books and records.

3.7.3   An annual audit of the accounting books and records of the Joint Venture shall be conducted by an outside independent auditing firm as an Operating Cost of the Joint Venture. The outside independent auditing firm of the Joint Venture shall be mutually agreed upon by the JV Parties from time to time.

3.7.4   The Joint Venture shall be a classified as a pass through entity with respect to U.S. federal income tax. The JV Parties jointly shall cause the Joint Venture to make any and all filings required in respect thereof, if any.

## ARTICLE 4.
## EXCULPATION AND INDEMNIFICATION

**4.1**   <u>Exculpation</u>.   Neither JV Party shall be liable, responsible or accountable in damages or otherwise to any other JV Party or the Joint Venture for mistakes of judgment or

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro                                                                              11

for action or inaction which any such Person reasonably believed to be in the best interests of the Joint Venture; provided that such action or inaction did not constitute fraud, negligence or malfeasance on the part of such Person.

    **4.2**   Indemnification.

    4.2.1  Subject to the limitations in 4.3 hereof, CTFG shall defend, indemnify and hold harmless Centauro and the Joint Venture from and against any and all losses, claims, liabilities, judgments, settlements, lawsuits, damages, expenses and other costs of whatever nature (including reasonable attorneys' fees) which result from any breach of or failure by CTFG to perform any obligation or covenants set out or contemplated in this Agreement.

    4.2.2  Subject to the limitations in 4.3 hereof, Centauro shall defend, indemnify and hold harmless CTFG and the Joint Venture from any and all losses, claims, liabilities, judgments, settlements, lawsuits, damages, expenses and other costs of whatever nature (including reasonable attorneys' fees) which result from any breach of or failure by Centauro to perform any obligation or covenants set out or contemplated in this Agreement.

    **4.3**   Limitation of Liability.  In no event shall either JV Party be liable to the other JV Party or to the Joint Venture for any special, consequential, incidental, indirect, punitive, or exemplary damages or for loss of profits or revenue, loss of use, loss of opportunity, loss of goodwill, cost of substitute facilities, goods or services, or cost of capital.

## ARTICLE 5.
## TERM AND TERMINATION

    **5.1**   Term.  This agreement shall take effect and commence on the date hereof and shall continue thereafter for a period of twenty-four (24) months, and shall continue thereafter for successive automatic extension periods of twelve (12) months unless terminated in accordance with Section 5.2.

    **5.2**   Termination.  This Agreement shall be terminated upon the happening of any of the following events:

    5.2.1  the mutual agreement of the JV Parties;

    5.2.2  thirty (30) days' following the delivery of written notice by a JV Party to the other JV Party of the intent to terminate this Agreement; or

    5.2.3  immediately upon the Bankruptcy or dissolution of either of the JV Parties.

Initials Cinque Terre _____
EAST\42469644.2
6033091v6

Initials Centauro _____

12

**5.3**    Consequences of Termination.

5.3.1    Upon the termination of this Agreement for any reason, each JV Party and its respective successors or representatives shall immediately cease to operate the Joint Venture other than as required to complete ongoing Approved Deals; provided that CTFG shall promptly cause the dissolution of the Joint Venture and any of its subsidiaries.

5.3.2    In the event of termination of this agreement, both JV Parties shall be entitled to receive all compensation due to them from any and all ongoing Approved Deals.

5.3.3    Sections 4, 5, 6, 7, 8, 9, 10 and 12 of this Agreement shall survive the termination of the Agreement.

## ARTICLE 6.
## NOTICES

**6.1**    Unless otherwise specifically provided herein, any notice, request, instruction or other communication herein required or permitted to be given shall be in writing and may be personally served or sent by telefacsimile, certified or registered mail or by e-mail message transmission and shall be deemed to have been given (i), if personally served, when delivered in person; (ii) if by telefacsimile, upon confirmation of receipt of such telefacsimile if on a Business Day during regular business hours, or, if not on a Business Day, on the next Business Day following the date of such confirmation of receipt; (iii) in the case of certified or registered mail, as of the third (3rd) Business Day after depositing it in the certified or registered mail, with postage prepaid and properly addressed; and (iv) if by e-mail message transmission, as of confirmation of receipt of such e-mail message if on a Business Day during regular business hours, or, if not on a Business Day, on the next Business Day following the date of such confirmation of receipt; provided that the address of each of the JV Parties shall be as set forth in Article 1, or such other address as may be designated by any such JV Party in a written notice delivered to the other JV Party in accordance with this Section 6.1.

