UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENTAURO LIQUID OPPORTUNITIES MASTER FUND, L.P., <br><br> Plaintiff, <br><br> vs. <br><br> ALESSANDRO BAZZONI, CINQUE TERRE FINANCIAL GROUP, LTD., CT ENERGIA LTD., and CT ENERGIA Ltd. d/b/a, ELEMENTO LTD., <br><br> Defendants. | Case No. 15-cv-9003 (LTS) |

**LOCAL CIVIL RULE 56.1 STATEMENT OF DEFENDANTS
ALESSANDRO BAZZONI AND CT ENERGIA LTD.**

In accordance with Local Civil Rule 56.1, Defendants Alessandro Bazzoni and CT Energia Ltd. respectfully submit the following material facts as to which it contends there is no genuine issue to be tried for the above-captioned action:

**THE PARTIES**

1.  Plaintiff Centauro Liquid Opportunities Master Fund, L.P. ("Centauro") is a limited partnership formed under the laws of the Cayman Islands, the sole general partner of which is Yvonne Morabito ("Morabito"). *See* Amended Complaint (Exhibit A[1]), ¶ 8.

2.  Defendant CT Energia Ltd. ("CTEL") is a British Virgin Islands corporation

---

[1] All references to exhibits herein are to those attached to the accompanying September 28, 2018 Declaration of Matthew G. DeOreo.

(Exhibit A, ¶ 8), which was formed on May 9, 2013. *See* CTEL's Memorandum of Association and Articles of Incorporation (Exhibit E).

3. The earliest Morabito heard of CTEL was the "later part of 2012, maybe beginning of 2013." *See* Transcript of October 7, 2016 Yvonne Morabito/Centauro deposition (Exhibit C), 63:10-14.

4. Alessandro Bazzoni ("Bazzoni"), appearing as a deposition witness on behalf of CTEL, pursuant to Fed.R.Civ.P. 30(b)6), explained that CTEL "did not have any activity in terms of or related ... to the purchase and sale of oil," "never bought or sold any oil or anything," and "was not an active company." *See* Transcript of December 5, 2016 CTEL deposition (Exhibit D), 16:13-20, 76:16, 77:24-78:1).

## THE JOINT VENTURE AGREEMENT

5. Cinque Terre Financial Group, Ltd. ("CTFG") is a limited liability company formed and existing under the laws of the British Virgin Islands. (Exhibit A,¶ 9).

6. Centauro and CTFG entered into a Joint Venture Agreement ("JVA") as of September14, 2009, for the purpose of forming an entity to trade petrochemical products through the commercial expertise of CTFG and the financial support of Centauro. (Exhibit A, ¶ 19); *see also*, JVA (Exhibit A at Ex. A), p.1, 1st "Whereas" clause; p.3, § 1.27.

7. CTEL was never a party to the JVA, as the only parties to that agreement were Centauro and CTFG. (Exhibit A, ¶ 19; Exhibit A at Ex. A, at ¶ 2).

8. According to the JVA, "any Losses of the Joint Venture in respect of an Approved Deal shall be borne solely by Centauro...." (Exhibit A at Ex. A, § 2.2.2). In addition, the JVA insulated CTFG from liability on, among other things, the loss of profits and revenue, stating:

> In no event shall either JV Party [CTFG and Centauro] be liable to the other JV Party or to the Joint Venture for any special, consequential, incidental, indirect, punitive, or exemplary damages or for loss of profits or revenue, loss of use, loss of opportunity, loss of goodwill, cost of substitute facilities, goods or services, or cost of capital. (Exhibit A at Ex. A, p.5, § 4.3).

9. During the course of the joint venture, Centauro invested monies ("Deal Capital") with CTFG in various transactions. (Exhibit A, ¶ 23).

10. During the course of the joint venture, certain Deal Capital was returned by CTFG to Centauro. (Exhibit C, 161:23 – 162:2).

11. However, during the course of the joint venture, certain Deal Capital was not returned to Centauro, and CTFG advised that such "money is gone as of the start of 2015." (Exhibit A, ¶ 24 - ¶25; Exhibit C, 140:21 - 141:15).

