UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CENTAURO LIQUID OPPORTUNITIES          :
MASTER FUND, L.P.                       :
                                       :
            Plaintiff,                 :
                                       :         15 Civ. 9003 (LTS) (SN)
          - against -                  :
                                       :
ALESSANDRO BAZZONI, CINQUE             :
TERRE FINANCIAL GROUP, LTD.,           :
CT ENERGIA LTD., and CT ENERGIA        :
LTD. d/b/a ELEMENTO LTD.,              :
                                       :
            Defendants.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## RULE 56.1 STATEMENT OF UNDISPUTED
## MATERIAL FACTS OF DEFENDANT ELEMENTO LTD. IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant Elemento Ltd. ("Elemento") submits the

following Statement of Undisputed Facts in Support of its Motion for Summary Judgment.

Elemento avers that there is no genuine issue to be tried with respect to the following material

facts:

1.      On November 18, 2015 plaintiff began this action against CTFG, CTEL-BVI,

Bazzoni and several other entities.  *See* the Declaration of Michael T. Sullivan, dated September

28, 2018 (the "Sullivan Decl."), Ex. A.

2.      "Alter ego" was the sole predicate for liability, except Bazzoni, CTFG and CTEL-

BVI.  *See* Sullivan Decl. Ex. A at ¶¶ 10, 12, 14.

3.      On April 11, 2016, in proceedings begun in November 2015, BVI authorities

ordered CTFG to wind up its affairs and appointed a liquidator.  *See* Sullivan Decl. Ex. I.

4.       CTFG's liquidator began ancillary proceedings in the United States, *In re Cinque Terre Financial Group Limited*, No. 16-11086 (JLG) (S.D.N.Y Bankr.), which resulted in an injunction against further proceedings against CTFG in the United States.  *See* Chapter 15 Petition, Sullivan Decl. Ex. H; Memorandum Opinion and Order entered in this action on September 30, 2016 (ECF 107) ("2016 Opinion") at 2, Sullivan Decl. Ex. D.

5.       On September 30, 2016, this Court dismissed the Complaint for lack of personal jurisdiction as against all except CTEL-BVI.  *See* Sullivan Decl. Ex. F.

6.       On September 8, 2017, Elemento was drawn into this action when plaintiff filed its Amended Complaint.  *See* 2016 Opinion, Sullivan Decl. Ex. D.

7.       The Amended Complaint named Elemento and re-named Bazzoni, both as alter-ego defendants.  *See* Amended Complaint, Sullivan Decl. Ex. E.

8.       On July 23, 2018, this Court denied plaintiff's motion to attach Elemento's property, noting that:

> [Plaintiff] has not proffered evidence to support its allegations that CTEL and Elemento are principally engaged in the same business ventures, using the same offices, email accounts, revenue streams, and personnel, that Elemento's assets and profits ultimately flow back to CTEL through Bazzoni, who has used CTEL's accounts to purchase personal property, or that Bazzoni or Elemento misused CTEL, the Court finds that Centauro has not met its burden, on the basis of the current record, of demonstrating a likelihood of success on the merits of its alter ego claims.

*See* Memorandum Order entered in this action on July 23, 2018 (ECF 209), Sullivan Decl. Ex. G.

9.       Contemporaneously, the Court denied Elemento's motion to dismiss.  *See* Memorandum Opinion and Order entered in this action on July 20, 2018 (ECF 208), Sullivan Decl. Ex. F.

10.     In denying Elemento's motion to dismiss, the Court emphasized Centauro's alter ego theory of liability in the Amended Complaint, which is that Elemento is the alter ego of CTEL-BVI (*see* AC ¶ 12) and thus "the relevant question is whether CTEL's corporate form will be disregarded, not Elemento's," which is a question of BVI, and thus English law.  *See* Sullivan Decl. Ex. F.

