IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CENTAURO LIQUID OPPORTUNITIES
MASTER FUND, L.P.,

                              Plaintiff,

          vs.

ALESSANDRO BAZZONI, CINQUE TERRE
FINANCIAL GROUP, LTD., CT ENERGIA
LTD., and CT ENERGIA LTD. d/b/a
ELEMENTO LTD.,

                              Defendants.

Civil Action No. 15-cv-9003 (LTS) (SN)


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CT
ENERGIA LTD. D/B/A ELEMENTO LTD.'S MOTION FOR SUMMARY JUDGMENT**


Donald L. Flexner (*Counsel*)
Randall W. Jackson
Byron Pacheco
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
T. 212-446-2300

# Table of Contents

Preliminary Statement ................................................................................................. 1

Statement of Facts ...................................................................................................... 2

Legal Standard ........................................................................................................... 5

Argument .................................................................................................................... 6

I.      THERE IS NO BASIS TO DEVIATE FROM THE LAW OF THE CASE. .................... 6

     A.      CTEL Malta offers no cogent or compelling reason to abandon the Court's
           existing articulation of the alter ego standard. ....................................................... 7

     B.      Centauro would be unduly prejudiced by deviating from the existing alter ego
           standard at this late stage. .................................................................................... 10

II.     BAZZONI CONTROLLED CTEL MALTA AT ALL RELEVANT TIMES AND CTEL
        MALTA HAS FAILED TO SHOW OTHERWISE. .......................................................... 11

     A.      Bazzoni dominated CTEL Malta at all relevant times. ......................................... 11

          1.      The Loan Agreement, Shareholder Agreement, and Purchase Agreement
               did not provide Cedaridge with any control over CTEL Malta. .............. 12

          2.      Cedaridge had no veto power over CTEL Malta's activities.................... 14

          3.      Bazzoni continued to control CTEL Malta after he "resigned" as a
               director. ................................................................................................. 16

          4.      Bazzoni maintained ownership and control even after ownership of CTEL
               Malta supposedly changed hands in February 2017. ............................... 17

     B.      The Cisneros Corp. was well aware that it was financing an alter ego at the time it
           provided the financing. ........................................................................................ 18

     C.      CTEL's assets were transferred to CTEL Malta.................................................. 18

     D.      CTEL Malta and Bazzoni profited from abusing CTEL's corporate form........... 20

Conclusion ................................................................................................................ 21

# Table of Authorities

**Cases**

*Ali v. Mukasey,*
  529 F.3d 478 (2d Cir. 2008) ................................................................................... 7

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .............................................................................................. 5

*Arizona v. California,*
  460 U.S. 605 (1983) .............................................................................................. 7

*Caldarola v. Calabrese,*
  298 F.3d 156 (2d Cir. 2002) ................................................................................... 5

*De Venustas v. Venustas Int'l, LLC,*
  No. 07-cv-4530-LTS-THK, 2008 WL 619028 (S.D.N.Y. Mar. 5, 2008) ............................ 7, 10

*Elisa W. v. City of New York,*
  No. 15-cv-5273-LTS-HBP, 2017 WL 4005633 (S.D.N.Y. Sept. 11, 2017) ............................ 7

*Flaherty v. Filardi,*
  388 F. Supp. 2d 274 (S.D.N.Y. 2005) ....................................................................... 5

*Holtz v. Rockefeller & Co.,*
  258 F.3d 62 (2d Cir. 2001) ..................................................................................... 6

*In re Tyson,*
  433 B.R. 68 (S.D.N.Y. 2010) ............................................................................... 8, 9

*Prest v. Petrodel Resources Ltd,*
  [2013] UKSC 34 (June 12, 2013) ........................................................................ 7, 8, 9

*Tianbo Huang v. iTV Media, Inc.,*
  13 F. Supp. 3d 246 (E.D.N.Y. 2014) ........................................................................ 8

*United States v. Tenzer,*
  213 F.3d 34 (2d Cir. 2000) ..................................................................................... 7

*United States v. Uccio,*
  940 F.2d 753 (2d Cir. 1991) ............................................................................... 7, 10

*VTB Capital plc. Nutritek International Corp.,*
  [2013] UKSC 5 (February 6, 2013) ....................................................................... 7, 8

**Rules**

Fed. R. Civ. P. 56 ................................................................................................ 1, 5

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Centauro Liquid Opportunities Master Fund, L.P. ("Centauro"), respectfully submits this memorandum of law in opposition to the motion for summary judgment filed by Defendant CT Energia Ltd. d/b/a Elemento Ltd. ("CTEL Malta").

