UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

CENTAURO LIQUID OPPORTUNITIES
MASTER FUND, L.P.,

        Plaintiff,

    -v-                                    No.  15 CV 9003-LTS-SN

ALESSANDRO BAZZONI, et al.,

        Defendants.

------------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

        Plaintiff Centauro Liquid Opportunities Master Fund, L.P. ("Centauro") brings this action for fraud and breach of contract against Defendants Cinque Terre Financial Group Ltd. ("CTFG"), CT Energia Ltd. ("CTEL"), CT Energia Ltd. d/b/a Elemento Ltd. ("Elemento"), and Alessandro Bazzoni ("Bazzoni").  This action is stayed as against CTFG by an order of the United States Bankruptcy Court of the Southern District of New York pending resolution of a petition for recognition of a foreign liquidation proceeding under Chapter 15 of the United States Bankruptcy Code, and nothing in this Memorandum Opinion and Order constitutes an adjudication of CTFG's rights or defenses.  The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332.  Before the Court are three motions for summary judgment, filed by Centauro, Elemento, and CTEL and Bazzoni.[1]  (Docket entry nos. 217, 221, 226.)  The Court has reviewed carefully the parties' submissions and, for the reasons that follow, the motions are granted in part and denied in part, as set forth below.

---

[1]     Elemento, CTEL, and Bazzoni are referred to collectively herein as the Moving Defendants.

The following facts are undisputed unless otherwise noted.[2]  Plaintiff Centauro Liquid Opportunities Master Fund, L.P. is a limited partnership formed under the laws of the Cayman Islands.  (Docket entry no. 232, Pl. 56.1 St. ¶ 1.)  Defendant CTFG is a limited liability company formed under the laws of the British Virgin Islands ("BVI").  (Docket entry no. 219, CTEL 56.1 St. ¶ 5.)  Defendant CTEL is a BVI corporation that was formed on May 9, 2013.  (CTEL 56.1 St. ¶ 2.)  Defendant Alessandro Bazzoni is the sole owner, director, and officer of CTEL.  (Pl. 56.1 St. ¶¶ 5, 6, 22.)

On September 14, 2009, Centauro and CTFG executed a Joint Venture Agreement to "form an entity to trade [certain petrochemical] [p]roducts . . . through the commercial expertise of CTFG and the financial support of Centauro."  (CTEL 56.1 St. ¶ 6; docket entry no. 234, Pacheco Decl. Ex. 30, the "JVA.")  During the course of the joint venture, Centauro invested certain "Deal Capital" with CTFG which was not returned to Centauro.  (CTEL 56.1 St. ¶¶ 9, 11.)  In early 2015, CTFG advised Centauro that the unreturned Deal Capital was "gone."  (CTEL 56.1 St. ¶ 11.)

On May 21, 2015, Bazzoni signed a Promissory Note on behalf of CTFG and CTEL for $21,092,213 in favor of Centauro.  (CTEL 56.1 St. ¶ 12; docket entry no. 234, Pacheco Decl. Ex. 31 (the "Note") at 1.)  The Note states that it was issued "for value received" and that:

> [T]he obligations of [CTFG and CTEL (collectively, the "Makers")] under this
> [Note] . . . arise from and are in consideration of certain Deal Capital provided by

---

[2]  Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no nonconclusory contrary factual proffer.  Citations to the parties' respective Local Civil Rule 56.1 Statements ("Pl. 56.1 St." or "Elemento 56.1 St." or "CTEL 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

[Centauro] to CTFG from time to time on or prior to December 31, 2014 in connection with transactions contemplated by that certain Joint Venture Agreement, dated as of September 14, 2009, by and between CTFG and [Centauro]. CTFG has advised Centauro that such Deal Capital has been lost and not returned to [Centauro], and this Note evidences the commercial agreement reached between Makers and [Centauro] with respect to the repayment by Makers of such Deal Capital to [Centauro].

(Note at 1.)

Under the Promissory Note, CTFG and CTEL were required to make monthly payments to Centauro until April 30, 2017, when the "full unpaid amount of principal hereof plus all accrued but unpaid interest on th[e] Note shall be due and payable." (Note §§ 1(a), 1(b).) Upon payment of "all amounts due under th[e] Note in full," Centauro agreed, "all disputes, claims, damages or actions that [Centauro] may have or could have asserted against CTFG as a result of or with respect to the failure of CTFG to return such Deal Capital will be fully and completed settled and discharged," and Centauro "shall be deemed to have released CTFG from any further claims, liability, damages or actions as a result of such Deal Capital." (Note at 1.)

In addition to CTFG and CTEL's payment obligations under the Note, section 2(c) of the Promissory Note provides:

During the term of this Note, the Makers covenant that all revenues generated from the operations of (i) any Maker, (ii) any entity majority-owned or otherwise controlled by any Maker or (iii) any other entity under common control with any Maker shall in each case be distributed to the Makers subject to (1) payments of all expenses incurred by such entity in connection with the generation of such operating revenue, (2) contractual distributions or payments to bona fide third party partners of any of the Makers or such other entities, (3) restrictions on such distributions or payments under applicable laws, or (4) restrictions under applicable contractual arrangements with bona fide third party partners of any of the Makers or such other entities with respect to the timing of such distributions or payments.

(Note § 2(c).)