## ARTICLE 7.
## SEVERABILITY

**7.1**    The provisions of this Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

**7.2**    In the event that any time or distance limitations set forth in this document are deemed too restrictive, such limitations shall nonetheless be effective and enforceable for the longest period of time and greatest distance which are legally enforceable.

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

13

12/08/2009   05:32    12122230048                                                    PAGE   14/19

## ARTICLE 8.
## ARBITRATION AND CHOICE OF LAW

**8.1**   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**8.2**   Arbitration.

8.2.1   Subject to Section 8.3, any dispute, controversy, difference or claim arising among the JV Parties concerning the interpretation, performance or enforcement of this Agreement shall be finally resolved and decided by arbitration, in New York City, pursuant to the then-applicable Commercial Arbitration Rules of the American Arbitration Association (the "**AAA**").   The arbitration shall be conducted in the English language; provided that testimony and documents may be submitted in a foreign language accompanied by an English translation.   The arbitral proceedings shall be confidential, and any information disclosed therein shall be treated by the Parties as Confidential Information.   There shall be three arbitrators to be selected as follows, one arbitrator shall be selected by the petitioning JV Party (the "**Petitioning Party**"), one arbitrator shall be selected by the JV Party defending the arbitration (the "**Defending Party**"), and the third arbitrator shall be selected by the two arbitrators selected by the Petitioning Party and the Defending Party, or, if such arbitrators cannot agree within thirty (30) days on the third arbitrator, such arbitrator shall be selected by the AAA pursuant to AAA rules.   In the event that the Defending Party within thirty (30) days of any notification made to the Defending Party of the demand for arbitration by the Petitioning Party (containing the name, address and profession of the arbitrator selected, the subject matter of the dispute and the relief sought) does not name its arbitrator (providing the same information), such arbitrator shall be appointed by the AAA at the request of the Petitioning Party.

8.2.2   The decision of the arbitral panel shall be in writing and shall set forth in detail the facts of the dispute and the reasons for the decision. Each JV Party accepts and consents to the jurisdiction of the arbitral panel and, solely for purposes of the enforcement of the arbitral award, any court of competent jurisdiction, for itself and in respect of its property, and waives in respect of both itself and its property, any defense it may have as to or based on lack of jurisdiction, improper venue or inconvenient forum.  The arbitral award shall be binding on the JV Parties, who hereby waive any appeal of such award.  In the event that the losing JV Party fails or refuses to comply with the arbitral award within fourteen (14) days following the date of which the award is notified to it, the prevailing JV Party, the arbitrators or their respective attorneys-in-fact may immediately proceed to request the judicial approval necessary for execution before a competent court of the domicile of the losing JV Party or before any other court where such JV Party or its assets and properties may be found.

8.2.3   Each of the JV Parties irrevocably consents to the service of process, notices or other papers in connection with or in any way arising from the arbitration or the enforcement of any arbitral award, by use of any of the methods and to the addresses set forth for the giving of notices in Section 6.1. Nothing contained herein shall affect the right of any JV Party to serve such processes, notices or other papers in any other manner permitted by applicable law.

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

14

**8.3**   Specific Performance; Injunctive Relief.   Each JV Party acknowledges that remedies at law for any actual or threatened breach of the covenants set forth in Articles 9 and 10 would be inadequate and that the complaining party shall be entitled to specific performance of such covenants or injunctive relief against activities in violation of such covenants, or both, by temporary or permanent injunction or other appropriate judicial remedy, writ, or order, in addition to any damages that the complaining party may be legally entitled to recover, which may be sought in any court of law having jurisdiction to afford such relief. Each party hereby consents to such relief being issued against it, and acknowledges and agrees that any recourse to a court of law shall not be deemed a waiver or modification of the arbitration provisions of Section 8.2 above.   The parties acknowledge that the covenants contained in Sections 9 and 10 of this Agreement shall be construed as agreements independent of any provision of this or any other contract between the parties, and that the existence of any claim or cause of action by a party hereto against the other party, whether predicated upon this Agreement or any other contract, shall not constitute a defense to the enforcement of such covenants.