## THE PROMISSORY NOTE

12. On May 21, 2015, Alessandro Bazzoni ("Bazzoni") signed a promissory note on behalf of CTEL and CTFG for $21,092,213 in favor of Centauro ("Promissory Note"). (Exhibit A, pp., ¶31); *see also* Promissory Note (Exhibit A at Ex. B).

13. To date, CTFG and CTEL have not fully satisfied the Promissory Note (Exhibit A, ¶¶ 34-35), to the extent there is a duty to do so.

14. The Promissory Note, which states that it was made "FOR VALUE RECEIVED," also explicitly sets forth the basis for any obligations under it:

> [T]he obligations of Makers under this promissory note (this "Note") arise from and are in consideration of certain Deal Capital provided by Payee [Centauro] to CTFG from time to time on or prior to December 31, 2014 in connection with transactions contemplated by that certain Joint Venture Agreement, dated September 14, 2009, by and between CTFG and Payee [Centauro] (as amended from time to time, (the "Joint Venture Agreement"). CTFG has advised Centauro that such Deal Capital has been lost and not returned to the Payee, and this Note evidences the commercial agreement reached between Makers and the Payee with respect to the repayment by Makers of such Deal Capital to the Payee. (Exhibit A at Ex. B, p.1).

15. The Promissory Note releases CTFG exclusively from "all disputes, claims, damages or actions that [Centauro] may have or could have asserted against CTFG as a result of or with respect to the failure of CTFG to return such Deal Capital" and "further claims, liabilities, damages or actions as a result of such Deal Capital." (Exhibit A at Ex. B, p.1, 2nd paragraph; Exhibit C, 169:8-10)

16. "The promissory note does not say that Centauro would forgive CTEL for any liability if its deal capital were returned." (Exhibit C, 169:3-7).

17. Centauro was "represented by counsel when this promissory note was drafted." (Exhibit C, 165:10-13).

18. "In this promissory note CTFG is defined as a different entity from CT Energia Ltd." (Exhibit C, 165:18-21).

19. "[T]he promissory note does not in any way reference deal capital provided by Centauro to CTEL." (Exhibit C, 164:17-20).

20. Nor can Centauro identify any such monies received by CTEL, as :

> By being a maker of the note and by the failure of Alessandro Bazzoni and his team to ever fully prove what happened to our capital, ***we don't really know where the money went*** and therefore whether it was under CTFG deal capital or other, that's why CT Energia is a maker of the note. (Exhibit C, 164:25-165:9) (emphasis added).

## **LACK OF CONSIDERATION**

21. When directly asked what consideration Morabito believed CTEL received from Centauro in exchange for signing the Promissory Note, she responded on behalf of herself and Centauro:

>CTEL got the – most basically CTEL got a long run room of time to return capital and to execute a business that otherwise wouldn't have been possible without the fraudulent misappropriation of Centauro's money so first and foremost it got a lot of time. Secondly, is it probable if I could get through proper discovery with all these entities and see what Alessandro and his people did, did CT Energia use some of Centauro's capital for transactions and make money and defraud us and therefore owe us money, probably. In fact, absolutely yes so yes, there's consideration for CT Energia in this note. Exhibit C, 169:20-170:13).

22. Morabito further testified:

>CTEL received benefit, yes and plus it's acknowledged in the actual making of the note and all the effort that went into it that the two makers are acknowledging the consideration which was extensive. (Exhibit C, 170:17-21).

## THE LACK OF FRAUD AND REASONABLE RELIANCE

21. Prior to Plaintiff executing the Promissory Note, Bazzoni twice emailed Morabito stating that CTFG and CTEL could not payoff the Promissory Note. (Exs. G and H; Ex. F at pp. 182-187).

22. Morabito testified that she read these emails to mean that the obligors of the note were "backing off an obligation ...." (Ex. F at 191: 7-9).

23. Therefore, prior to executing the Promissory Note, Plaintiff was on actual written notice that the obligors were **not** representing that they had the funds to payoff the Promissory Note. (Exs. F at 191: 7-9; G and H).

24. "By April 2014, Centauro had not received returns on transactions [and] ... CTFG had specifically represented that by this time period the transactions would be complete and that Centauro's funds would be returned. Nevertheless, by the spring of 2014, CTFG had failed to return Centauro's investment." (Ex. I at ¶ 24).