11.     In or about September 2015, Bazzoni, Richard Rothenberg, and Francisco D'Agostino (collectively, the "Promoters") met with Eduardo Cisneros.  *See* Sullivan Ex. GG, Deposition Testimony of Eduardo Cisneros ("Cisneros Depo.") at 42:12-17; 70:18-24.

12.     D'Agostino, who is Eduardo Cisneros's stepbrother, arranged the meeting.  *See* Cisneros Depo. at 42:12-17; 70:18-24, Sullivan Ex. GG.

13.     The purpose was to discuss financing a contemplated new oil trading company to be established in Malta.  *See* Declaration of Eduardo Cisneros, dated Dec. 21, 2017 ("Cisneros 2017 Decl.") at ¶ 5, Cisneros Declaration, dated September 28, 2018 ("Cisneros 2018 Decl.") at Ex. B; Declaration of Joan Jensen, dated Sept. 28, 2018 ("Jensen Decl."), at Exhibit A.

14.     Eduardo Cisneros, in his role as president and chief executive officer of Cisneros Corporation, and on behalf of his father, RJC, met with the Promoters.  *See* Cisneros 2017 Decl. at ¶¶ 5-7, Cisneros 2018 Decl. Ex. B; Cisneros Depo. 45:16-46:2, Sullivan Decl. Ex. GG.

15.     The Cisneros Corporation, organized under Delaware law with its principal place of business in Coral Gables, Florida, provides administrative and associated support in connection with various companies and investments of the Ricardo Cisneros family.  *See* Jensen Decl. at ¶ 4.

16.     Ms. Jensen is the Cisneros Corporation's General Counsel.  *See* Jensen Decl. at ¶¶ 1, 4.

17.     Early discussions between the Promoters and Eduardo Cisneros and his team emphasized that the new venture would pursue oil trading, a single line of business which the Promoters would not pursue elsewhere.  *See* Cisneros Depo. at 39:19-23, Sullivan Decl. Ex. GG.

18.     Oil trading was not the business of the failed JV, which was, "to purchase oil at wholesale price and sell it to end users at retail price."  AC ¶ 16.

19.     It was important to Eduardo Cisneros that because the new Malta business was to engage solely in oil trading, it would not compete with the Promoters' other businesses.  *See* Cisneros 2017 Decl. ¶ 6, Cisneros 2018 Decl. Ex. B.

20.     Following the initial meeting, Eduardo Cisneros instructed his team members, headed by Ms. Jensen, to pursue the proposal.  *See* Jensen Decl. ¶ 7, Ex. A; Cisneros Depo. at 98:12-99:21, Sullivan Decl. Ex. GG.

21.     Eduardo Cisneros understood that the Promoters and the Cisneros Corporation were establishing a new venture, the purpose of which would be—and in fact became—to use RJC capital to finance oil trades.  *See* Cisneros Depo. at 37:13-38:18, 38:3-15, Sullivan Decl. Ex. GG.

22.     On October 6, 2015, shortly after the initial meeting among the Promoters and Eduardo Cisneros, Elemento was established in Malta under its original name, CT Energia Ltd., as a wholly owned subsidiary of CT Energia Holding, Ltd. ("CT Holding-Malta").  *See* Elemento Memorandum of Association at § 5.2, Sullivan Decl. Ex. Q; CT Energia Ltd. Certificate of Registration, Sullivan Decl. Ex. R.

23.     Bazzoni and Rothenberg, two of the Promoters, were Elemento's sole directors at inception.  *See* Elemento Memorandum of Association at § 6, Sullivan Decl. Ex. Q; CT Energia Ltd. Certificate of Registration, Sullivan Decl. Ex. R.

24.     Malta records reflect Bazzoni as CT Holding-Malta's sole shareholder and director when organized in August 2014.  *See* CT Energia Holding Ltd. Certificate of Registration, Sullivan Decl. Ex. S.

25.     D'Agostino became an equal shareholder of CT Energia Holding in or about October, 2015.  *See* Sullivan Decl. Ex. T.