## PRELIMINARY STATEMENT

In the months after executing a $21 million promissory note in Centauro's favor, neither Cinque Terre Financial Group, Ltd. ("CTFG") nor CT Energia Ltd. ("CTEL") paid Centauro a single penny of what they owed.  Defendant Alessandro Bazzoni and Defendant CTEL's CFO, Richard Rothenberg, repeatedly assured Centauro that CTEL was in the process of setting up transactions in Venezuela, West Africa, and elsewhere, that would generate revenue for CTEL to pay on the note.  At the very same time, CTEL was scheming to avoid its note obligations by cloning itself in another jurisdiction.  After CTEL had already defaulted on the note, Bazzoni created a second, identically-named "CT Energia Ltd." in Malta—CTEL Malta—and used CTEL's employees, infrastructure, and CTEL's oil trading registrations to operate CTEL Malta. Bazzoni and Rothenberg made no mention of the second CTEL to Centauro, and it was only through discovery in this litigation that Centauro learned about the clone.  In particular, Centauro learned that Bazzoni diverted supposed CTEL business opportunities to CTEL Malta as part of arrangements he set up with third party investors.  Yet he continued to use CTEL's oil trading licenses, personnel and infrastructure to generate revenues.  Soon after Centauro obtained an order of attachment against CTEL through this lawsuit, Bazzoni caused the cloned CTEL to change its name to "Elemento," so as to avoid public association with its debt-ridden alter ego. These facts, alone, entitle Centauro to summary judgment on its alter ego liability claim.

CTEL Malta's motion ignores these facts.  Instead, it seeks to move the goal posts, claiming that the existing law of the case is wrong, and that instead of piercing CTEL's corporate

1

veil, it is CTEL Malta's veil that must be pierced.  CTEL Malta also claims that the standard for

veil-piercing is higher than what this Court has articulated.  In a case where the Court has

reaffirmed the relevant legal standard multiple times (including in a motion on which CTEL

Malta prevailed), one would expect CTEL Malta to offer some reason to deviate from the law of

the case.  But it completely fails to do so.  And in so doing, CTEL Malta also ignores the

prejudice to Centauro that would result from changing the law of the case at this stage, after

discovery has closed.

Having *sua sponte* revised the law of the case, CTEL Malta also offers a revision of its

own background that is pure make-believe: it claims to be an unsuccessful and independent

company, founded, funded, and controlled at all times by innocent and unwitting third-parties.

But to offer this revision, CTEL Malta must ignore its own documents and witnesses, none of

which corroborate this account.  To the contrary, as shown in Centauro's motion for partial

summary judgment, the evidence indicates that Bazzoni dominated CTEL and CTEL Malta well

into 2017, if not longer.  Accordingly, there is no basis to issue summary judgment in CTEL

Malta's favor, and to the contrary, it is Centauro who has made the requisite summary judgment

showing that CTEL Malta is an alter ego of CTEL and Bazzoni.

## STATEMENT OF FACTS[1]

In 2009, Centauro entered into a Joint Venture Agreement (the "JVA") with CTFG in

which Centauro would fund oil trades that CTFG executed.  *See* Plaintiff's Rule 56.1 Statement

of Material Facts, ECF No. 232 ("PMF"), ¶ 35.  In or around 2015, a dispute arose regarding

---

[1]  Plaintiff's Rule 56.1 Statement of Material Facts and exhibits thereto (ECF No. 232), submitted with Plaintiff's Motion for Partial Summary Judgment (ECF No. 226), and Plaintiff's Rule 56.1 Counterstatement of Material Facts to Defendant CTEL Malta's Statement, submitted herewith, together contain a full statement of the facts and evidence that support Plaintiff's opposition (all of which are incorporated by reference herein); what follows is a summary of those facts.

CTFG's mishandling of Centauro's funds. *Id.* ¶ 36. Centauro agreed to settle the dispute by entering into a promissory note, dated May 21, 2015 (the "Note"), with a principal amount of $21,093,213. *Id.* ¶¶ 36, 42. Centauro was the payee under the Note while CTFG and another entity controlled by Bazzoni, CTEL, were the Note's two co-makers. *Id.* ¶ 37. The Note required monthly payments through April 21, 2017, when the full outstanding principal and interest would be due. *Id.* ¶ 44. The Note was signed on behalf of Centauro by Yvonne Morabito and Ron Dagar, Centauro's two directors at the time (Morabito is currently Centauro's only director). *Id.* ¶¶ 2-3, 41. The Note was signed twice by Bazzoni on behalf of CTEL as its CEO, and separately, on behalf of CTFG as its CEO. *Id.* ¶¶ 39-40.

Both before and after the Note was executed, Bazzoni and CTEL's chief financial officer, Richard Rothenberg, repeatedly informed Centauro of CTEL's current and prospective trading activities that would be used to service obligations on the Note. *Id.* ¶¶ 86-94. CTEL's trading opportunities focused primarily on Venezuela and West Africa. *Id.* CTEL possessed a coveted registration to do business with the Venezuelan state-owned oil company, PDVSA Petróleos S.A. ("PDVSA"), and its business included both trading oil and drilling for it. *Id.* ¶¶ 86-87, 90(f)-(g). CTEL's West Africa business was one that Rothenberg told Centauro in May 2015 "we are currently operating very profitably." *Id.* ¶ 94(a). Indeed, CTEL's 2015 trading in West Africa was so prominent that it was the subject of multiple news stories. *Id.* ¶ 94(e), (g).

Alongside Bazzoni and Rothenberg, CTEL's team in 2015 included Ruben Alejandro 'Alex' Goldstein, chief operating officer; Mark Walker, head of operations; Tracey/Tracy Jones, trader; Albert Alpha, trading and logistical operations; Jesus Pereyra; Lisbeth Flaquer; and Francisco D'Agostino. *Id.* ¶¶ 22-34. CTEL's main office was at 500 East Broward Boulevard, Suite 2400, Fort Lauderdale, Florida 33394. *Id.* ¶¶ 57-58.