Section 15 of the Promissory Note provides that all disputes arising under the Note are governed by New York law and are subject to resolution in New York courts.  (Note § 15.)  CTEL does not dispute that it has failed to fully satisfy the Note and that no payments have been made to date on the Note.  (CTEL 56.1 St. ¶ 13; Pl. 56.1 St. ¶ 45.)

On October 6, 2015, CT Energia Ltd. ("CTEL Malta"), was established under the laws of Malta as a wholly owned subsidiary of non-Defendant CT Energia Holding, Ltd. ("CT Energia Holding").  (Elemento 56.1 St. ¶ 22.)  Bazzoni and an individual named Richard Rothenberg were CTEL Malta's sole directors at its inception.  (Elemento 56.1 St. ¶ 23.)  Bazzoni was CT Energia Holding's sole shareholder and director when CT Energia Holding was organized in August 2014.  (Elemento 56.1 St. ¶ 24.)  In or about October 2015, 582 of CT Energia Holding's 1,165 shares were transferred from Bazzoni to an individual named Francisco D'Agostino.  (Elemento 56.1 St. ¶ 25; docket entry no. 243, Pl. Resp. to Elemento 56.1 St. ¶ 25; docket entry no. 228, Sullivan Decl. Ex. T.)

On January 5, 2016, Bazzoni delivered a notice of share transfer in Malta, stating that all shares of CTEL Malta were transferred to non-Defendant CT Energia Oil and Gas Ltd. ("CTOG"), a Maltese corporation formed on December 3, 2015.  (Pl. 56.1 St. ¶¶ 52, 54.)  Bazzoni was CTOG's sole shareholder and director when it was first formed, however, D'Agostino became an equal shareholder and a director sometime in or after February 2016.[3] (Elemento 56.1 St. ¶ 30.)  On or about July 25, 2016, CTEL Malta and CTOG's corporate names

---

[3] The parties' submissions do not indicate the date on which the transfer occurred.  The cited "notice of transfer or transmission of shares" states that the "transfer of shares has been registered with the company on the 4th February, 2016."  The notice is dated February 18, 2016, was marked received by the registry of companies on March 16, 2016, and is also stamped with the date March 23, 2016.  (See Sullivan Decl. Ex. N.)

were changed to Elemento Ltd. and Elemento Oil & Gas Ltd. ("EOG"), respectively. (Elemento 56.1 St. ¶ 71.) On or about August 18, 2016, Elemento and EOG filed notifications with the Maltese registrar of companies stating that Bazzoni and D'Agostino had resigned from their positions as directors of both companies, and that Rothenberg and an individual named Carlos Galindez had been appointed in their stead. (Elemento 56.1 St. ¶ 72; Sullivan Decl. Exs. P, W.) On February 7, 2017, CISA Holdings Limited, a company affiliated with investor Ricardo Cisneros, executed an agreement purchasing Elemento from EOG. (Elemento 56.1 St. ¶¶ 81, 82.)

In connection with the instant motion practice, the parties have proffered voluminous documentary evidence from which the Court has distilled a number of disputed factual issues material to Centauro's claims for alter ego liability, breach of section 2(c) of the Promissory Note, and fraudulent inducement. The parties principally dispute the following four factual questions: (1) the extent to which CTEL Malta's, and subsequently Elemento's, operations represent a continuation of CTEL's business, (2) the extent to which Elemento was an entity "under common control" with CTEL, (3) whether Elemento earned any revenues that it was required to remit to CTEL pursuant to section 2(c) of the Note, and (4) whether Centauro's reliance on certain alleged misrepresentations made by CTEL prior to executing the Note regarding its current and future business opportunities was reasonable.

Centauro argues that Elemento is a "carbon copy" of CTEL, with identical oil trading operations, including shared executive leadership, employees, email and physical addresses, computer records, files, corporate branding, logos, bank accounts, and business models, and that revenue-generating opportunities arising from CTEL's licenses and relationships with various state owned and other oil companies were diverted to Elemento to

ensure that those revenues would be unavailable to satisfy CTEL's obligations under the Note. (Docket entry no. 258, Centauro MSJ at 10-24.)  Despite transfers in Elemento's ownership and changes to its corporate name, Centauro asserts that, in practice, Bazzoni controlled Elemento's operations at all relevant times, even after he resigned as its director.  (Id. at 23.)

Citing a 2016 financial statement and the deposition testimony of Ricardo Cisneros' son, Eduardo Cisneros, Centauro also submits that Elemento generated revenues of 3,468,675 euros in 2016 and "between $10 million and $50 million" in 2017, which it was required to remit to CTEL pursuant to section 2(c) of the Promissory Note.  (Id. at 9.)  Citing email correspondence between Centauro, CTEL, and other third parties regarding, among other things, CTEL's business transactions, CTEL's financial statements, and CTFG's prior debts, Centauro argues that it conducted the appropriate due diligence prior to executing the Note, but was unable to discover that CTEL's statements about its current and future business opportunities were false.  (Docket entry no. 260, Pl. Opp. to CTEL MSJ at 18-19.)

The Moving Defendants vigorously dispute these factual assertions and Centauro's characterization of the cited evidence, arguing that many of Centauro's exhibits do not support the propositions for which they are cited and often either relate to CTFG or do not distinguish between CTEL and CTFG.  Among other things, the Moving Defendants contend that Bazzoni is CTEL and Elemento's only shared employee, that CTEL did not maintain an office or have an email address separate from CTFG's, that the bank account identified by Centauro belongs to CTEL Malta, not CTEL, that CTEL's logo was widely used by other "CT" entities, including CTFG, and that Elemento's trading activities did not overlap with those of CTEL because CTEL was "just a name" created for marketing purposes and never engaged in

any oil trading had any other business to transfer to Elemento.  (See docket entry no. 256, Elemento Opp. to Centauro MSJ at 11-19.)