## ARTICLE 9.
## NON-COMPETITION

**9.1**   Non-Competition.

**9.1.1**   In the event of termination of this Agreement, for a period of two (2) years from the date of the last Approved Deal under this Agreement:

(a)   Centauro shall not, and shall ensure that its Affiliates do not, enter into any transaction that is similar to the structure or operation of any Deal Summaries or Approved Deals and, without limiting the restrictions set forth in Article 10 hereof, which involves the purchase of Products from any Supplier that was identified to Centauro by CTFG; and

(b)   CTFG shall not, and shall ensure that its Affiliates do not, enter into any transaction directly or indirectly with financial investors that, to CTFG's and its Affiliates' knowledge (without any duty of investigation), are also financial investors in Centauro, its Affiliates or investment vehicles designed, managed or Controlled by them.

**9.1.2**   Notwithstanding anything herein to the contrary, the JV Parties shall be entitled to operate any separate or other business except that neither JV Party may be Affiliated with a Supplier or Buyer without disclosing such Affiliation to the other JV Party prior to the execution of a Deal Summary for a proposed transaction involving such Supplier or Buyer.

**9.2**   No Partnership.   Except as provided herein, this Agreement shall not create a partnership, agency, employer/employee or similar relationship between the JV Parties.

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

15

## ARTICLE 10.
## MUTUAL CONFIDENTIALITY AND PROPERTY RIGHTS

**10.1**   Confidentiality.

10.1.1 In the performance of this Agreement, each JV Party (a "**Receiving Party**") may have access to private and confidential information ("**Confidential Information**") owned or controlled by the other JV Party (the "**Disclosing Party**"), relating to such Disclosing Party's property, business, data or products, including apparatus, licensed programs, software, specifications, drawings, customer and supplier lists, investor lists, and other data, and such information may contain proprietary details and disclosures which are essential to the Disclosing Party's business. Confidential Information shall include the terms and conditions of this Agreement.

10.1.2 All Confidential Information acquired by a Receiving Party, or its employees and agents, shall be and shall remain the exclusive property of the Disclosing Party, and the Receiving Party shall keep all such Confidential Information confidential, and shall not copy, publish, or disclose it to others, without the Disclosing Party's prior written approval. Each JV Party recognizes that such Confidential Information is a valuable, special and unique asset of the Disclosing Party's business. Each JV Party further agrees that such Confidential Information constitutes the "trade secrets" of the Disclosing Party and that unauthorized disclosure or use of such Confidential Information by a Receiving Party or its owners, officers, agents or Affiliates would irreparably harm the Disclosing Party. The Receiving Party shall have no right, title, or interest to any Confidential Information of the Disclosing Party, except as stated herein, and shall not sell, transfer, or otherwise make available the Disclosing Party's Confidential Information to others except as provided in this Agreement, and further shall secure and protect all Confidential Information consistent with the maintenance of rights therein and take each such action as may be necessary with its employees who are permitted access to each such Confidential Information to satisfy its obligations hereunder.

10.1.3 Following the termination of this Agreement, the Receiving Party and shall return all Confidential Information to the Disclosing Party at its request; provided, however, that, subject to the foregoing confidentiality obligations, the Receiving Party may retain copies of any and all Confidential Information in accordance with its standard document retention policy in effect from time to time or as required to be maintained by it to satisfy its fiduciary or contractual obligations to its investors or as required by Applicable Law.

10.1.4 Nothing in this Section 10.1 shall restrict the Receiving Party with respect to Confidential Information which:

(a)   was generally known prior to the date of this Agreement or subsequently came to be so known through no fault of the Receiving Party;

(b)   is subsequently furnished rightfully to the Receiving Party by a third party not known, at the time of receipt or disclosure, to be under restrictions on use or disclosure;

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

16

(c)    was already in the possession of the Receiving Party prior to initial receipt thereof, directly or indirectly, from the Disclosing Party; or

(d)    is independently developed by the Receiving Party or its employees, officers, directors or advisers without reference to the Confidential Information provided by the Disclosing Party.

**10.2**    Publicity.  No JV Party may issue any press release or make a public statement or disclosure concerning the subject matter of this Agreement without the prior written consent of the other JV Party.

**10.3**    No License.  Neither JV Party will reference or use the other JV Party's name, logo, or trademark in marketing or other literature without the prior written approval of the other Party; provided, however, that Centauro may reference the terms of this Agreement, CTFG and the Cinque Terre group of companies in any confidential private offering memoranda distributed by Centauro to its potential investors and in discussions with such other Persons as are necessary for the operation of Centauro's business.