25. "When Centauro requested an explanation for the missing funds, CTFG provided a number of incoherent and unverifiable justifications for its failure to return Centauro's funds" (*id.* at ¶ 25).

26. "In December 2014, CTFG advised Centauro that it could not return Centauro's money due to a variety of alleged intervening factors" (*id.* at ¶ 27).

27. Prior to the execution of the Promissory Note, Plaintiff believed that CTFG gave "many excuses" for its failure to repay Plaintiff (Ex. C at 121:21)

28. Prior to the execution of the Promissory Note, Plaintiff believed that CTFG gave "constant excuses, delays and hijack[ed] of our capital for nine months" (*id.* at 123:5-6).

29. Prior to the execution of the Promissory Note, Plaintiff believed that CTFG "committed fraud and it stole our money" (*id.* at 131:23-24)

30. Prior to the execution of the Promissory Note, Plaintiff "had lost faith in [Bazzoni's] truthful representation[s]" (*id.* at 137:9-10).

31. Prior to the execution of the Promissory Note, Plaintiff believed that Richard Rothenberg ("Rothenberg") and Bazzoni "repeatedly showed bad faith throughout the negotiations [of the Promissory Note] by refusing to provide diligence on CTFG's finances and CTFG's ability to pay the promissory note" (*id.* at 146:3-10, 158:10-18; *see also* Ex. J at ¶ 24).

32. Prior to the execution of the Promissory Note, Plaintiff believed that Rothenberg and Bazzoni "were not forthcoming about CTFG's current finances" (Ex. C at 147:3-8, 158:19-23; *see also* Ex. J at ¶ 24).

33. Prior to the execution of the Promissory Note, Plaintiff believed that CTFG committed fraud and the Promissory Note would relieved it of having to prove such fraud: "[the

Promissory Note] took out of the equation this need to go prove the fraud" (Ex. C at 154:21-22).

34. Prior to the execution of the Promissory Note, Plaintiff believed that the Promissory Note would "stop[] this monthly madness of [CTFG] telling us lies about transactions" (*id.* at 155:17-19).

35. Prior to the execution of the Promissory Note, Plaintiff believed that "[CTFG's] story ha[d] changed 15 different times with all sorts of lies and stories" (*id.* at 155:21-23).

36. Morabito and Centauro were clearly sophisticated investors. Morabito testified that she received a Bachelors of Science in economics from the University of Pennsylvania's Wharton School, a Masters of Business Administration from New York University's Stern School, a juris doctorate from Cardozo Law School in 1995, and an admission to the New York Bar in 1997, with which she has practiced law. (Ex. C at 10:23 to 12:4).

37. Morabito also has an extensive finance background, has practiced in that field for numerous years, and has run multiple investment funds. (*Id.* at p. 14-20).

38. She also testified that she has been conducting due diligence for investment opportunities for over a decade. (Ex. F at pp. 9-10).

39. Morabito further testified that if she was doing due diligence for an investment opportunity in a company, she would want to review that company's financial health, balance sheets, cash flow statements, income statements and financial statements. (*Id.* at pp. 10-16).

40. During the negotiations of the Promissory Note, Plaintiff's investors emailed Plaintiff demanding that Plaintiff obtain numerous financial records from CTFG and CTEL as part of the due diligence for the Promissory Note, including those companies' balance sheets, cash flows statement, and full audited and unaudited financial statements. (Ex. K at pp. 8000-8002; Ex. L at p. 4370).

41. During the negotiations of the Promissory Note, Morabito emailed her partner in Plaintiff, Ronald Dagar ("Dagar"), conceding that "all the verbiage of a note at this point is academic as there is no way to sign off on it before seeing the financial condition of CT - via bank account history, transaction history and pipeline, balance sheets/income statements of CT entities, etc." (Ex. M).

42. Morabito testified that she could not remember if, prior to the execution of the Promissory Note, Plaintiff received any balance sheets or any financial statements for CTFG and CTEL for years 2012 to 2014 (Ex. F at pp. 110, 115-119, 122-133, 142-147, 155-160, 180, Ex. N).