26.     By November 2015, negotiations between the Promoters and Eduardo Cisneros and his team had progressed to the point where the form of RJC's investment was agreed:  the new venture would consist of a holding company whose sole holding was Elemento; Cedaridge (another company beneficially owned by RJC) would become fifty percent co-owner of the new venture and would have "veto rights" on transactions.  *See* Jensen Decl. ¶ 9; Cisneros Depo. at 45:7-47:12, Sullivan Decl. Ex. GG.

27.     In November 2015, a new holding company was formed in Malta, CT Energia Oil and Gas Ltd ("CTEO&G").  *See* CTEO&G Memorandum of Association, Sullivan Decl. Ex. M.

28.     Elemento, which was still called CT Energia Ltd. was transferred from CT Holding-Malta to CTEO&G.  *See* December 9, 2016 Notice of Transfer of Shares, Sullivan Decl. Ex. U.

29.     The Promoters and Eduardo Cisneros and his team prepared and executed the following documentation:

    a.  A Loan Agreement by and between CTEO&G and Cedaridge.  The Loan Agreement provided for a loan of up to $30,000,000.00, which was repayable 90 days following demand.  Jensen Decl. Ex. E.

    b.  A Share Purchase Agreement by and among CTEO&G, Cedaridge, Bazzoni, and D'Agostino pursuant to which Cedaridge was to become a 50 percent owner of CTEO&G and Bazzoni and D'Agostino (Eduardo Cisneros's stepbrother) were each to become 25 percent owners.  Jensen Decl. Ex. F.

      c.     A Shareholders' Agreement by and among CTEO&G, Cedaridge, D'Agostino, and Bazzoni.  Jensen Decl. Ex. G.

30.     At its inception, Bazzoni was listed as CTEO&G's sole shareholder and director. Later, D'Agostino became an equal shareholder and a director.  *See* CTEO&G Memorandum of Association § 6, Sullivan Decl. Ex. M; February 18, 2016 Notice of Transfer of Shares, Sullivan Decl. Ex. N.

31.     The agreements and Financing were negotiated at arm's length and the Cisneros team negotiated these agreements with the intent to protect RJC's investment and ensure that Elemento was operated properly and in accordance with corporate formalities.  The email exchanges between the Promoters and Eduardo Cisneros's team evidence these facts.  For example: After Ms. Jensen circulated the draft Shareholder's Agreement on November 23, 2015, Mr. Rothenberg raised concerns about the language about the put/call option, claiming that "[t]his is not our understanding."  Ms. Jensen responded:  "The intention is that whatever the loan amount outstanding is—this amount will be paid in full.  When I read the language 'up to', it implied that less than the outstanding debt could be paid."  *See* Jensen Decl. Ex. C, Ex. B.

32.     Under the Loan Agreement, at any time, on 90 days notice, Cedaridge could require repayment of the entirety of the Financing.  *See* Jensen Decl. Ex. E, Loan Agmt. ¶ 2.4.

33.     The Shareholders' Agreement provided Cedaridge with a Put Option, exercisable at any time, to require CTEO&G (the holding company) "to acquire all of [Cedaridge's] Shares and repay the Loan for the equity value, i.e., meaning the total amount of the assets of the Company and [Elemento] up to the outstanding loan amount due under the Loan Agreement, plus one half of the reserves in excess thereof, counting the reserves of both the company and any subsidiaries including [Elemento] . . ."   Jensen Decl. Ex. G, Shareholders' Agreement at ¶ 11.

34.   The Shareholders' Agreement also provided, among other things:

    a.   The Board of CTEO&G would be comprised of four directors, two appointed by Cedaridge and one appointed each by Bazzoni and D'Agostino;

    b.   Most of Elemento's activities, would require unanimous board approval, including, "[t]he commitment to any Business transaction", ¶ 6.(b); and

    c.   Any distributions were prohibited until and unless Cedaridge's Loan/Investment was fully repaid. ¶ 16.

*See* Jensen Decl. Ex. G, Shareholders Agreement.