CTEL in 2015 was thus positioned to make payments on the Note given its established revenue opportunities and experienced team. Instead, CTEL immediately defaulted on the Note, as did CTFG. *Id.* ¶ 45. Centauro has not received a single payment on the Note, which has been in continuous default since the first payment became due in June 2015. *Id.* Centauro has informed CTEL of this default multiple times, and CTEL has not denied that it has failed to pay. *Id.* ¶ 45a-f.

Despite not paying on the Note, CTEL continued to carry out its business, though using an alter ego entity. On October 6, 2015, Bazzoni created a carbon copy of CTEL in Malta with the same name—CT Energia Ltd. ("CTEL Malta"), *id.* ¶ 48, same core group of employees (Bazzoni, Rothenberg, Goldstein, Alpha, Jones Pereyra, Flaquer, and D'Agostino), *id.* ¶¶ 64-73, same email address (@ctenergia.com), *id.* ¶ 63, same address (500 E. Broward Boulevard, Fort Lauderdale, Florida), *id.* ¶¶ 57-62, same bank account (Banque de Commerce et des Placements), *id.* ¶¶ 106, 139-40, and same logo as CTEL (prancing lion), *id.* ¶¶ 76-80, among other things. At the same time Bazzoni was creating this alter ego entity, he and Rothenberg continued to represent to Centauro that CTEL had lucrative transactions in the pipeline. *E.g., id.* ¶ 94. They never told Centauro about the second CTEL they had created in Malta. *See* Declaration of Byron Pacheco ISO Partial Summary Judgment, ECF No. 234 ("Pacheco Decl."), Ex. 4 (Tr. at 281:8-21).

CTEL Malta benefited from this alter ego status: instead of starting from the ground up, it was able to leverage the connections, talent, opportunities, registrations, and brand that CTEL had built. CTEL Malta's alter ego status was a central part of its business strategy. For example, shortly after CTEL Malta was founded it ████████████████████████████████ ████████████████████████████████ *Id.* ¶ 104. At the time CTEL Malta had

none, *id.* ¶ 103, but the identically named CTEL did, *id.* ¶¶ 86, 93.  Likewise, CTEL Malta sent a

letter to ██████████████████████████████████████████████████████████

████████████████████  By taking all of CTEL's employees, assets, and opportunities,

CTEL Malta was able to effectively conduct itself as CTEL.  Accordingly, CTEL Malta's core

business strategy is identical to CTEL's: oil trading and oil exploration/production in Venezuela

and West Africa.  *Compare id.* ¶¶ 86, 94, 126, *with id.* ¶¶ 107-18, 131-35.

 After Centauro filed this lawsuit, and obtained an order of attachment against CTEL,

CTEL Malta took efforts to obfuscate its alter ego status.  First, after Centauro asked Bazzoni

questions about CTEL Malta in a June 2016 deposition (in which he invoked his Fifth

Amendment privilege), it changed its name to "Elemento Ltd." in July 2016.  *Id.* ¶¶ 119-21.

Later, CTEL Malta took efforts to erase any official connection with Bazzoni, and had him

purportedly resign as a director in August 2016.  *Id.* ¶ 136.  However he continued to run CTEL

Malta's core trading business, continued to oversee CTEL Malta's accounting, and continued to

receive correspondence as chief executive officer.  *Id.* ¶¶ 64, 128.  To date, Bazzoni continues to

authorize and approve CTEL Malta's business activities.  *See id.* ¶ 64(f).  Moreover, despite the

purported name change, CTEL Malta still used the CT Energia, Ltd. name to transact business

well into at least 2017.  *Id.* ¶¶ 122-126.

<u>**Legal Standard**</u>

 "Summary judgment shall be granted in favor of a moving party where the 'pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law.'"  *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 285-86

(S.D.N.Y. 2005) (Swain, D.J.) (*quoting* Fed. R. Civ. P. 56(c)).  The moving party bears the

burden of establishing the absence of any genuine issue of material fact.  *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 256 (1986).  To oppose summary judgment, the nonmoving party

need only "come forward with specific facts showing that there is a genuine issue for

trial."  *Flaherty*, 388 F. Supp. 2d at 286 (quoting *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d

Cir. 2002)).  In the summary judgment context, a fact is material "if it might affect the outcome

of the suit under the governing law," and an issue of fact is genuine "if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Holtz v. Rockefeller & Co.,*

258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks omitted).

<u>ARGUMENT</u>

## I.   THERE IS NO BASIS TO DEVIATE FROM THE LAW OF THE CASE.

On September 30, 2016, the Court determined that BVI law governs the alter ego claims

in this case and that BVI imposes two requirements on such claims: (1) that defendants abused

CTEL's corporate form; (2) and that the abuse occurred after CTEL incurred a debt to Centauro.