Elemento argues that it was itself a "non operating shell" company until February 2016, when it received the first installment of a $30,000,000 loan from Cedaridge Investments S.A. ("Cedaridge"), a company beneficially owned by Ricardo Cisneros.  (Docket entry no. 231, Elemento MSJ at 5-6, 21-22.)  Elemento asserts that it was formed in October 2015 after discussions in September 2015 among Bazzoni, Rothenberg, D'Agostino, and Eduardo Cisneros regarding a new oil trading venture.  (Id. at 4.)  Pursuant to a series of agreements executed in December 2015 between Cedaridge, CTOG, Bazzoni, and D'Agostino, Elemento contends, it was prohibited from making any distributions unless it first repaid Cedaridge's loan.  (Id. at 6.)  In addition, Elemento argues that, under the agreements, Cedaridge became a fifty percent owner of CTOG, obtained the right to demand repayment of its loan within 90 days, and obtained the right to approve Elemento's activities by appointing members to CTOG's board of directors.  (Id. at 5-6.)  Although "[f]ormal recognition of Cedaridge's shareholding interest was delayed because of certain local (Malta) administrative processes," Elemento argues that, in practice, "[t]he Cisneros team [that controlled Cedaridge] regularly exercised ongoing control over transactional activity" at Elemento and "no deal proceeded without [Eduardo Cisneros'] approval."  (Id. at 7, 9.)

Citing the deposition testimony of Eduardo Cisneros, Elemento argues that it has earned "little or no trading profit, off of scant net revenues" since it was formed.  (Elemento Opp. to Centauro MSJ at 25.)  Relying primarily on emails from Bazzoni and the deposition testimony of Centauro's Chief Executive Officer, Yvonne Morabito, the Moving Defendants argue that Centauro was "on actual written notice that CTFG and CTEL were not representing

that they had the funds or resources to payoff [sic] the Promissory Note," and that Centauro

executed the Note without performing any meaningful due diligence. (Docket entry no. 220,

CTEL MSJ at 16-20.)


Procedural History

Centauro commenced the instant action on November 17, 2015, against CTEL,

CTFG, Bazzoni, CT Energia Holding, CT Energy Holding SRL, and CTVEN Investments SRL.

Those defendants who were not signatories to the Promissory Note (the "the Non-Signatory

Defendants"), and who therefore had not consented to personal jurisdiction pursuant to section

15 of the Note, moved to dismiss the Complaint arguing, among other things, that the Court

lacked personal jurisdiction over the Non-Signatory Defendants. (Docket entry nos. 58, 91.)

Centauro argued that the Non-Signatory Defendants were subject to personal jurisdiction as alter

egos of CTEL and CTFG and proffered no other bases for personal jurisdiction in response to the

Non-Signatory Defendants' motions to dismiss.

On September 30, 2016, this Court granted in part and denied in part the Non-

Signatory Defendants motions to dismiss, holding that, among other things, the Complaint failed

to establish that the Court had personal jurisdiction over the Non-Signatory Defendants. (Docket

entry no. 107, the "September Opinion.") Specifically, the Court determined that, because

Centauro "must demonstrate that the Non-Signatory Defendants are alter egos of [CTEL and

CTFG] in order to establish personal jurisdiction over the Non-Signatory Defendants, the law of

the BVI governs the assessment of Plaintiff's alter ego theory." (Id. at 6-7.) The Court

concluded, on the basis of the parties' arguments concerning CTFG and CTEL, that "the

substantive law governing alter ego liability in the BVI is English law," and found that Centauro

had failed to allege facts sufficient to demonstrate a basis for the exercise of personal jurisdiction over the Non-Signatory Defendants under English law.  (Id. at 8-10.)

On August 28, 2017, the Court granted in part and denied in part Centauro's motion for leave to file its proposed Amended Complaint asserting claims against Bazzoni and Elemento as alter egos of CTEL.  (Docket entry no. 126, the "August Opinion.")  In their opposition to Centauro's motion for leave to amend its Complaint, Bazzoni and CTEL argued that Centauro had failed to allege sufficient facts to support its alter ego theory under either BVI law, where CTEL is incorporated, or the laws of Malta, where Elemento is incorporated. Centauro argued that the Court had already determined in the September Opinion that BVI, or English, law applied to its veil piercing claim, and that the Amended Complaint alleged plausibly a claim for alter ego liability under English law.  Centauro did not assert that it sought to pierce Elemento's corporate veil under Maltese law.  The August Opinion concluded that Centauro had adequately made a prima facie showing that, under English law, the corporate form of CTEL could be disregarded to reach CTEL Malta and Bazzoni individually based upon allegations that "Bazzoni caused [CTEL] to create [CTEL Malta] following the commencement of this litigation, and then shifted [CTEL]'s personnel, operations, and revenue streams to the new Maltese entity, allegedly as a means to avoid [CTEL]'s liability to Centauro in this action."  (Id. at 7.)

Centauro filed its Amended Complaint on September 8, 2017.  (Docket entry no. 129, the "AC.")  The Amended Complaint asserts three causes of action against CTFG, CTEL, Elemento, and Bazzoni.  Centauro's First and Second Causes of Action allege that CTFG and CTEL breached their obligations under the Note by failing to make the required payments and by failing to remit, pursuant to section 2(c) of the Note, revenue from entities that are "majority-owned or otherwise controlled" by CTFG and CTEL, including Elemento.  (AC ¶¶ 50-62.)