### ARTICLE 11.
### FURTHER ASSURANCES

**11.1**    Each JV Party shall execute and deliver such other documents, certificates, agreements and other writings and take such other actions as may be reasonably necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement, including, without limitation, such actions as are necessary to consummate an Approved Deal.

### ARTICLE 12.
### GENERAL PROVISIONS

**12.1**    Headings.  The headings, titles and subtitles used in this Agreement are for ease of reference only and shall not control or affect the meaning or construction of any provision hereof.

**12.2**    Entire Agreement.  This agreement contains the entire agreement of the JV Parties and supersedes any previous representations, statements, understandings, commitments or agreements, oral or written, it is complete as written and no JV Party is entitled to rely upon any matter, data, material or omission prior to but not expressly set forth in this Agreement.  In furtherance and not in limitation of the foregoing, the JV Parties acknowledge and agree that the governing documents of the Joint Venture entity to be formed in accordance herewith shall conform in all material respect to the terms and conditions set forth in this Agreement, and in the event of disagreement between this Agreement and such Joint Venture governing documents, this Agreement shall govern, provided, however, that the JV Parties further acknowledge and agree that this Agreement shall not supersede with respect to the subjects referenced in Section 2.3 for further development in such governing documents.

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

17

12/08/2009  05:32   12122230048                                      PAGE  18/19

**12.3**   Assignment.   Neither JV Party may delegate or assign any of its rights, duties or responsibilities in and to this Agreement, or any interest arising hereunder, without the prior written consent of the other JV Party; provided, however, that Centauro may assign this Agreement to a wholly owned subsidiary of Centauro upon prior written notice to CTFG.

**12.4**   Time.   Time shall be of the essence of this Agreement and every part thereof.

**12.5**   No Waiver.   No waiver on behalf of any JV Party or breach of any of the covenants, conditions and provisions herein contained shall be effective or binding upon such JV Party unless the same shall be expressed in writing and any waiver so expressed shall not limit or affect such JV Party's rights with respect to any future breach.

**12.6**   Amendment.   This Agreement shall not be altered, amended or qualified except by a memorandum in writing, signed by all of the parties, and any alteration, amendment or qualification thereof shall be null and void and shall not be binding upon any such party unless made and recorded as aforesaid.

**12.7**   Counterparts.   This Agreement may be signed in any number of counterparts and the signatures delivered by facsimile, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument and delivered in person.

**12.8**   No Third-Party Beneficiaries.   No provision of this Agreement shall create any third-party beneficiary rights in any Person whatsoever.

*[Signature page follows]*

Initials Cinque Terre
EAST\42469644.2
6033091v6

Initials Centauro

18

Case 1:15-cv-09003-LTS-SN  Document 129  Filed 09/08/17  Page 40 of 53

IN WITNESS WHEREOF the JV Parties have executed this Agreement as of the date and year first above indicated.

**Centauro Liquid Opportunities Master Fund, LP**

By: _____

Name: Ronald S. Dagar
Title:  Managing Partner

By: _____

Name: Yvonne Morabito
Title   Managing Partner

**CINQUE TERRE FINANCIAL GROUP, LTD**

By: _____

Name: Alessandro Bazzoni
Title:  President

19

**EXHIBIT B**

**PROMISSORY NOTE**

US$21,092,213.00                                                May 21, 2015

FOR VALUE RECEIVED, each of Cinque Terre Financial Group Ltd., a British Virgin Islands corporation ("CTFG"), and CT Energia Ltd., a British Virgin Islands corporation ("CTE"; each of CTFG and CTE is a "Maker" and collectively are the "Makers"), both with primary offices located at Craigmuir Chambers, Road Town, Tortola, British Virgin Islands, jointly and severally, hereby unconditionally promises to pay to the order of Centauro Liquid Opportunities Master Fund, L.P., a Cayman Islands exempted limited partnership with an office at 641 Lexington Avenue, 31st Floor, New York, NY 10022, email dagar@centaurocap.com, or its registered assigns (the "Payee"), upon the terms set forth below, the principal sum of Twenty-One Million Ninety-Two Thousand Two Hundred and Thirteen United States Dollars and No Cents (US$21,092,213.00) (as such amount may be increased pursuant to Section 1(a) hereof) plus interest on the unpaid principal sum outstanding at the rate of 1% per month.