43. Morabito admits that, prior to the execution of the Promissory Note, Plaintiff only obtained "piece meal" financial records from CTFG (Ex. F at 92:22), not the "the full picture" of CTFG's finances (*id.* at 97:16), and "[w]e did not receive everything we wanted *** I did not get to see that whole universe of information" with regards to the finances of CTFG and CTEL (*id.* at 122:9-10, 125:15-16).

44. She also conceded that she did not even know if CTFG and CTEL had an auditor for its finances. (*Id.* at pp. 162-174).

45. Prior to the execution of the Promissory Note, Morabito thought CTFG's attitude about getting Plaintiff the financial records of CTFG and CTEL was "was cavalier and infuriating" (*id.* at 138:12-14; Ex. M).

46. Morabito testified that, prior to the execution of the Promissory Note, Bazzoni specifically told her that CTFG's "bank will come first" before the Promissory Note (Ex. F at 72:5), and that she thought that one of the bank's debt alone was $17 million at the time of the execution of the Promissory Note (*id.* at 216:20 to 217:3).

47. Plaintiff knew these facts (*see supra* No. 46) and was represented by counsel for the Promissory Note negotiations (Ex. C at pp. 134, 165; Ex. F at p. 214), Plaintiff failed to obtain confirmation of the amounts owed to these secured lenders prior to executing the Promissory Note. (Ex. F at 217:4-20, pp. 279-280).

48. As to Plaintiff's assertions that CTEL told Plaintiff that CTEL had business opportunities that could assist CTEL in satisfying the Promissory Note, Morabito admitted that Plaintiff did not contact any of the counter-parties to those proposed deals to see if such deals were viable (Ex. C at pp. 142).

49. Morabito also testified that she could not identify a single specific proposed business opportunity that, prior to the execution of the Promissory Note, she believed was "viable." (Ex. F at 197:6-22).

## BAZZONI IS NOT AN ALTER-EGO OF CTEL

50. Plaintiff concedes that "Centauro and CTFG executed a Joint Venture Agreement ('JVA')" and that Bazzoni was not a signatory to that agreement (Ex. A at ¶19).

51. Centauro further admits that the Promissory Note was executed by CTFG and CTEL– not by Bazzoni (*id.* at ¶¶ 1, 28-33, 51).

52. CTEL did not have any operations because "CTEL [BVI] was just a company that was created for marketing purpose[s]," and "did not have any activity in terms or related to ... the purchase and sale of oil ...." (Ex. D 16:15-21; *see also id.* at 43:5-22).

53. CTEL "never bought or sold oil ever." (*Id.* at 55:17-18; *see also id.* at 65: 8-9, p. 66:19-21).

54. CTFG, not Bazzoni, created CTEL so that CTFG could use another name for

marketing purposes because the name "Cinque Terre Financial Group was too complicated and did not reflect what was the business, what was the core business of the company." (*Id.* at 23:8-20; *see also id.* at 31:14 to 32:16; 82:22 to 83:15; 89:12-17).

55. Bazzoni never used funds of CTEL to pay for his personal expenses (*Id.* at p. 113:10-19).

56. Plaintiff cannot identify any assets, property or business opportunities of CTFG or CTEL that were transferred to Elemento (Ex. F at pp. 244-245; 278-279)

57. Plaintiff does not know what Elemento's business is and she could not identify any activities of Elemento that are similar to that of CTFG or CTEL (*id.* at pp. 245-246).

58. Plaintiff cannot identify any employee of Elemento or any personnel shared by Elemento and CTFG or CTEL (*id.* at pp. 249, 265-266)

59. Plaintiff does not know why Elemento was created or who created it (*id.* at p. 263).

60. Plaintiff cannot identify any office, financial account or revenue stream that was shared by Elemento and CTFG and CTEL (*id.* at pp. 263-265).

Dated: New York, New York
      September 28, 2018

Yours, etc.,

TACOPINA & SEIGEL

By:   /s/ *Matthew G. DeOreo*
Joseph Tacopina, Esq.
Chad D. Seigel, Esq.
Matthew G. DeOreo, Esq.
275 Madison Ave., Fl. 35
New York, New York 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
*Attorneys for Defendants Alessandro Bazzoni and CT Energia Ltd.*