35.   The three agreements were executed and Cedaridge provided the contemplated $30,000,000.00 Financing, received by Elemento on or about February 4, 2016 and March 10, 2016. *See* Declaration of Liana Galanti, dated September 28, 2018 (the "Galanti Decl.") at ¶¶ 5-6.

36.   Funds transfers are confirmed by wire transfers, auditor financial reports, and bank statements attached to declarations submitted in support of this motion. *See* Galanti Decl. ¶ 6; Declaration of Joseph Camilleri, dated August 23, 2018 (the "Camilleri Decl.") at ¶¶ 2-3.

37.   The Financing proceeds represented the entirety of Elemento's capital, as evidenced by both Elemento's bank statements and the Interim Financial Report prepared by PricewaterhouseCoopers ("PWC") concerning Elemento. *See* Camilleri Decl. Exs. A, B.

38.   Neither Mr. Bazzoni nor CTEL-BVI transferred any funds to Elemento, and prior to funding by Cedaridge, Elemento conducted no business and had no assets. *See* Camilleri Decl. Exs. A, B*; Cisneros Depo. 38:3-15, Sullivan Decl. Ex. GG.

39.   The Share Purchase Agreement provided that Cedaridge was fifty percent shareholder of CTEO&G, Elemento's holding company parent. *See* Share Purchase Agmt. ¶ 2.2(a) and (b), Ex. A, Jensen Decl. Ex. F.

40.     Formal recognition of Cedaridge's shareholding interest was delayed because of certain local (Malta) administrative processes.  *See* Jensen Decl. ¶ 18.

41.     The need to recognize Cedaridge's ownership interest became moot when CISA, another RJC entity, acquired the entirety of Elemento from its holding company parent pursuant to terms agreed in September 2016 and concluded in February 2017.  *See* Jensen Decl. ¶¶ 23-26.

42.     That delay notwithstanding, Cedaridge's shareholder rights, including those listed above, were incorporated into the Loan Agreement.  *See* Loan Agmt. ¶ 2.4, Jensen Decl. Ex. E.

43.     The Shareholders' Agreement provides, among other things, that Elemento's parent was to operate solely as a passive holding company.  *See* Shareholders Agreement § 2, Jensen Decl. Ex. G.

44.     Elemento was to engage in the business of wholesale trading of hydrocarbon products for distribution to commercial customers.  *See* Shareholders Agreement § 2, Jensen Decl. Ex. G.

45.     That Elemento was to pursue this particular and singular activity, oil trading, is significant.  *See* Cisneros 2017 Decl. ¶ 6, Cisneros 2018 Decl. Ex. B.

46.     Of the two Signatory Defendants, only CTFG was operational.  *See* Deposition Testimony of Alessandro Bazzoni ("Bazzoni Depo.") at 23:5-20; 16:15-21, 32:9-16; 65:12-66:21, Sullivan Decl. Ex. CC.

47.     "CT Energia Ltd." was a "marketing tool," a "name," rather than a substantive business, because "Cinque Terre Financial Group" was too complicated and did not reflect . . . what was the core business of the company."  Bazzoni Depo at 23:5-20, 16:15-21, 32:9-16; 65:12-66:21, Sullivan Decl. Ex. CC.

48.     CTEL-BVI "never sold or bought any drop of oil, never had the possibility to do it, didn't have the logistic[s] to do it, because it was just a name."  Bazzoni Depo. at 82:22-83-2, Sullivan Decl. Ex. CC.

49.     "[CTFG's] core business was to – deliver product to strategic location, and from there we distribute the product either regionally or domestically.  So it was more toward doing business downstream."  *See* Deposition Testimony of Ruben Alejandro Goldstein ("Goldstein Depo.") at 34:6-11, Sullivan Decl. Ex. DD.

50.     "In Elemento, the – the company was set out to do something completely different, which was mainly trading cargos.  So buying from point A, delivering to point B.  End of story."  *See* Goldstein Depo. at 34:12-15, Sullivan Decl. Ex. DD.