*See* ECF No. 107 at 8-9.  The Court also held that it is CTEL's British Virgin Islands veil that

should be pierced, not CTEL Malta's Maltese veil, in finding that "the law of the BVI governs

the assessment of Plaintiffs' alter ego theory."  *Id.* at 6-7.  The Court did so after considering

lengthy affidavits regarding foreign law.  *See* ECF No. 59 (affidavits submitted by then-

defendants).  And the Court has twice reaffirmed both holdings; first in granting Centauro leave

to amend its complaint (*see* ECF No. 126 at 6), and most recently, in denying Centauro's request

to amend the existing order of attachment—a motion to which CTEL Malta was expressly a

party (*see* ECF No. 209 at 2).  Ignoring all of this, CTEL Malta claims that it is CTEL Malta's

Maltese veil that must be pierced, and that the standard for doing so is different than what the

Court has said.  However, CTEL Malta offers no reasons for deviating from the law of the case,

and even assuming the Court were to engage the merits of its position, the purportedly different

case law it cites is not new at all.  It predates the Court's decision and predates the main case the Court relied on.  Nor does it compel the result CTEL Malta claims it does.

Because the Court has already determined the governing alter ego standard, that holding "governs here as the law of the case."  *Elisa W. v. City of New York*, No. 15-cv-5273-LTS-HBP, 2017 WL 4005633, at *2 (S.D.N.Y. Sept. 11, 2017) (Swain, J.).  Under that doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  *Id.* (brackets in original) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  A party seeking to overturn the law of the case ordinarily must provide "'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (quoting *United States v. Tenzer,* 213 F.3d 34, 39 (2d Cir.2000)).  Another "prong of the doctrine is whether" deviating from the law of the case would cause prejudice, "where the term 'prejudice' refers to a lack of sufficiency of notice or a lack of sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling.  *De Venustas v. Venustas Int'l, LLC*, No. 07-cv-4530-LTS-THK, 2008 WL 619028, at *2 (S.D.N.Y. Mar. 5, 2008) (Swain, J.) (quoting *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991)).

### A.  CTEL Malta offers no cogent or compelling reason to abandon the Court's existing articulation of the alter ego standard.

To support its revised alter ego standard, CTEL Malta found two cases from the United Kingdom that it believes impose a higher alter ego burden than the cases this Court previously relied on.  *See* CTEL Malta's Mem. of Points of Authorities, ECF No. 231 at 13-18 (hereinafter, "MOL").  But those cases do no such thing.

*First*, the cases CTEL Malta cites do not mark any intervening change in BVI law: both cases predate the Court's September 30, 2016 decision (ECF No. 107), which it set the law of the case. CTEL Malta relies on two 2013 cases, *VTB Capital plc. Nutritek International Corp*., [2013] UKSC 5 (February 6, 2013), and *Prest v. Petrodel Resources Ltd*, [2013] UKSC 34 (June 12, 2013), which were both handed down over three years before this Court's decision.

Moreover, both of these cases inhered in the Court's decision. *VTB Capital* was reviewed in *Tianbo Huang*, which in turn was one of the primary decisions this Court analyzed in deciding the alter ego law to apply. *See* ECF No. 107 at 7. *Tianbo Huang* noted that *VTB Capital* came after *In re Tyson*, but the court still determined that the analysis in *In re Tyson* properly reflects English law. *See Tianbo Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 258 n.6 (E.D.N.Y. 2014) ("Additionally, the Court reviewed the more recent case of *VTB Capital* . . . . "). As for *Prest*, CTEL Malta concedes that the case was part of the briefing the Court already considered on the motion to dismiss the first complaint. *See* MOL at 18 n.11.

*Second*, CTEL Malta provides no reason to doubt the conclusions about BVI law that the Court reached. As *Tianbo Huang* implicitly concluded, the *VTB Capital* case does not contradict the "misuse" and "temporal" elements of the alter ego test outlined in *In re Tyson*. *Tianbo Huang*, 13 F. Supp. 3d at 258 ("(1) plaintiffs seeking to pierce the corporate veil under English law must allege and prove that defendants misused a corporate façade; (2) the misuse must have occurred after the liability arose"). Similarly, CTEL Malta concedes that the lead opinion in *Prest* stated that alter ego liability is based on evading liability—*i.e.*, the same principle announced in *In re Tyson*. *See* MOL at 19.

Tellingly, CTEL Malta relies most heavily on a *concurring* opinion in *Prest* where Justice Neuberger mused about the propriety of veil piercing generally. *See* MOL at 17. CTEL

8

Malta provides no explanation for how a concurring opinion in an English case could be taken to eliminate the doctrine of veil piercing altogether from BVI law, particularly where the lead opinion stated that the doctrine is alive and well.

The other principle that CTEL Malta attempts to draw from *Prest* is similarly misplaced. CTEL Malta argues that *Prest's* requirements of "an existing legal obligation or liability" and "interposing a company under its control" means that CTEL Malta's veil is the one that must be pierced, not CTEL's.  MOL at 24 (quoting *Prest* ¶ 35).  While CTEL Malta refers to these elements as some radical change in the law, they are the same requirements laid out in *In re Tyson* and quoted by the Court in the September 30, 2016 decision: "[T]he plaintiff's ability to recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure."  ECF No. 107, at 8 (quoting *In re Tyson*, 433 B.R. at 88).  Thus, even under CTEL Malta's reading, *Prest* affirmed, rather than changed, the elements of veil piercing, and the Court had those elements well in mind when it determined that the veil to be pierced in this case was CTEL's.