Centauro's Third Cause of Action alleges that it was induced by CTEL to execute the Note after CTEL made certain false representations about its revenue and investments. (AC ¶¶ 63-72.) Centauro alleges that Elemento and Bazzoni are liable as CTEL's alter egos. (AC ¶¶ 43-49.)

On July 20, 2018, the Court denied Elemento's motion to dismiss the Amended Complaint for lack of personal jurisdiction and for failure to state a claim for alter ego liability, finding that Centauro's allegations, which were materially unchanged from the proposed Amended Complaint filed in connection with Centauro's motion for leave to amend, were sufficient to "make a prima facie showing that Elemento is the alter ego of CTEL and its sole owner Bazzoni." (Docket entry no. 208, the "July Opinion" at 4.) In connection with this motion practice, Elemento renewed CTEL and Bazzoni's argument that the law of Malta governed Centauro's veil piercing claim with respect to Elemento. In response, Centauro once again asserted that the law of CTEL's place of incorporation, or BVI law, governed Centauro's veil piercing claim. Centauro once again rejected the notion that Maltese law governed its alter ego claim.

Thus, unlike CTEL, over which this Court has jurisdiction pursuant to the forum selection provision of section 15 of the Promissory Note, Elemento and Bazzoni have not been shown to be subject to personal jurisdiction in this Court except by reason of their alleged status as CTEL's alter egos under BVI law. The viability of Centauro's substantive claims with respect to those Defendants similarly hinges upon Centauro's theory that CTEL's corporate veil may be pierced to hold Elemento and Bazzoni liable for CTEL's alleged breach of the Note. While the Court has previously determined that Centauro's veil piercing claim against each of those Defendants was viable under BVI law, the Court now concludes, for the reasons explained below, that its prior determinations in this regard were erroneous.

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is to be granted in favor of a moving party where that party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011). In evaluating a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Alter Ego Liability

In its prior decisions in this case, the Court concluded that the law of the British Virgin Islands, where CTEL is incorporated, governs the assessment of Centauro's alter ego theory. (See September Opinion at 6-7; August Opinion at 6-7; July Opinion at 3-4.) Because the substantive law governing alter ego liability in the BVI is English law, the Court has looked to the requirements for veil piercing under English law when evaluating Centauro's alter ego liability claims against Bazzoni and Elemento. (September Opinion at 8-9; August Opinion at 6-7; July Opinion at 3-4.) As explained in further detail below, the more extensive briefing of English law that has been proffered in connection with this motion practice has led the Court to conclude that, under English law, a plaintiff seeking to pierce the corporate veil must prove that the defendant misused a corporate façade, and that the misuse occurred after the defendant's own liability arose. In re Tyson, 433 B.R. 68, 87-88 (S.D.N.Y. 2010). Thus, "[a] plaintiff's ability to

recover from the defendant on a veil-piercing theory turns on whether the defendant had already incurred some liability to the plaintiff at the time he interposed the corporate structure." Id. at 88. In addition, there is a preference under English law for fraud claims directly against individual defendants. Id. at 89. Here, Bazzoni, whom Centauro seeks to hold liable as CTEL's controlling alter ego, had no personal liability for the obligation CTEL has contracted to pay. Furthermore, it is now clear that the assets allegedly transferred and directed to Elemento are protected, if at all, from the reach of CTEL's creditors by Maltese law rather than BVI or English law. The Court accordingly departs from the conclusions regarding alter ego liability that were previously established as law of the case.

The Moving Defendants argue that Centauro's alter ego liability claims must be dismissed because Centauro cannot, as a matter of law, satisfy the English standard for veil piercing. Citing the U.K. Supreme Court's decisions in VTB Capital plc. v. Nutritek International Corp., [2013] UKSC 5 (Feb. 6, 2013) and Prest v. Petrodel Resources Ltd., [2013] UKSC 34 (June 12, 2013), Elemento argues that, under English law, "it is the corporate veil of the 'interposed' [company] that is at risk for piercing, not the originally burdened party." Thus, Elemento contends, even if CTEL, through Bazzoni, had "interposed" the corporate structure of Elemento to evade CTEL's alleged liability under the Note, English law requires that Elemento's corporate form—and not CTEL's—be disregarded to hold it liable for CTEL's breach of contract. Thus, Elemento asserts, "the status of [CTEL's] corporate veil is irrelevant" to the question of whether Elemento can be held liable for CTEL's alleged breach of contract and fraudulent misrepresentations. Moreover, because Centauro has never sought to pierce Elemento's corporate veil under Maltese law, Elemento submits that Centauro cannot sustain a claim for alter ego liability on the theory it has pursued throughout this action.

For his part, Bazzoni argues that CTEL's corporate veil cannot be pierced to hold him individually liable unless he misused CTEL's corporate form to avoid a liability independent of CTEL's that he had personally incurred.  Because there is no allegation that Bazzoni signed the Note in his personal capacity, Bazzoni submits that CTEL's corporate form cannot be disregarded under English law to hold him, as CTEL's sole shareholder, liable for CTEL's breach of contract.  In addition, Bazzoni argues that Centauro's veil piercing claims against him must be dismissed because English law prefers that fraud claims be asserted directly against the individual shareholder.