Makers acknowledge and agree that the obligations of Makers under this promissory note (this "Note") arise from and are in consideration of certain Deal Capital provided by the Payee to CTFG from time to time on or prior to December 31, 2014 in connection with transactions contemplated by that certain Joint Venture Agreement, dated as of September 14, 2009, by and between CTFG and Payee (as amended from time to time, the "Joint Venture Agreement"). CTFG has advised Centauro that such Deal Capital has been lost and not returned to the Payee, and this Note evidences the commercial agreement reached between Makers and the Payee with respect to the repayment by Makers of such Deal Capital to the Payee. The Payee acknowledges and agrees that, upon payment of all amounts due under this Note in full, (a) all disputes, claims, damages or actions that the Payee may have or could have asserted against CTFG as a result of or with respect to the failure of CTFG to return such Deal Capital will be fully and completely settled and discharged, and (b) the Payee shall be deemed to have released CTFG from any further claims, liabilities, damages or actions as a result of such Deal Capital; *provided, however*, that notwithstanding the foregoing, nothing herein shall constitute a release or discharge of CTFG in respect of CTFG's obligation to indemnify the Payee in accordance with the Joint Venture Agreement with respect to any claims that are or may be made against the Payee by third parties, other than claims that may be made by limited partners of Payee relating to such Deal Capital after payment of all amounts due under this Note in full.

1.      Principal and Interest Payments. Makers shall make payments under this Note as follows:

(a) An amount equal to US$500,000 of principal plus all accrued but unpaid interest on this Note as of such date shall be due and payable monthly in arrears on the 5th Business Day of each month (each, a "Payment Date");

*provided, however,* that with respect to the payments owing hereunder on each of June 5, 2015, July 8, 2015, and August 7, 2015, the Makers shall have right, exercisable by written notice delivered to the Payee no later than two (2) Business Days prior to such Payment Date, to elect that the interest owing on such Payment Date shall be automatically added to the principal amount of this Note. The Payee hereby acknowledges receipt of payments totaling US$850,000 having been made prior to May 1, 2015. Makers and the Payee agree and acknowledge that the principal amount of this Note represents the balance owing by Makers to the Payee after receipt of such payments.

(b) The full unpaid amount of principal hereof plus all accrued but unpaid interest on this Note shall be due and payable on April 30, 2017 (the "Maturity Date"), unless due earlier in accordance with the terms of this Note.

(c) Makers may prepay, in whole or in part, without premium or penalty, the principal sum and accrued but unpaid interest under this Note at any time without the prior written consent of Payee. All prepayments shall be applied first to the amount of any accrued but unpaid interest hereunder and then to the unpaid principal balance of this Note.

(d) All payments under this Note shall be paid in the lawful currency of the United States of America and shall be made by wire transfer of immediately available funds to an account designated in writing by Payee.

2. Covenants.

(a) The obligations of this Note are obligations of each Maker, severally and jointly with the other Maker, subordinated only to the indebtedness existing as of the date hereof or incurred under the existing terms of the loan facilities of CTFG's existing senior secured lenders (the "Existing Secured Lenders"), which loan facilities are listed on Annex A hereto. Each Maker agrees that it shall not incur any further indebtedness for borrowed money which is not expressly subordinated to the payment of principal and interest to the obligations of such Maker to Payee hereunder.

(b) Makers covenant with the Payee that Makers shall, within 30 calendar days of the end of each fiscal quarter, provide to Payee quarterly financial statements of each Maker certified by the responsible officers of each Maker.

(c) During the term of this Note, the Makers covenant that all revenues generated from the operations of (i) any Maker, (ii) any entity majority-owned or otherwise controlled by any Maker or (iii) any other entity under common control with any Maker shall in each case be distributed to the Makers subject to (1) payment of all expenses incurred by such entity in connection with the generation of such operating revenue, (2) contractual distributions or payments to bona fide third party partners of any of the Makers or such other entities, (3) restrictions on

2

such distributions or payments under applicable laws or (4) restrictions under applicable contractual arrangements with bona fide third party partners of any of the Makers or such other entities with respect to the timing of such distributions or payments. Notwithstanding the foregoing, Centauro shall have no security interest in or any other contractual or other interest in such revenues.