51.     This type of trading was something that CTFG only did "sporadically."  *See* Goldstein Depo. 35:5, Sullivan Decl. Ex. DD.

52.     "Elemento intermediates the purchasing and selling of case fuel from certain providers to certain clients."  Deposition Testimony of Carlos Galindez ("Galindez Depo.") at 42:3-4, Sullivan Decl. Ex. FF.

53.     Elemento makes a modest profit on the spread between the wholesale purchase price and the resale price.  Galindez Depo. at 42:24-25, 43:2, Sullivan Decl. Ex. FF.

54.     Elemento purchased 220,000 bbls of naphtha fuel (the "Naphtha Fuel") from the state oil company of Peru, Petróleos del Perú S.A. ("PetroPeru") for $12,637,896.00.  Elemento then resold the Naphtha Fuel to SK Energy Americas ("SK") for $12,720,271.78, resulting in a net profit to Elemento of $47,306.50.  *See* Sullivan Decl. Exs. J, K, L, Z.

55.     The benefit of Elemento's contemplated back-to-back oil trading is that "you don't take additional risk on the product."  *See* Goldstein Depo. at 34:18-19, Sullivan Decl. Ex. DD.

56.     When it became clear that formal recognition of Cedaridge's shareholding interest might be delayed, Ms. Jensen repeatedly tried to ensure that the Cisneros Corporation would have veto power over transactions and, eventually, have directors appointed.  For example, on May 5, 2016, Ms. Jensen emailed Mr. Rothenberg, writing: "Ask them [the Malta corporate services provider] to . . . please add our two directors now.  We have provided their names and passport  numbers previously.  This is something we insist upon.  We have too large an investment to have had to wait 6 months to be  reflected as a shareholder.  We need our directors now." *See* Jensen Decl. Ex. J; *see also* Jensen Decl. Ex. D.

57.     She went on to say: "If FENLEX does not agree to add their names now (because they have not cleared them as responsible individuals), then tell them  to modify the MOA to provide that no decisions can be made by the directors without the prior written consent of Cedaridge. In  the alternative, if Cedaridge be a director---then Cedaridge should be elected as a director counting as two-- with two votes—no  quorum without Cedaridge etc." *See* Jensen Decl. Ex. J

58.     Ms. Jensen sought to ensure that full deal documentation, and the approvals of the Cisneros Corporation for each deal, were provided to her to maintain transparency.  *See* Jensen Decl.  O.

59.     On July 6, 2016 she wrote to Rothenberg: "Starting with the deal you discussed with us last week, for each approved transaction going forward, could you please send Javier and me copies of the complete deal summary/analysis, in the form as approved by the partners.

In addition, after each deal is finalized and closed, please send us the 'true up' with the final

numbers. We want to keep our files up to date and complete.   Since the deal flow is just getting

started this will not be any burden----once things pick up, we will let you know if we want to

receive less documents!"  *See* Jensen Decl. Ex. O.

60.     She also followed up with Rothenberg for other business information as well,

including budgets and reports.  *See* Jensen Decl. Ex. Q.

61.     The Cisneros team regularly exercised ongoing control over transactional activity.

As Eduardo Cisneros explained, deals did not proceed without his approval.  *See, e.g.*, Cisneros

Depo. at 37:23-38:2, 49:8-12, Sullivan Decl. at GG.

62.     "All deals needed to be approved by shareholders."  Cisneros Depo. 170:12-15,

Sullivan Decl. Ex. GG.

63.     Deal approvals are illustrated by extracts from Slack, an online messaging system

through which involved persons, i.e., Eduardo Cisneros, Bazzoni, Rothenberg, and D'Agostino,

discussed proposed transactions.  *See* Cisneros 2018 Decl. Ex. B.

64.     Beyond deal control, the Eduardo Cisneros and his team were involved in regular

oversight of Elemento's business activities:  For example, in June 2016, Eduardo Cisneros

reviewed a risk analysis for Elemento's contemplated, but as yet unsuccessful oil trading

business, and asked detailed questions.  *See* Jensen Decl. Ex. P.