This is also not the first time that CTEL Malta has attempted to alter the veil-piercing analysis.  In denying CTEL Malta's motion to dismiss, the Court wrote, "Elemento incorrectly argues that Maltese law governs the assessment of Plaintiff's alter ego theory . . . . Elemento's argument misinterprets the AC, which asserts that Elemento is an alter ego of CTEL.  Thus, the relevant question is whether CTEL's corporate form will be disregarded, not Elemento's."  ECF No. 208, at 4 n.1.  CTEL Malta's argument has gotten no better with age.  It remains the case that CTEL's corporate form is the one that was abused to avoid the Note, and that its veil is the one to be pierced: CTEL went from a functioning company (when the Note was signed) to

9

having its office, intellectual property, files, employees, business opportunities, and assets transferred to CTEL Malta for no compensation. *See* PMF ¶¶ 22-34; 57-62; 76-82; 127-129.

Accordingly, CTEL Malta has offered no cogent or compelling reason for deviating from the law of the case. The cases CTEL Malta relies on predate the Court's decision, and thus cannot be the basis for any intervening change in law. And because those cases are consistent with the standard announced by the Court, there is no reason to question the Court's judgment.

**B. Centauro would be unduly prejudiced by deviating from the existing alter ego standard at this late stage.**

CTEL Malta's lack of compelling or cogent explanation is reason enough to dismiss its attempt to change the law of the case. There is also a separate and independent reason to reject CTEL Malta's attempt: the prejudice that a change at this stage would cause to Centauro. "[T]he decision whether or not to apply law-of-the-case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Uccio*, 940 F.2d at 758.

A party is prejudiced if it "lack[s] [] sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling." *De Venustas*, 2008 WL 619028, at *2 (quoting *Uccio*, 940 F.2d at 758). Centauro would suffer precisely that prejudice were the law of the case to be deviated from here. The discovery phase in this case is over, and that discovery was conducted based on the existing law of the case regarding alter ego liability. Indeed, when Centauro sought to compel CTEL Malta to produce documents through 2017, CTEL Malta objected, and Judge Netburn denied the application, reasoning that the evidence Centauro sought was not relevant to the abuse of CTEL's corporate form. *See* ECF No. 197 at 3. Had CTEL Malta's new legal standard been operative at the time, then Centauro may have been able to obtain such discovery. Regardless, it would be highly prejudicial to change the law of the

10

case now, at the summary judgment stage, when discovery has already closed, and Centauro was previously denied the opportunity to obtain discovery that likely would have been relevant to CTEL Malta's revisionist alter ego standard.

## II.   BAZZONI CONTROLLED CTEL MALTA AT ALL RELEVANT TIMES AND CTEL MALTA HAS FAILED TO SHOW OTHERWISE.

According to CTEL Malta's revisionist history, it is an unsuccessful and independent company, founded, funded, and controlled at all times by innocent and unwitting third-parties, who received no benefit from CTEL.  In particular, it claims to be ultimately owned and controlled by the Cisneros Corporation ("Cisneros Corp."), at various times through an entity said Cedaridge S.A. ("Cedaridge") or CISA Holdings ("CISA").  *See* MOL at 10-11.  All of this is demonstrably false.  Regardless of the corporate shell game CTEL Malta has been engaged in, its own documents and witnesses prove that Bazzoni dominated CTEL Malta, used its alter ego relationship with CTEL to generate profits, and extracted those profits from it.  Moreover, the evidence also shows that the supposedly unwitting third parties, the Cisneros Corp. (including Eduardo Cisneros) and Francisco D'Agostino, were well aware that CTEL Malta was intended to be a clone of Bazzoni's BVI-based company CTEL.

### A.  Bazzoni dominated CTEL Malta at all relevant times.

Centauro has documented the myriad ways that Bazzoni dominated CTEL Malta.  *See* PMF ¶¶ 48-50, 64, 136.  For instance, Bazzoni founded CTEL Malta and was its original sole owner.  *Id.* ¶ 50.  Until February 7, 2017, Bazzoni's ownership of CTEL Malta never fell below 50%.  *Id.* ¶¶ 95-117.  Bazzoni is CTEL Malta's chief executive officer.  *Id.* ¶ 64.  Until August 18, 2016, Bazzoni was a named director of CTEL Malta.  *Id.* ¶ 136.  And since then, he has continued to operate as an officer and/or director.  *Id.* ¶¶ 64(b), 64(f); Plaintiff's Rule 56.1

Counterstatement of Material Facts to Defendant CTEL Malta's Statement ("CMF"), Responses to ¶¶ 65, 73.

### 1. The Loan Agreement, Shareholder Agreement, and Purchase Agreement did not provide Cedaridge with any control over CTEL Malta.

CTEL Malta ignores Bazzoni's domination, and continues to assert that Cisneros Corp. ultimately controlled CTEL Malta by virtue of three agreements between Cedaridge (an affiliate of the Cisneros Corp.) and CTEL Malta's parent company, CT Energia Oil & Gas ("CTEO&G")): (1) a Share Purchase Agreement; (2) a Shareholders' Agreement; and (3) a Loan Agreement. *See* MOL at 5-7.  CTEL Malta's reliance on these agreements is misplaced.