The Court has reviewed the authorities cited by the Moving Defendants, including the U.K. Supreme Court's decisions in <u>VTB Capital</u> and <u>Prest</u>, and agrees with the Moving Defendants that Centauro's claims for alter ego liability cannot be sustained under English law insofar as Centauro seeks to pierce CTEL's corporate veil to hold Bazzoni and Elemento liable for CTEL's alleged evasion of its obligations under the Note.  With respect to Elemento, English law does not support the proposition that CTEL's veil can be pierced to hold liable a third-party entity for CTEL's alleged evasion of its own contractual obligations.  <u>See</u> <u>Tyson</u>, 433 B.R. at 93 (rejecting veil piercing claim where corporate entity was misused by third party individual who was a "friend and business acquaintance" of the individual that controlled the entity).  As the U.K. Supreme Court noted in <u>Prest</u>, the limited principle of veil piercing applies "when a person is under an existing legal obligation or liability or subject to an existing legal restriction which he deliberately evades or whose enforcement he deliberately frustrates by interposing a company under his control.  The court may then pierce the corporate veil for the purpose, and only for the purpose, of depriving the company or its controller of the advantage that they would otherwise have obtained by the company's separate legal personality."  <u>Prest</u>, [2013] UKSC 34 [¶ 35].  In

other words, English law contemplates that when the person with the existing legal obligation (here, CTEL) misuses a corporate entity with a separate legal personality (here, Elemento) to frustrate the enforcement of the person's legal obligation, courts will disregard the separate legal personality of the controlled company to hold the controlled company liable for the controller's existing obligation. Thus if, as Centauro alleges here, CTEL's operations were transferred to Elemento for the purpose of rendering CTEL judgment proof, it is Elemento's corporate structure which has allegedly been "devised as a mere façade concealing true facts," and therefore Elemento's veil which must be pierced. Tyson, 433 B.R. at 81. Elemento is an entity organized under Maltese law. It is thus to Maltese law, rather than English law, that the Court must turn to determine whether Elemento's veil can be pierced to satisfy CTEL's liability. See Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993) (holding that, under New York choice of law rules, the law of the state of incorporation of the entity whose veil is sought to be pierced governs whether protection can be stripped away). Centauro has not sought to demonstrate that Elemento's veil can be pierced under the laws of Malta in these proceedings. Thus, Centauro's claim for alter ego liability as to Elemento, as currently formulated, must be dismissed.

With respect to piercing CTEL's veil to reach Bazzoni in light of his alleged misuse of CTEL to protect its assets by transferring them to Elemento, Tyson, Prest, and other decisions from this district persuade this Court that the necessary predicate question is whether Bazzoni, as CTEL's sole owner and director, had any existing legal obligation whose enforcement he deliberately frustrated by allegedly transferring CTEL's operations to Elemento. See, e.g., In re Optimal U.S. Litig., 2011 WL 4908745, at *7 (S.D.N.Y. Oct. 14, 2011) ("[T]o pierce the corporate veil a defendant must have already incurred a liability and then set up a

fraudulent shell entity to avoid that liability.").  As the <u>Tyson</u> court observed, "[t]he common theme running through all the cases in which the [British] court has been willing to pierce the veil is that the company was being used by its controller in an attempt to immunize himself from liability for some wrongdoing which existed entirely <u>dehors</u> [<u>i.</u>e., outside or irrespective of] the company.  It is therefore necessary to identify the relevant wrongdoing . . . before proceeding to demonstrate the wrongful misuse or involvement of the corporate structure."  <u>Id.</u> at 88 (quoting <u>Ben Hashem v. Ali Shayif</u>, [2008] EWHC 2380 (Sept. 22, 2008)).  Here, Centauro does not allege that Bazzoni misused CTEL's corporate form to evade his own liability, but rather maintains that Bazzoni transferred CTEL's operations to avoid <u>CTEL's</u> obligations under the Note.  To hold Bazzoni personally liable for CTEL's breach of contract under those circumstances would, as the court noted in <u>VTB Capital</u>, be "an illegitimate extension of the circumstances in which the veil can be pierced" under U.K. law because it "would lead to the person controlling the company being held liable as if he had been a co-contracting party . . . even though neither [the person controlling the company] nor any of the contracting parties . . . intended [the person controlling the company] to be a party."  [2013] UKSC 5 [¶ 132].  Accordingly, Centauro cannot pierce CTEL's BVI corporate veil to hold Bazzoni personally liable for CTEL's breach of the Promissory Note.

While this result may seem harsh, English law recognizes that "no one need trust a limited liability company unless he so please, and that before he does so he can ascertain, if he so please, what is the capital of the company and how it is held."  <u>Tyson</u>, 433 B.R. at 90 (quoting <u>Salomon v. A. Salomon & Co., Ltd.</u>, [1897] A.C. 22 (H.L.) 46); <u>see also id.</u> ("[I]t has long been recognised that the <u>Salomon</u> principle can cause hardship, although those dealing with one-man companies may, and commonly do, seek to protect themselves by requiring a personal

guarantee") (quoting <u>Yukong Line Ltd. of Korea v. Rendsburg Invs. Corp. of Liberia (The Rialto)</u>, [1998] 1 W.L.R. 294 (Q.B.D.) 305).  To the extent that Bazzoni, as the controlling shareholder of CTEL, made misrepresentations to Centauro about CTEL to induce Centauro to enter into the Note, English law prefers that Centauro proceed directly against Bazzoni through a claim for negligent or fraudulent misrepresentation.  See <u>VTB Capital</u>, [2013] UKSC 5 [¶139] ("[W]here B and C are the contracting parties and A is not, there is simply no justification for holding A responsible for B's contractual liabilities to C simply because A controls B and has made misrepresentations about B to induce C to enter into the contract.  This could not be said to result in unfairness to C: the law provides redress for C against A, in the form of a cause of action in negligent or fraudulent misrepresentation.").