3. Security Interest. If requested by Payee, each Maker shall use commercially reasonable efforts to cause the Existing Secured Lenders to enter into an Intercreditor Agreement (the "Intercreditor Agreement") with Payee in form and substance acceptable to Payee and the Existing Secured Lenders, which Intercreditor Agreement shall include, *inter alia*, a waiver by the Existing Secured Lenders of any restrictions on the ability of Makers to grant a subordinated security interest to the Payee. Contemporaneously with the entry by Payee and the Existing Secured Lenders into such Intercreditor Agreement, each Maker shall grant to Payee a security interest in and to all of such Maker's assets (including after-acquired assets and all proceeds thereof), such security interest to be subordinated only to the security interests of the Existing Secured Lenders. From and after the grant of such security interest, each Maker agrees to take, at such Maker's own expense, any and all action requested by Payee from time to time to ensure the attachment, perfection and priority of, and the ability of Payee to enforce, Payee's security interest in such assets. If an Event of Default shall have occurred and be continuing, and if such security interest shall have been granted in accordance with the terms of this Section 3, then Payee may, without notice to or demand upon any Maker, have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the laws of any jurisdiction in which the assets of any Maker are located, subject to the terms and conditions of such Intercreditor Agreement.

4. Events of Default.

(a) "Event of Default", wherever used herein, means the occurrence of any one or more of the following events (whatever the reason and whether it shall be voluntary or involuntary or effected by operation of law or pursuant to any judgment, decree or order of any court, or any order, rule or regulation of any administrative or governmental body):

(i) any default in the payment of the principal of, or the interest on, this Note, as and when the same shall become due and payable hereunder;

(ii) except for payment defaults described in Section 4(a)(i), any Maker shall fail to observe or perform any obligation or shall breach any term or provision of this Note and such failure or breach shall not have been remedied within seven calendar days after the date on which written notice of such failure or breach shall have been delivered to each Maker by Payee;

3

(iii) any Maker shall fail to observe or perform any of their respective obligations owed to Payee or shall be in breach of any other covenant, agreement, representation or warranty contained in the Joint Venture Agreement (including, without limitation, any amendments thereto), and such failure or breach shall not have been remedied within seven calendar days after the date on which written notice of such failure or breach shall have been delivered to each Maker by Payee;

(iv) any Maker or any of the other entities identified on Schedule 1 hereto (each of the foregoing entities, together with the Makers, the "CT Entities"; the Makers and each of the foregoing entities are sometimes referred to individually as a "CT Entity", which Schedule 1 shall be amended from time to time to include other entities (A) majority-owned by any Maker or (B) that become under common control with any Maker, in each case on or after the date hereof, or (C) that are successors or assigns to or of a CT Entity) shall commence, or there shall be commenced against any CT Entity, a case under any applicable bankruptcy or insolvency laws as now or hereafter in effect or any successor thereto, or any CT Entity commences any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to any CT Entity, or there is commenced against any CT Entity any such bankruptcy, insolvency, arbitration, or other new proceeding (all current proceedings are set forth in Annex B) which remains undismissed for a period of 60 calendar days; or any CT Entity is adjudicated insolvent or bankrupt; or any order of relief or other order approving any such case or proceeding is entered; or any CT Entity suffers any appointment of any custodian or the like for it or any substantial part of its property which continues undischarged or unstayed for a period of 60 calendar days; or any CT Entity makes a general assignment for the benefit of creditors; or any CT Entity shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due; or any CT Entity shall call a meeting of its creditors with a view to arranging a composition, adjustment or restructuring of its debts; or any CT Entity shall by any act or failure to act expressly indicate its consent to, approval of or acquiescence in any of the foregoing; or any corporate or other action is taken by any CT Entity for the purpose of effecting any of the foregoing;

(v) any CT Entity, or any person acting on behalf of any CT Entity, provides Payee with any false, inaccurate, or misleading information contained in any financial statement, application, schedule, report, or any other document given by any CT Entity, or any person acting on behalf of any CT Entity, in connection with this Note or the Joint Venture Agreement or any transaction contemplated hereby or thereby, and either Maker shall not have corrected any immaterial incorrect statements therein

4

within a period of not more than seven calendar days from the date of delivery of any such information; or

(vi) any CT Entity shall default in any of its respective obligations under any other note or any mortgage, credit agreement or other facility (including any trade finance or other facility with BNP Paribas or any other financial institution), indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement of such CT Entity, whether such indebtedness now exists or shall hereafter be created and such default shall result in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

(b) In the event that one of the CT Entities, other than the Makers, causes an Event of Default under Section 4(a)(iv) or Section 4(a)(vi) hereof, the Makers shall have 14 calendar days from the occurrence of such Event of Default to replace such CT Entity with a substitute entity that the Makers can reasonably establish will provide a substantially similar source of revenue that will be available to the Makers for purposes of meeting the payment obligations under this Note, in which event such Event of Default shall be deemed cured. The Makers shall notify the Payee of such substitute entity and provide such financial information regarding the substituted revenue source as may be reasonably requested by the Payee.