65.     Mr. Cisneros repeatedly testified that he understood that Richard Rothenberg was

responsible for Elemento's operations.  *See, e.g.*, Cisneros Depo at 37:23-25, 43:3-13; 70:25-

71:11, Sullivan Decl. Ex. GG.

66.     Bazzoni (and D'Agostino) were involved in Elemento's business, but their

responsibility was that of shareholders, and Bazzoni was to be involved in searching for business

opportunities for Elemento.  *See* Cisneros Depo at 37:23-25, 43:3-13; 70:25-71:11, Sullivan

Decl. Ex. GG; Sullivan Decl. Ex. FF.

67.     Mark Walker, a former CTFG employee who provided services to Elemento for a

period of time testified in CTFG's U.S. bankruptcy case that at Elemento, Bazzoni was" not the

decision-maker any more; whereas at [CTFG], he was pretty much the decision-maker.  But my

understanding is he's – you know, he's a minority partner."  Deposition Testimony of Mark G.

Walker, dated August 16, 2016 at 15:4-16:16, Sullivan Decl. Ex. AA.

68.     By mid 2016, Bazzoni's involvement became a concern to Eduardo Cisneros's

team.  During that time the Cisneros team became aware of issues including this case.  *See*

Cisneros Depo. at 198:22-199:5, Sullivan Decl. Ex. GG.  *See* Jensen Decl. ¶¶ 21-22.

69.     Organizational and management steps were taken at Elemento to minimize the

risk Elemento might be confused with Bazzoni's BVI entities.  *See* Jensen Decl. ¶ 22;

Declaration of Carlos Galindez, dated December 21, 2017 ("Galindez Decl."), ¶¶ 13-15, Sullivan

Decl. Ex. Y; Galindez Depo. 37:23-38:17, Sullivan Decl. Ex. FF.

70.     The names of both Malta entities were changed.  *See* Galindez Decl. ¶ 13,

Sullivan Decl. Ex. Y; Galindez Depo. at 37:23 – 38:17, Sullivan Decl. Ex. FF.

71.     On or about July 25, 2016, CTEO&G became Elemento Oil & Gas Ltd; and CT

Energia Ltd. became Elemento Ltd.  *See* Jensen Decl. ¶ 22; Galindez Decl. ¶ 13, Sullivan Decl.

Ex. Y; Sullivan Decl. Exs. O, V.

72.     On or about August 18, 2016, Messrs. Rothenberg and Galindez replaced Messrs.

Bazzoni and D'Agostino as directors of CTEO&G and Elemento.  *See* Galindez Decl. ¶¶ 13-14,

Sullivan Decl. Ex. Y; Sullivan Decl. Exs. P, W.

73.     While Messrs. Bazzoni and D'Agostino remained involved in the business, their roles were reduced and their appointments were terminated.  *See* Galindez Decl. ¶ 18, Sullivan Decl. Ex. Y; Cisneros Depo. at 187:25-188:5, Sullivan Decl. Ex. GG.

74.     Eduardo Cisneros expected the Financing to be returned within twelve months. Cisneros Depo. at 41:24-42:3, Sullivan Decl. Ex. GG.

75.     Elemento completed only "one or two" transactions in 2016, which generated no profit.  Cisneros Depo at 35:17-24, 171:14-172:4, Sullivan Decl. Ex. GG.

76.     Elemento failed to generate any profit in all of 2016.  *See* Cisneros Depo. at 171:14-172:4, Sullivan Decl. Ex. GG.

77.     Bazzoni has received no payments of any kind from Elemento from Elemento. *See* Cisneros Depo. at 172:19-173:4, Sullivan Decl. Ex. GG.

78.     Bazzoni was contractually entitled to nothing from Elemento until the Loan was fully repaid, absent Cedaridge approval.  *See* Shareholder Agmt. ¶ 16, Jensen Declaration Ex. G.