First, CTEL Malta has provided conflicting evidence about when they were executed, stating in its interrogatory responses that these documents were not actually executed until around "December 2016," which is over a year after CTEL Malta was founded.  CMF, Response to ¶ 29.  Thus, they do not provide a basis for negating Bazzoni's control of CTEL Malta from its inception and through at least the end of 2016.

Second, regardless of when these agreements were executed, they did not provide Cedaridge, or Cisneros Corp. for that matter, with any legal control over the parent company CTEO&G, or its subsidiary CTEL Malta.  CTEL Malta continues to assert that the Shareholders' Agreement gave Cedaridge the power to appoint two directors, and that a majority of the board had to approve every transaction.  MOL at 6, 9.  However, CTEL Malta concedes that Cedaridge was never actually a shareholder and thus never had any right to appoint directors.  CMF, Response to ¶ 39.  Joan Burton Jensen, the general counsel of Cisneros Corp., confirmed that Cedaridge was never a shareholder of CTEL Malta's parent CTEO&G and never appointed any directors to it.  *Id.*  CTEL Malta therefore has no basis to assert that Eduardo Cisneros (son of the owner of the Cisneros Corp.) was a CTEO&G shareholder who had approval over deals.  *See*

12

MOL at 20-21. ███████████████████████████████████████████

████████████████████████████████████████████

CTEL Malta claims that even if Cedaridge never became a shareholder under the

Shareholder Agreement, the Loan Agreement "incorporated" the Shareholder Agreement, and

thus Cedaridge effectively gained control regardless of not formally becoming a shareholder. But

the Loan Agreement did no such thing.  Rather than some wholesale incorporation, the Loan

Agreement only makes reference to three aspects of the Shareholders' Agreement:

> "Maturity Date - Ninety (90) days after demand, in accordance with the terms of the Shareholders' Agreement," ¶ 1.1(n);

> "Payments. The principal amount of the Loan outstanding shall be due and payable no later than ninety (90) days after demand by the Lender as provided in the Shareholders' Agreement," ¶ 2.4;

> "Payment Default. If Borrower shall fail to make or cause to be made any Principal Payment or interest payment on the Note in accordance with the terms set forth in the Shareholders' Agreement," ¶ 7.1(a).

Declaration of Joan Burton Jensen, ECF No. 172 (Dec. 21, 2017) ("1st Jensen Decl."), Ex. C, ¶¶

1.1(n); 2.4; 7.1(a).  None of these provisions grant Cedaridge the power to appoint directors or

otherwise to control CTEO&G or its subsidiary, CTEL Malta.  Thus, these references in the

Loan Agreement do not fill the void left by Cedaridge failing to be a shareholder.

CTEL Malta also argues that the Loan Agreement granted Cedaridge *de facto* control

over CTEL Malta by giving Cedaridge the right to demand payment at any time, which would be

due within 90-days of such demand.  *See* MOL at 6.  Yet this argument too rings hollow: CTEL

Malta has put in no evidence that payment was ever demanded or even threatened.  To say that

debt equates to control, without more, is to erase the distinction between debt and equity.

### 2. Cedaridge had no veto power over CTEL Malta's activities.

CTEL Malta claims that the Cisneros Corp. "sought to ensure that Cedaridge would maintain veto power," (MOL at 9), but the Cisneros Corp. never had that veto power in the first place. Indeed, the sole evidence CTEL Malta relies on for this point ████████████ ████████████████████████████████████████████████████████████████████████ ████████████████ Missing, however, is any evidence that CTEL Malta ever complied. It did not. ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████

████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ In other words, as CTEL Malta concedes, the shares were never allotted to Cedaridge, and so it was never able to appoint two of its own directors appointed. *Id.* Response to ¶ 39. It does not matter, as CTEL Malta claims, that the Cisneros Corp. "sought to ensure that Cedaridge" would control CTEL Malta (MOL at 9); what matters is that Cedaridge never in fact had such control. *See id.*; *see also id.* Response to ¶ 58.

CTEL Malta also asserts that "appropriate steps were taken" to give Cedaridge control over CTEL Malta's operations, including deal approval. MOL at 9. Yet the only evidence offered on this point shows the opposite. ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ does not evidence that Cedaridge (or the

Cisneros Corp.) had the right to approve deals; to the contrary, ██████████████████████ ████████████████████████████████████████████ only *after* Bazzoni had already approved them.

CTEL Malta also relies on testimony from Cisneros that he approved transactions.  CTEL Malta Rule 56.1 Statement ¶ 61, ECF No. 229 (Sept. 28, 2018) ("CTEL Malta 56.1").  However, this testimony is inconsistent with other Cisneros testimony that he did not approve a single transaction detailed in CTEL Malta's wire transfer log for 2016.  *See* CMF Response to ¶ 61.