Centauro does not meaningfully respond to the Moving Defendants' veil piercing arguments under English law and, unsurprisingly in light of the rulings from which this Court now deviates, argues principally that the Court's prior decisions foreclose the Moving Defendant's arguments and are now law of the case.  Specifically, Centauro contends that the Court has already determined that "it is CTEL's British Virgin Islands veil that should be pierced, not [Elemento's] Maltese veil" and that the Court has "identified allegations that, if proven, would suffice to demonstrate misuse of the corporate form" with respect to both Elemento and Bazzoni.  (Docket entry no. 261, Pl. Opp. to Elemento MSJ at 6, 22.)  Centauro claims that it would be unduly prejudiced if the Court deviated from the existing alter ego standard at this stage because Centauro was "previously denied the opportunity to obtain discovery that likely would have been relevant" to Elemento's alter ego liability arguments, including an opportunity to pursue documents from Elemento through 2017.  (Pl. Opp. to Elemento MSJ at 10-11.)

The law of the case doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Ali v. Mukasey, 529 F.3d 478, 490 (2d Cir. 2008) (quoting United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000)). Although Prest, VTB Capital, and the other authorities cited by the Moving Defendants do not mark a recent change in controlling law, the Moving Defendants' arguments regarding those cases, and the principles of English law discussed in their briefing on the current motion practice, represent the most thorough information proffered by the parties to date on the requirements for veil piercing under English law. Having reviewed these expanded legal arguments in the context of a fully developed record, the Court recognizes that its application of English law in the September, July, and August Opinions was erroneous insofar as those decisions concluded that Centauro had pled facts sufficient to demonstrate the misuse of CTEL's corporate form under English law and that CTEL's corporate veil could be pierced on the theory advanced by Centauro to reach Bazzoni in his individual capacity and the assets of Elemento.

While the Court is mindful of the "concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit" of the law of the case doctrine, including the "lack of sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling," United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991) (internal quotation marks omitted), the Court finds that Centauro has not demonstrated that it would be prejudiced by the correct application of English law in this case. Centauro never advanced any legal argument that Elemento's corporate veil should be pierced under Maltese law despite multiple opportunities to do so in response to Defendants' arguments that BVI law neither

applied nor authorized veil piercing under the circumstances of this case. Nor, although it asserts that it would suffer prejudice because it was denied certain discovery, has Centauro demonstrated how documents regarding Elemento's activities in 2017 are relevant to the question of whether Bazzoni personally incurred a liability to Centauro which he sought to evade through the alleged transfer of CTEL's operations to Elemento. Under these circumstances, it would be unjust to the Moving Defendants not to depart from the Court's prior rulings to correct an error of law.

Accordingly, the Court exercises its discretion not to apply the law of the case doctrine here and denies, for the reasons stated above, Centauro's motion for summary judgment on its claim for alter ego liability. Because Centauro's claim for alter ego liability is the sole basis for the Court's exercise of personal jurisdiction over Elemento and Bazzoni, the Court dismisses Centauro's claims against those Defendants for lack of personal jurisdiction. See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 142-43 (2d Cir. 1991) ("[A]lter egos are treated as one entity" for jurisdictional purposes.). The Court grants Centauro an opportunity to make a proffer, consistent with the Federal Rule of Civil Procedure 12(b)(2) standard, demonstrating a basis for the exercise of personal jurisdiction over either Bazzoni or Elemento on a veil piercing theory under Maltese law upon the current record, or any other facts which may be alleged by affidavit, no later than October 2, 2019. In light of the dismissal of Centauro's claims against Elemento and Bazzoni for lack of personal jurisdiction, the Court does not address the merits of those claims and accordingly denies without prejudice Moving Defendants' motions for summary judgment to the extent that they seek dismissal of Centauro's alter ego claim, and its claims against Bazzoni and Elemento, on the merits.

The Court now turns to the parties' arguments concerning Centauro's claims against CTEL.

Underline **First Cause of Action: Breach of Contract for Default on Note**

Centauro seeks summary judgment on its First Cause of Action for breach of contract arising from CTEL's failure to make payments on the Note. "Summary judgment is appropriate in an action on a promissory note upon a showing of no material question concerning execution and default." AAI Recoveries, Inc. v. Pijuan, 13 F. Supp. 2d 448, 450 (S.D.N.Y. 1998). Here, it is undisputed that CTEL executed a Promissory Note in the amount of $21,092,213 in favor of Centauro, and that CTEL failed to make any payments on the Note. (CTEL 56.1 St. ¶¶ 12, 13; Pl. 56.1 St. ¶ 45.) CTEL argues, however, that the Note is unenforceable as to CTEL for lack of consideration. Specifically, CTEL contends that it received nothing of value in exchange for its payments under the Note because CTEL, unlike CTFG, was not a party to the JVA, received no Deal Capital under the JVA, and incurred no liability to Centauro prior to executing the Note. CTEL also argues that Centauro suffered no detriment under the Note because it was free to pursue its claims against CTFG under the JVA until the Note had been fully paid.