(c) If any Event of Default occurs, the full principal amount of this Note, together with all accrued but unpaid interest thereon, shall become, at the Payee's election, immediately due and payable in cash. Commencing immediately upon the occurrence and during the continuation of an Event of Default, whether or not Payee accelerates this Note, the interest rate on this Note shall accrue at the rate of 1.5% per month, or such lower maximum amount of interest permitted to be charged under applicable law. Except as otherwise expressly provided herein, the Payee need not provide and Makers hereby waive any presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, and the Payee may immediately enforce any and all of its rights and remedies hereunder and all other remedies available to it, whether at law or in equity. Such declaration may be rescinded and annulled by Payee at any time prior to payment hereunder. No such rescission or annulment shall affect any subsequent Event of Default or impair any right consequent thereon.

5. <u>No Waiver of Payee's Rights</u>. All payments of principal and interest shall be made without setoff, deduction or counterclaim and free and clear of and exempt from, and without deduction for or on account of, any present or future taxes, levies, imposts, duties, deductions, withholdings or other charges of whatsoever nature imposed, levied, collected, withheld or assessed by any government or any political subdivision or taxing authority thereof (it being understood that Makers

5

shall not be responsible for taxes imposed on Payee's income by any taxing authority). In the event that, subject to the provisions of the preceding sentence, any payments made under this Note on account of the principal or interest hereunder shall not be made free and clear and exempt from and without deduction for, or on account of, any such taxes or other charges of whatever nature, then and in any such event Maker shall pay such additional amounts as may be necessary in order that each net payment made hereunder, after payment or deduction or withholding for, or on account of, any such taxes or other charges of whatever nature will not be less than the amount otherwise provided in this Note to be then due and payable. No delay or failure on the part of the Payee in exercising any of its options, powers or rights, nor any partial or single exercise of its options, powers or rights shall constitute a waiver thereof or of any other option, power or right, and no waiver on the part of the Payee of any of its options, powers or rights shall constitute a waiver of any other option, power or right. Acceptance by the Payee of less than the full amount due and payable hereunder shall in no way limit the right of the Payee to require full payment of all sums due and payable hereunder in accordance with the terms hereof.

6. <u>Modifications</u>. No term or provision contained herein may be modified, amended or waived except by written agreement or consent signed by the party to be bound thereby.

7. <u>Cumulative Rights and Remedies; Usury</u>. The rights and remedies of the Payee expressed herein are cumulative and not exclusive of any rights and remedies otherwise available under this Note or applicable law (including at equity). The election of the Payee to avail itself of any one or more remedies shall not be a bar to any other available remedies, which each Maker agrees the Payee may take from time to time. If it shall be found that any interest due hereunder shall violate applicable laws governing usury, the applicable rate of interest due hereunder shall be reduced to the maximum permitted rate of interest under such law.

8. <u>Collection Expenses</u>. In case of any legal proceedings or other actions to collect under or to enforce this Note, then Makers, jointly and severally, shall be liable for and shall reimburse the Payee for all of its costs of collection and attorneys' fees incurred with the investigation, preparation and prosecution of such action or proceeding.

9. <u>Severability</u>. If any provision of this Note is declared by a court of competent jurisdiction to be in any way invalid, illegal or unenforceable, the balance of this Note shall remain in effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other persons and circumstances.

10. <u>Successors and Assigns</u>. This Note shall be binding upon each Maker and its successors and shall inure to the benefit of the Payee and its successors and assigns. The term "Payee" as used herein, shall also include any endorsee, assignee or other holder of this Note. Neither Maker may, directly or indirectly,

assign this Note or its obligations hereunder without the prior written consent of the Payee.

11. Lost or Stolen Promissory Note. If this Note is lost, stolen, mutilated or otherwise destroyed, Makers shall execute and deliver to the Payee a new promissory note containing the same terms, and in the same form, as this Note. In such event, Makers may require the Payee to deliver to Makers an affidavit of lost instrument and customary indemnity in respect thereof as a condition to the delivery of any such new promissory note.