79.     Eduardo Cisneros determined to acquire the entirety of Elemento and total control over its operations.  *See* Cisneros Depo. at 103:9-104:22, Sullivan Decl. Ex. GG.

80.     The relevant framework for this the Cisneros Corporation's acquisition of Elemento was agreed in August 2016. *See* Jensen Decl. ¶ 23-24, Exs. S, T.

81.     The result was an agreement under which another RJC entity, CISA, acquired the entirety of Elemento from its holding company parent and assumed its obligation to repay the Financing, resulting in the termination of the ownership interests of both Bazzoni and D'Agostino.  As with the original Financing, this transaction was fully documented.  *See* CISA Certificate of Registration, Sullivan Decl. Ex. HH; Jensen Decl. ¶ 26, Ex. U.

82.     Since February 7, 2017, Elemento has been a wholly owned subsidiary of CISA. *See* Jensen Decl. ¶ 26, Ex. U.

83.     Elemento earned only a slight profit in 2017 and recently wired $1 million of unused capital back to the Cisneros Corporation.  *See* Cisneros Depo. at 171:17-172:11, Sullivan Decl. Ex. GG.

84.     Elemento successfully bid for a PetroPeru transaction in 2017 and it did so by improperly using the registration number that PetroPeru had issued to CTFG.  This was the transaction at issue in both a maritime action in Texas, *Chemoil Latin America, Inc. v.  Cinque Terre Financial Group*, C.A. No. 4:17-cv-00813 (S.D. TX), and in CTFG's domestic bankruptcy case,  *In re Cinque Terre Financial Group Limited*, No. 16-11086 (JLG) (S.D.N.Y Bankr.) (the "Bankruptcy Case").

85.     Elemento and the Liquidator engaged in discovery for the purposes of settlement and entered into a heavily negotiated settlement resolving both the Bankruptcy Case and the Maritime Action, the substance of which called for release of the sale proceeds less a payment of $437,500 to pay for attorney's fees and a small penalty for having used CTFG's registration.  *See* Sullivan Decl. Exs. J, K, L.

86.     The bankruptcy court approved the settlement authorizing the release of the sale proceeds to Elemento, and rejected plaintiff's objection—in which plaintiff essentially attempted to enforce the order of attachment in this case (which does not reach Elemento)—noting that plaintiff's position had "no merit."  *See* Bankruptcy Opinion, Sullivan Decl. Ex. L at 21.

87.     Yvonne Morabito testified at her deposition: that plaintiff, engaged in extensive negotiations and due diligence with CTEL-BVI's representatives before entering into the Note; that CTEL-BVI made representations about CTEL-BVI's finances and business; that plaintiff did

not know if the representations were true or not; that plaintiff repeatedly requested certain

information from CTEL-BVI and received some, but not all of that information, including that

which she deemed to be the most important and which she understood to be available; that

Bazzoni told her right before execution of the Note that CTEL-BVI could not make the required

payments under the Note; and that plaintiff, knowing the information it had was incomplete and

possibly false nevertheless decided to execute the Note.  *See, e.g.*, 2016 Deposition Testimony of

Yvonne Morabito at 137:4-12; 146:3-9; 147:3-8, Sullivan Decl. Ex. BB; 2018 Deposition

Testimony of Yvonne Morabito at 92:15-94:24, 110:11-112:3, 161:22-162:15; 181:14-186:2,

Sullivan Decl. Ex. EE.


Dated: New York, New York                    **SULLIVAN & WORCESTER LLP**
      September 28, 2018

                                                   By: /s/Michael T. Sullivan
                                                      Michael T. Sullivan
                                                     Clark A. Freeman

                                           1633 Broadway
                                           New York, New York 10019
                                           Telephone: (212) 660-3000
                                           Facsimile: (212) 660-3001
                                           msullivan@sandw.com
                                           cfreeman@sandw.com

                                         *Attorneys for Defendant Elemento Ltd.*