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███

Moreover, CTEL Malta conveniently ignores the fact that its business focuses heavily on the basis of submitting auction bids.  *See id.* (examples of bidding).  Therefore, the critical managerial decision is often not whether to approve a deal, but rather, whether to approve the initial bid.  If the bid was lost, no deal would follow; if the bid was won, then CTEL Malta would have to decide how to structure the deal.  █████████████████████████

█████████████████████████████████████████████

███████████████████████████████████

Finally, CTEL Malta asserts that the Eduardo Cisneros and those working for him were. engaged in "regular oversight activities" over CTEL Malta.  MOL at 10.  But the examples it provides are irregular and sporadic.  CTEL Malta 56.1 ¶ 64 (citing Declaration of Joan Burton Jensen, ECF No. 224 (Sept. 27, 2018) ("2d Jensen Decl."), Ex. P (lone example provided is an email chain where Eduardo Cisneros asked questions about hedging and margins); *see* CMF

Response to ¶ 61.  More telling are the types of CTEL Malta business decisions over which Eduardo Cisneros had oversight: he did not oversee hiring, Bazzoni did, *compare* PMF ¶ 65(b), *with id.* ¶¶ 21, 64(d); he did not control wire transactions, Bazzoni had signatory authority over CTEL Malta's bank account, *compare* CMF Response to ¶ 77, *with id.* Response to ¶ 66; he was unfamiliar with CTEL Malta's finances, Bazzoni was part of the audit process, through at least 2017, *compare id.* Response to ¶ 83, with Pacheco Decl. Ex, 69, at 1; and, bids would proceed without his approval, CMF Response to ¶ 61 whereas Bazzoni enjoyed unilateral control over bidding, *see* Pacheco Decl. Ex. 95, at 2.

### 3.   Bazzoni continued to control CTEL Malta after he "resigned" as a director.

CTEL Malta asserts that by having Bazzoni resign as a director on August 18, 2016, Bazzoni's control ended.  *See* MOL at 10.  But in truth, the resignation had no impact on Bazzoni's control.  Indeed, discovery has shown that CTEL Malta's supposed divorce from Bazzoni was mere window dressing.

First, CTEL Malta's own evidence shows that Bazzoni's role did not diminish after he resigned as director on August 18, 2016.  He continued to serve as CEO (a position for which there is no evidence of any resignation).  PMF ¶ 64(b).  And he continued to direct Rothenberg regarding CTEL Malta's oil business, CMF Response to ¶ 66; to be involved in CTEL Malta's auditing, *id.* Response to ¶ 73; to be involved in approvals of general business decisions, PMF ¶ 64(f), and to use a CTEL Malta email address, *id.* ¶ 64(g).  Thus, any purported reduction in Bazzoni's role was in name only.

There is also evidence that Galindez's appointment as a director in Bazzoni's place was purely cosmetic.  For example, Galindez was purportedly named a director of both CTEL Malta and its parent, CTEO&G.  *See* CTEL Malta 56.1 ¶ 72; *see* Declaration of Michael T. Sullivan,

16

ECF No. 228 (Sept. 28, 2018), Ex. P, at 2 (Rothenberg notifying Maltese authorities of director changes at CTEO&G).  However, Galindez testified in 2018 that, "I have never been a director of CTE Oil and Gas."  CMF, Response to ¶ 72.  Galindez's involvement with CTEL Malta is hardly more substantial.  While testifying as CTEL Malta's 30(b)(6) witness in June 2018, he was unable to answer what CTEL Malta's 2017 revenue, explaining that it was Rothenberg's "job," and that Galindez did "not have those financial status records."  CMF, Response to ¶ 72.

Whereas Galindez testified that he did not have access to CTEL Malta's financials, *id.*, Bazzoni does have access to CTEL Malta financial records and was consulted regarding their preparation in 2017, PMF ¶ 64(g).  And after Bazzoni supposedly resigned as director,

**4.  Bazzoni maintained ownership and control even after ownership of CTEL Malta supposedly changed hands in February 2017.**

CTEL Malta claims its ownership changed hands in February 2017, when a company called CISA (also affiliated with the Cisneros Corp.) purchased CTEL Malta's shares.  But CTEL Malta fails to mention that as part of this transaction, Bazzoni appears to have retained ownership of CTEL Malta shares in a trust.  CMF, Response to ¶ 81.

In addition to retaining an ownership interest, Bazzoni's control did not diminish after the CISA purchase.  CTEL Malta's financial manager testified that Bazzoni continues to be copied on emails seeking approvals regarding the general business of the company.  PMF ¶ 64(f).  And in or after March 2017, Rothenberg sought Bazzoni's input regarding CTEL Malta's audit.  *Id.* 64(g).

**B. The Cisneros Corp. was well aware that it was financing an alter ego at the time it provided the financing.**

Contrary to the CTEL Malta's narrative of the Cisneros Corp. as the innocent-investor, the undisputed evidence indicates that the Cisneros Corp. understood that CTEL Malta's business plan was premised on being CTEL's alter ego.  For instance, when Bazzoni and Rothenberg emailed the Cisneros Corp. about doing business together as CT Energia Ltd. (i.e., CTEL Malta, whose official name was originally CT Energia Ltd.), they did so from their identically named CTEL (i.e., CT Energia Ltd.) email accounts.  From this alone, it is implausible that the Cisneros Corp. believed that identically named CTEL Malta was a brand new company on a blank slate.  ████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████  The Cisneros Corp. would have known that CTEL Malta had no prior deals and no substantial operating history, as it has just been created; thus it would have understood these as relating to CTEL instead.  *See id.*  Similarly, Eduardo Cisneros testified that he understood that CTEL Malta would "hit the ground rolling" once it started and that it would be trading with PDVSA.  PMF ¶ 100.  But a new trading company cannot just start trading with PDVSA immediately; it takes time to obtain registrations. *Id.* ¶ 103.  Thus, the only way CTEL Malta would be able to "hit the ground rolling" would be to rely on registrations from others.  Moreover, as a condition for its funding, the Cisneros Corp. (through Cedaridge) required Bazzoni to shut down CTEL's trading operations—further evidencing that it intended for CTEL Malta to pick up where CTEL left off.  *Id.* ¶¶ 95-99.