CTEL's arguments are without merit. Under New York law, sufficient consideration exists as long as there is "either a benefit to the promisor or a detriment to the promisee." Weiner v. McGraw-Hill, Inc., 443 N.E.2d 441, 444 (N.Y. 1982). Absent fraud or unconscionability, courts do not scrutinize the adequacy of consideration. Apfel v. Prudential-Bache Securities Inc., 616 N.E.2d 1095, 1097 (N.Y. 1993). It is also well established that "[i]t matters not from whom the consideration moves or to whom it goes." Restatement (Second) of

Contracts § 71(4) & cmt. e (1981).  Under the Promissory Note, CTFG and CTEL were required to make monthly payments to Centauro until April 30, 2017, when the "full unpaid amount of principal hereof plus all accrued but unpaid interest on th[e] Note [would] be due and payable." (Note §§ 1(a), 1(b).)  Upon payment of "all amounts due under th[e] Note in full," Centauro agreed, "all disputes, claims, damages or actions that [Centauro] may have or could have asserted against CTFG as a result of or with respect to the failure of CTFG to return such Deal Capital will be fully and completed settled and discharged," and Centauro "shall be deemed to have released CTFG from any further claims, liability, damages or actions as a result of such Deal Capital."  (Note at 1.)

Centauro's agreement to release its claims against CTFG under the JVA is sufficient consideration for CTEL's promise to pay Centauro the sum owed under the Note.  That the benefit of the release does not flow directly to CTEL, or that the release is conditioned upon payment of the full amount due under the Note does not render the consideration inadequate.  To the contrary, "the benefit need not move to the promisor, and the discharge of one person from liability under a debt is a sufficient consideration for the promise of another to pay."  County Trust Co. of N.Y. v. Mara, 242 A.D. 206, 211 (N.Y. App. Div. 1934).  Because there is no material factual question concerning CTEL's execution of, or subsequent default on, the Note, Centauro's motion for summary judgment on its First Cause of Action is granted as against CTEL.  Correspondingly, CTEL's motion for summary judgment is denied to the extent that it seeks dismissal of Centauro's breach of contract claims against CTEL for lack of consideration.

<u>Second Cause of Action: Breach of Contract for Failure to Distribute Revenue</u>

Centauro also seeks summary judgment with respect to its Second Cause of Action, for breach of section 2(c) of the Note. Section 2(c) provides that "all revenues generated from the operations of" entities "majority-owned or otherwise controlled by" any Maker of the Note or "under common control" with any Maker of the Note "shall . . . be distributed to the Makers subject to . . . (2) contractual distributions or payments to bona fide third party partners of any of the Makers or such other entities . . . or (4) restrictions under applicable contractual arrangements with bona fide third party partners of any of the Makers or such other entities with respect to the timing of such distributions or payments." (Note § 2(c).) The parties do not dispute that Bazzoni is the sole owner, director, and officer of CTEL. (Pl. 56.1 St. ¶ 5, 6, 22.) They do, however, dispute the extent to which Elemento was an entity "under common control" with CTEL and whether Elemento earned any revenue that was required to be remitted under section 2(c).

Centauro argues that, despite changes to Elemento's ownership structure and corporate name in 2015 and 2016, both CTEL and Elemento were controlled at all relevant times by Bazzoni, and that Elemento generated revenues of 3,468,675 euros in 2016 and "between $10 million and $50 million" in 2017, which were required to be remitted to CTEL pursuant to section 2(c) of the Promissory Note. (Centauro MSJ at 9, 23.) For its part, CTEL adopts Elemento's argument and contends that ownership and control of Elemento had been transferred to Cedaridge pursuant to a series of agreements executed in December 2015 between Cedaridge, CTOG, Bazzoni, and D'Agostino. (Elemento MSJ at 6.) Under the agreements, Cedaridge became a fifty percent owner of CTOG, Elemento's sole shareholder, and obtained the right to approve Elemento's activities by appointing members to CTOG's board of directors. (<u>Id.</u> at 5-6.)

Despite a delay in the "formal recognition of Cedaridge's shareholding interest," CTEL argues, the Cisneros team, including Eduardo Cisneros, "regularly exercised ongoing control" over Elemento's transactional activities.  (Id. at 7, 9.)  CTEL contends that Elemento was prohibited under the December 2015 agreements from making any distributions unless it first repaid Cedaridge's loan, and thus any revenues generated by Elemento in 2016 and 2017 were "subject to . . . contractual distributions" and "restrictions under applicable contractual arrangements," rendering section 2(c) inapplicable.  (Elemento Opp. to Centauro MSJ at 24-25.)

The Court has reviewed the underlying evidence cited by Centauro and CTEL in support of these arguments, and finds that a reasonable juror could conclude on the basis of this record that Elemento was not an entity "under common control" with CTEL, or that Elemento's 2016 revenues were "subject to . . . contractual distributions" and "restrictions under applicable contractual arrangements."  Accordingly, Centauro's motion for summary judgment against CTEL on its Second Cause of Action is denied.