12. Due Authorization. This Note has been duly authorized, executed and delivered by Maker and is the legal obligation of each Maker, enforceable against such Maker in accordance with its terms. No consent of any other party and no consent, license, approval or authorization of, or registration or declaration with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by each Maker, or the validity or enforceability of this Note other than such as have been met or obtained. The execution, delivery and performance of this Note and all other agreements and instruments executed and delivered or to be executed and delivered pursuant hereto or thereto will not violate any provision of any existing law or regulation or any order or decree of any court, regulatory body or administrative agency or the constituent documents or by-laws of each Maker or any mortgage, indenture, contract or other agreement to which each Maker is a party or by which such Maker or any property or assets of such Maker may be bound. Each Maker further represents, warrants, certifies and declares that all acts, conditions and things required to be done and performed and to have happened precedent to the execution and delivery of this Note and to constitute this Note a legal, valid and binding obligation of such Maker in accordance with its terms have been done, performed and have happened in compliance with all applicable laws.

13. Construction. The parties agree that each of them and/or their respective counsel has reviewed and had an opportunity to revise this Note and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of the terms hereof or any amendments hereto.

14. Business Days. For purposes of this Note, "Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by law to close.

15. Governing Law. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. Makers and Payee agree that all legal proceedings concerning the interpretations, enforcement and defense of this Note shall be commenced in the state and federal courts sitting in the City of New York, Borough of Manhattan (the "New York Courts"). Makers and the Payee

7

hereby irrevocably submit to the exclusive jurisdiction of the New York Courts for the adjudication of any dispute hereunder (including with respect to the enforcement of this Note), and hereby irrevocably waive, and agree not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court or that such suit, action or proceeding is improper. Makers and the Payee hereby irrevocably waive personal service of process and consent to process being served in any such suit, action or proceeding by mailing a copy thereof via overnight delivery (with evidence of delivery) to the other at the address in effect for notices to it under this Note and agree that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **MAKERS AND THE PAYEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

16. Notice. All notices and other communications given or made pursuant to this Note shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or (a) personal delivery to the party to be notified; (b) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next Business Day; (c) five (5) calendar days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) Business Day after the Business Day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their addresses as set forth in the preamble hereto.

Each of the undersigned Makers agrees to remain fully bound hereunder until this Note shall be fully paid and waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, modification, waiver, or other indulgence by the Payee or upon the discharge or release of the other Maker hereunder or to this Note. No modification or indulgence by the Payee hereof shall be binding unless in writing; and any indulgence on any one occasion shall not be deemed to constitute the grant of a similar indulgence on any other occasion. Any modification or change of terms, hereunder granted by any holder hereof, shall be valid and binding upon each Maker, notwithstanding the acknowledgement of any Maker, and each Maker does hereby irrevocably grant to each other a power of attorney to enter into any such modification on their behalf. The rights of any Payee hereof shall be cumulative and not necessarily successive. **Each Maker fully understands the contents of this Note and, as a co-Maker, is fully aware that such Maker is jointly and severally liable for the full amount of principal and interest due and owing under this Note.**

*[Signature Page Follows]*

IN WITNESS WHEREOF, each Maker has caused this Note to be executed as of the date first above written.

MAKERS:

Cinque Terre Financial Group Ltd.

By: _____
Name:  Alessandro Bazzoni
Title:  ceo
Email:

CT Energia Ltd.

By: _____
Name:  Alessandro Bazzoni
Title:  Ceo
Email:

Acknowledged and Agreed to:

PAYEE:

**CENTAURO LIQUID OPPORTUNITIES MASTER FUND, L.P.**

By: _____
Name:  RONALD S. DAGAR
Title:  MANAGING MEMBER
e-mail:  DAGAR @ CENTAUROCAP. COM

By: _____
Name:  YVONNE MORABITO
Title:  MANAGING MEMBER
e-mail:  yvonne @ centaurocap.com

1

ANNEX A

## Existing Secured Lenders

BNP Paribas Suisse
RB International USA, Inc.
Credit Suisse SA
Bancredito International Bank, Corp.

ANNEX B

Existing Proceedings

Atlantic Pacific Logistics, SA - arbitration
Taryn Capital, Inc. - arbitration

## SCHEDULE 1

### CT Entities

CT Energia, Inc. (USA)
Cinque Terra Sucursal Peru
Cinque Terre Energia, S.A. (Dominican Republic)

12