**C. CTEL's assets were transferred to CTEL Malta.**

CTEL Malta contends that it did not receive any assets from CTEL.  MOL at 22.  To the contrary, the evidence shows that CTEL Malta benefited enormously from assuming CTEL's

business.  To claim otherwise, CTEL Malta relies on a series of demonstrably false assertions.

First, it contends that the funding it received from the Cisneros Corp. via Cedaridge "represented the entirety of Elemento's capital."  MOL at 12.  This statement is contradicted by CTEL Malta's own financials submitted alongside CTEL Malta's motion.  █████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████

Also, it is undisputed that CTEL Malta benefited from obtaining CTEL's roster of employees and not having to pay their salaries for several months.  *See* PMF ¶¶ 22-34 (CTEL); 64-73 (CTEL Malta); *see also id.*, ¶¶ 74-75.  CTEL Malta concedes in its interrogatories that Rothenberg was an employee by at least November 2015—months before CTEL Malta received any funding from Cedaridge.  CMF Response to ¶ 38.  Despite there being no funding yet from Cedaridge in November and December 2015, or January 2016, D'Agostino stated that all of CTEL Malta's employees, including Rothenberg, had their salaries paid during those months. PMF ¶ 74.  In other words, CTEL Malta did not have to pay its employees' salaries for several months because another entity was paying them.  Given this evidence, it cannot be true, as CTEL Malta claims, that the "entirety" of its capital came from Cedaridge.  MOL at 7.

CTEL Malta also claims that it could not have gotten assets from CTEL because CTEL had never conducted any business and had no assets to transfer.  Mot. 21-22  This is false.  CTEL

Malta acquired CTEL's name, branding, and logo, assets that CTEL had spent over a hundred thousand dollars developing, and for which CTEL Malta paid nothing.  PMF ¶¶ 76-78.  CTEL Malta also acquired CTEL's coveted registration with PDVSA; a registration with PetroChina; and a relationship with the Nigerian National Petroleum Corporation.  *Id.* ¶¶ 103-136.  All of this business was subsequently transferred from CTEL to CTEL Malta.  CTEL transferred ancillary assets as well, including CTEL's email addresses, CTEL's address in Florida, and CTEL's files and computers.  *Id.* ¶¶ 57-63, 81-82.

### D.  CTEL Malta and Bazzoni profited from abusing CTEL's corporate form.

CTEL Malta argues that it cannot be liable as an alter ego because it has little or no profits.  MOL at 23.  This argument is irrelevant and untrue.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

CTEL Malta offers no documentary evidence to rebut the fact it had profits and issued a dividend in 2016.  Instead, it relies on testimony from Eduardo Cisneros testifying that he was not aware of Bazzoni's being compensated.  But Cisneros, by his own testimony, was not involved in any of CTEL Malta's wire payments from its 2016 wire log, PMF ¶ 65(a), so his lack of awareness of Bazzoni's compensation is hardly edifying.  ████████████████████████

████████████████████████████████████████████████

when asked what CTEL Malta's profits were in 2016, Cisneros responded, "I would say zero."  CMF, Response to ¶ 83.

*     *     *

In sum, CTEL Malta has failed to carry its burden on summary judgment regarding alter ego liability.  It cannot show that Bazzoni lacked control over CTEL Malta; that all of CTEL Malta's funding came from Cedaridge; that CTEL transferred no assets to CTEL Malta; and that neither CTEL Malta nor Bazzoni profited from abusing CTEL's corporate form.  To the contrary, the facts show beyond any reasonable dispute that (1) Bazzoni controlled CTEL Malta both before and after he resigned his director position; (2) CTEL Malta received funding from Bazzoni, or entities controlled by him, prior to the purported Cedaridge loan; (3) CTEL transferred its assets and oil trading business to CTEL Malta; (4) that Cedaridge (and the Cisneros Corp.) understood that CTEL Malta would have a head start based on CTEL's assets; and (5) that CTEL Malta, and Bazzoni, profited from these abuses of CTEL's corporate form. Accordingly, it is Centauro, not CTEL Malta, which is entitled to summary judgment on alter ego liability.

<u>CONCLUSION</u>

For the reasons stated, Centauro respectfully requests that the Court deny CTEL Malta's motion for summary judgment, and instead grant Centauro's motion for partial summary judgment.

Dated: November 2, 2018

Respectfully submitted,

By: /s/ *Byron Pacheco*
    Donald L. Flexner (*Counsel*)
    Randall W. Jackson
    Byron Pacheco
    BOIES SCHILLER FLEXNER LLP
    575 Lexington Avenue
    New York, NY 10022
    T. 212-446-2300