Third Cause of Action: Fraudulent Inducement

CTEL argues that Centauro's Third Cause of Action, for fraudulent inducement, must be dismissed because it is duplicative of Centauro's claims for breach of contract, and because Centauro cannot establish that its reliance on certain misrepresentations regarding CTEL's current and future business opportunities that allegedly were made by CTEL prior to Centauro's execution of the Note was reasonable.  To succeed on a claim for fraudulent inducement under New York law, a plaintiff must prove: "(1) a material misrepresentation or omission that induced the party to sign the contract; (2) scienter; (3) reliance; and (4) injury."  Davidowitz v. Patridge, 2010 WL 5186803, at *7 (S.D.N.Y. Dec. 7, 2010).  Reasonable reliance is an "essential element" of a fraud claim.  ACA Galleries, Inc. v. Kinney, 928 F. Supp. 2d 699,

702 (S.D.N.Y. 2013). Reasonable reliance "entails a duty to investigate the legitimacy of an investment opportunity where [a] plaintiff was placed on guard or practically faced with the facts." <u>Crigger v. Fahnestock and Co., Inc.</u>, 443 F.3d 230, 234 (2d Cir. 2006) (internal quotation marks omitted). However, "[w]hen matters are held to be peculiarly within defendant's knowledge[] [it is] said that plaintiff may rely without prosecuting an investigation, as he ha[d] no independent means of ascertaining the truth." <u>Id.</u> Thus, a "plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth about an investment." <u>Id.</u> "[E]valuation of the reasonable-reliance element has involved many factors to consider and balance, no single one of which is dispositive." <u>STMicroelectronics, N.V. v. Credit Suisse Secs. (USA) LLC</u>, 648 F.3d 68, 81 (2d Cir. 2011). Because of this, "reasonable reliance is often a question of fact for the jury rather than a question of law for the court." <u>Id.</u>

As an initial matter, Centauro's fraudulent inducement claim is not duplicative of its claims for breach of contract. As the Court explained in the August Opinion, Centauro's fraudulent inducement claim is premised upon certain allegedly false or misleading statements made by CTEL regarding its current and future business activities which relate to CTEL's capacity to perform under the Note and are thus sufficiently collateral to the contract to sustain a separate claim for fraudulent inducement under New York law. <u>See</u> <u>Wild Bunch, SA v. Vendian Entm't, LLC</u>, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017) ("[A]t a minimum, false statements about a party's present financial condition or current ability to perform, made in order to induce a party to enter into a contract, will support a claim of fraudulent inducement.").

The Court is also unpersuaded that summary judgment dismissing Centauro's fraudulent misrepresentation claim for failure to demonstrate reasonable reliance is warranted on the basis of the current record. Relying primarily on emails from Bazzoni and the deposition testimony of Centauro's Chief Executive Officer, Yvonne Morabito, CTEL argues that Centauro was "on actual written notice that CTFG and CTEL were not representing that they had the funds or resources to payoff [sic] the Promissory Note," and that Centauro "ha[d] access to information that would have brought the alleged fraud to light but failed to invoke those resources." (CTEL MSJ at 14, 16.) In response, Centauro cites email correspondence among Centauro, CTEL, and other third parties, regarding, among other things, CTEL's business transactions, CTEL's financial statements, and CTFG's prior debts, and argues that it conducted the appropriate due diligence prior to executing the Note but was unable to discover that CTEL's statements about its current and future business opportunities were false. (Pl. Opp. to CTEL MSJ at 18-19.) The parties' competing factual proffers make plain that there are disputed issues of material fact going to the issue of reasonable reliance which are not susceptible to resolution on summary judgment. Accordingly, CTEL's motion for summary judgment is denied to the extent that it seeks dismissal of Centauro's Third Cause of Action for fraudulent inducement.

<u>C</u>ONCLUSION

For the foregoing reasons, Centauro's motion for summary judgment is granted as against CTEL with respect to Centauro's First Cause of Action and denied in all other respects. Centauro's claims against Bazzoni and Elemento are dismissed for lack of personal jurisdiction. Centauro may, by letter and accompanying exhibits, if any, make a written proffer, consistent with the Federal Rule of Civil Procedure 12(b)(2) standard, demonstrating a legal and factual basis for the exercise of personal jurisdiction over Bazzoni and/or Elemento on a veil piercing

theory under Maltese law, no later than **October 2, 2019**.  Any responsive submission must be filed no later than **October 9, 2019.**  In light of the dismissal of Centauro's claims against Elemento and Bazzoni for lack of personal jurisdiction, the Court does not address the merits of those claims and accordingly denies without prejudice Moving Defendants' motions for summary judgment to the extent that they seek dismissal of Centauro's alter ego and other claims against Bazzoni and Elemento on the merits.  CTEL's motion for summary judgment is denied to the extent that it seeks dismissal of Centauro's breach of contract claims against CTEL for lack of consideration, and to the extent that it seeks dismissal of Centauro's Third Cause of Action for fraudulent inducement.  Absent a timely and sufficient proffer demonstrating a basis for the exercise of personal jurisdiction over either Bazzoni or Elemento, this action will proceed solely upon Centauro's Second and Third Causes of Action as against CTEL.  All claims remain stayed as against CTFG.  The final pre-trial conference in this case is adjourned to **February 7, 2020, at 11:30 a.m.**  The parties must confer and make submissions in advance of the final pre-trial conference as provided in the Pre-Trial Scheduling Order (docket entry no. 46), and are also directed to renew in good faith their settlement discussions in advance of the conference.  This Memorandum Opinion and Order resolves docket entry nos. 217, 221, and 226.


   SO ORDERED.

Dated: New York, New York
   September 18, 2019

           /s/ Laura Taylor Swain  
           LAURA TAYLOR SWAIN
           United States Dist rict Judge